UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
|  |  |  |
|---|---|---|
| Lauren Andersen, | ) | Docket no. <u>22-cv-01045</u> |
| Plaintiff, *pro se,* | ) |  |
|  | ) |  |
| -- against -- | ) | **AMENDED COMPLAINT** |
|  | ) |  |
|  | ) |  |
| British Airways ("BA") PLC, | ) | JURY TRIAL |
| Mr. Anthony Battista Esq., Condon & Forsyth LLP, | ) | REQUESTED |
| Three John and Jane Doe BA employees; | ) |  |
|  | ) |  |
| Port Authority of New York & New Jersey; and | ) |  |
| Mr. Huntley Lawrence, Acting COO, | ) |  |
| Ms. Karen T. Connelly, Assistant Director, OIG, | ) |  |
| Lt. Michelle Serrano, CCIU/OIG, | ) |  |
| Sgt. Danielle Liantonio, P.O. Michael Corwin, | ) |  |
| and Lt. Daniel Carbonaro; | ) |  |
|  | ) |  |
| Northwell Health, Northwell Health Laboratories, | ) |  |
| Mr. Michael J. Dowling, CEO, | ) |  |
| Dr. Mark Russ, Dr. John Kane, Dr. Melissa Dudas, | ) |  |
| Ms. Renee Lifshitz, Dr. Mitchell Shuwall, | ) |  |
| Dr. Bruce Levy, Ms. Marybeth McManus, | ) |  |
| John Doe emergency room supervisor, | ) |  |
|  | ) |  |
| UnitedHealthcare Community Plan of New York, | ) |  |
| UnitedHealth Group, Ms. Madeline Harlan, | ) |  |
| One Jane Doe customer service agent, | ) |  |
| and Mr. Matthew P. Mazzola Esq., Robinson & Cole LLP; | ) |  |
|  | ) |  |
| Former US Congressman Peter T. King, Esq., | ) |  |
| Mr. Michael Schillinger, Esq.; | ) |  |
|  | ) |  |
| EMS technician identified only as "Frank 50", | ) |  |
| John Doe supervisor, | ) |  |
| and The City of New York; | ) |  |
|  | ) |  |
| Ms. Judith A. Pascale, Suffolk County Clerk; | ) |  |
|  | ) |  |
| Mr. Jonathan B. Bruno, Esq., and | ) |  |
| Kaufman Borgheest & Ryan LLP; | ) |  |
|  | ) |  |
| Mr. Daniel S. Ratner Esq., Mr. Daniel G. May, Esq., | ) |  |
| Mr. David A. Rosen, Esq., Ms. Rachel Bloom, Esq., | ) |  |
| Mr. Graham T. Musynske Esq., | ) |  |
| and Heidell Pittoni Murphy & Bach LLP; | ) |  |

Mr. Jeffrey Carucci, Director, Division of E-Filing, )
Mr. Justin Barry, Esq. Chief of Administration, )
and Ms. Sherrill Spatz, Esq., Inspector General, )
of the NYS Office of Court Administration; )
 )
Mr. Bret Parker, Executive Director, )
and the NYC Bar Association; )
 )
Ms. Letitia A. James, Esq., )
New York State Attorney General (NYSAG), )
John Doe representative identified only as "Alex" )
of the NYSAG's office, and John Doe supervisor; )
 )
    Defendants. )
----------------------------------------------------------------------x

# TABLE OF CONTENTS

**I. PRELIMINARY STATEMENT**  4

**II. PARTIES**  7

**III. JURISDICTION**  10

**IV. INTRODUCTION TO MY LITIGATION**  10

**V. FACTS AND DISCUSSION**  13

  British Airways  14

  The Port Authority (PANYNJ)  18

  Northwell Health and Northwell Laboratories  22

  Northwell is a repeat privacy offender  32

  UnitedHealthcare Community Plan of NY & UnitedHealth Group  33

  Former Congressman Peter King  37

  The City of New York  38

  Jonathan Bruno, Suffolk County clerk, & doxing on paper docket  40

  Heidell Pittoni Murphy & Bach, and doxing on the electronic docket  45

  The Office of Court Administration (OCA)  48

  Records of access to the civil dockets  55

  My FOIL request to OCA, and the meaning of "incident"  57

  Data ownership  63

  More legislation coming soon, but Shield Act not yet implemented  65

  NYSAG's involvement in these matters  68

  The City Bar Association, and obstruction of legal representation  71

Let's try to be fair, please ........................................................ 73
Conclusion ................................................................................. 74
Further relief requested ............................................................. 75
Leniency requested re deadlines ............................................... 78
HIPAA fines; litigation fees and costs ....................................... 80
**VI.   DISCOVERY REQUESTED** .............................................. 82
Wearers of too many hats .......................................................... 84
My FBI "rap sheet" .................................................................... 90
Other interlopers: the Treasury, Big Pharma, and the British .... 93
50 U.S.C. § 421 - the Intelligence Identities Protection Act ....... 97
No collateral estoppel here ...................................................... 107
"Back doors" ............................................................................ 109
Confidentiality, flexibility, urgency ......................................... 110
**VII.   CAUSES OF ACTION (and more facts)** ....................... 113
First: Constitutional rights violations under §1983 .................. 113
Second: Trafficking Victims Protection Act of 2003 ("TVPA") ... 120
Third: 42 U.S. Code § 1985 - Conspiracy ................................. 123
Fourth: Civil RICO – 18 U.S.C. § 1962(a) - (d) ....................... 124
Fifth: Titles II and III of the ADA (42 U.S.C. § 12101, et seq.) ... 128
Sixth: Section 504 of the Rehabilitation Act of 1973 ............... 132
Seventh: Title II of the Civil Rights Act of 1964, sec. 201-204 ... 134
Eighth: Negligence, under state tort law .................................. 136
Ninth: NYS Human Rights Law (Executive Law §296) ............. 137
Tenth: Negligent hiring, supervision under State tort law ........ 139
Eleventh: Deceptive business practices .................................... 142
Twelfth: NY Judiciary Law §487 .............................................. 144
Thirteenth: Fraud ..................................................................... 145
Fourteenth: Defamation *per se* .............................................. 148
Fifteenth: Abuse of Process ...................................................... 150
Sixteenth: Breach of Fiduciary Duty ........................................ 151
Seventeeth: Unjust enrichment ................................................ 152
Eighteenth: Negligent/Intentional Infliction of Emotional Distress ... 153
**VIII.   PRAYER FOR RELIEF** .................................................. 157
**IX.     DEMAND FOR JURY TRIAL** ........................................ 158

## I.     PRELIMINARY STATEMENT

1.      This is a *pro se* civil rights action about privacy.  The claims arise under the HIPAA Privacy, Security and Breach Notification Rules, 42 U.S.C. §§ 1983 and 1985, the Americans with Disabilities Act (ADA), the Rehabilitation Act, the Trafficking Victims Protection Act of 2003 ("TVPA"), civil RICO (18 U.S.C. § 1962(a) - (d)), the Civil Rights Act of 1964, and the laws of the State of New York.

2.      This case arises from the unlawful collection and wanton public dissemination of confidential medical information pertaining to me, Plaintiff Lauren Andersen, and the failure to disclose privileged records to which I am entitled.  This complaint is unusual due to the long span of time over which the violations have taken place (ten years) and their breadth (encompassing city, county, state, federal, international and private actors).  After being taken from me coercively and under false pretenses pursuant to a false arrest and unlawful detention, my confidential information has been simultaneously disseminated and concealed, without my authorization, by different Defendants – with the goals of harassment and obstruction.  In doing so, they have made utter chaos of an already unbearable situation, while reducing my ability to achieve procedural due process to near zero.  I am both disabled and an unrepresented litigant, which is a double disability, but these Defendants have been harassing me for a decade.  This has adversely affected my health and my standard of living.   I am asking for the privileged information that has been disseminated to be removed from circulation, and the information that has been concealed to be produced.  And I am requesting compensation.

3.      The term "doxing" or "online shaming" refers to publishing private or identifying information on the internet, with malicious intent.  I refer to this type of activity as "docket doxing" when the court dockets are used by predators as the publishing platform.  The "doxers" are Northwell Health, the law firms HPMB and KBR and their attorneys, the Suffolk County Clerk,

and the OCA officials who refused to assist in removing the records from the docket. The "concealers" are BA, the Port Authority, Northwell, UnitedHealthcare, all of the attorneys, NYC and the City Bar Association.

4.      There are several sub-topics as follows, not in order of priority: (a) my right not to be subjected to forced labor, (b) my right not to be obstructed in retaining appropriate legal counsel, (c) the right that I believe I have as a litigant to find out who has accessed my civil case docket, whether or not my action is e-filed, (d) my right to have judges and law clerks who are free of conflicts of interest, (e) my right not to have privileged information pertaining to me subjected to over-classification,  and (f) my right as a *pro se* litigant to have my SOLs and court deadlines adjusted, due to court and law library closures and lack of access to legal counsel.

5.      I have been plaintiff or petitioner in several cases in New York state and federal courts, pursuant to an improper mental health detention that took place in June 2011 under New York Mental Hygiene Law (NYMHL) §9.39 and §9.27.  These cases included *inter alia* an ADA and 42 USC §1983 action in EDNY and the Second Circuit, a subsequent medical malpractice action in NYS Supreme Court, and two Article 78 proceedings.  There are thousands of pages of related pleadings, and hundreds more pages of correspondence with these Defendants, but I have included herewith as exhibits only the most essential documents in the interest of paperwork reduction.

6.      I apologize to the Court for the length of this complaint.  It is long because it is a civil RICO case about a nightmarishly vast criminal enterprise, and cases such as this tend to be complicated.  For a decade, my adversaries have been constantly seeking additional ways to prejudice and harass me, which has repeatedly added to the list of facts, offenders, and causes of action.  My adversaries were like a giant squid that knew it was facing an injured quarry – a *pro se* plaintiff who was suffering from depression and PTSD, was under extreme stress, and had been

obstructed in retaining an attorney – so it chose to bewilder its prey even more by releasing a huge cloud of squid ink… thousands of pages' worth.

7.      Also, the complaint is long because I have been trying to help other victims while litigating for myself, in the spirit of charity.  Members of the public need to know about the Defendants' utter disrespect for confidential health information, because there is a chance that other people may fall victim to it.  **These Defendants collectively capture the private health information of tens of millions of Americans every year.**  Strong federal and state laws exist to protect this type of information, but they are worthless if regulators, police and judges refuse to uphold them, which is what has happened to me for a decade.  This Court needs to be the arbiter because others have spectacularly failed to do their jobs.

8.      I am simultaneously filing a related case against several public sector actors.  It started as a single complaint combined with this one, but I split it into more easily digestible chunks.  It was difficult to divide it because the actions of the various parts of the criminal enterprise are interrelated, but it is roughly split along the lines of Northwell and its conspirators who created the problem in the instant case, and the government officials who concealed and obstructed my complaints about Northwell in a separate case.  If the Court thinks the complaint is still too big, I request that it ask me to split it again rather than dismissing it.

9.      There has been a continuing course of tortious conduct by these Defendants and, therefore, the statutes of limitations do not begin to run until the commission of the last wrongful act.  *Inter alia,* my medical records remain on the Defendants' computer systems and on the Suffolk public docket, they are full of errors and deliberately false statements, and Defendants continue to show indifference.

10.     I ask for the instant proceeding to be assigned to a judge and law clerk who do not have material conflicts of interest with the Defendants or their affiliates, or my competitors in the pharmaceutical industry (such as Lilly, J&J and Pfizer) which openly give emoluments to

Northwell doctors, or the various city, county, state, federal or British government politicians and agencies involved.  Such conflicts of interest on the benches have caused me great difficulties over a decade of litigation, as I will explain.  I was unable to find an unconflicted bench in ten years of trying, in five different courts.  (NB: I am not going so far as to suggest that my judges should not have moderate amounts of pharma or UnitedHealthcare stocks in their portfolios.)

11.    Iqbal-Twombly ("Twiqbal") case law has raised the pleading bar since 2009, requiring that plaintiffs demonstrate that their claims are "plausible", rather than simply describing the case in sufficient detail to put the defendant on notice.  Twiqbal is important in this context because the City and the State routinely deny mental healthcare plaintiffs the investigations to which we are entitled, and refuse to provide basic evidence that we should be permitted to receive under FOIL, thereby using their immunity protection to shirk their responsibility for wrongdoing. It is institutionalized discrimination. SCOTUS said in the Twombly decision, "Determining whether a complaint states a plausible claim for relief will... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense".  In other words, the decisions are totally subjective.  But plausibility in a case such as mine – where the Defendants have been allowed to conceal evidence – could be difficult to prove.  This is why it is essential for the bench assignment in the instant case to be free of conflicts of interest. **A truly impartial judge will have zero tolerance for cover-ups in this case.**

## II.    PARTIES

12.    I, Lauren Andersen, Plaintiff *pro se*, live on Long Island, New York.  My postal address is PO Box 500, Cold Spring Harbor NY 11724.  I prefer to provide my address for personal service separately.  I am a victim of repeated crimes by these Defendants and their organizations, and identity theft by an unknown party, and I am trying to avoid further victimization by protecting

my personal information.  I am also being barricaded by my adversaries from retaining an attorney, who (if I had one) would be able to take steps to protect my privacy.

13.     British Airways PLC ("BA") is the flag carrier airline of the United Kingdom; it is based in Harmondsworth, UK, and its US Counsel is at 2 Park Avenue, Suite 1100, New York, New York 10016.  Anthony Battista Esq. of Condon & Forsyth LLP, 7 Times Square, New York, NY 10036, represented BA in my previous litigation, as a nonparty.  BA, Battista and Condon are Defendants, and its 3-4 customer service staff at JFK are John and Jane Does.

14.     The Office of the Inspector General (OIG) of the Port Authority of New York & New Jersey ("PANYNJ"), is located at 5 Marine View Plaza, Hoboken NJ 07030.  Mr. Huntley Lawrence, Acting Chief Operating Officer & Director of Aviation, and Ms. Karen T. Connelly, Assistant Director, Office of Inspector General, Police Integrity Division (suite 316), are being sued in their individual and official capacities.  Lieutenants Michelle Serrano (a.k.a. Serrano-Adorno, #139) CCIU/OIG, and Daniel Carbonaro, and PAPD officers known as Danielle Liantonio, and Michael Corwin (#2524), being sued in their individual capacities. They and their employer are Defendants, and the PAPD's JFK airport address is 269 S Service Rd, Queens, NY 11430.  PANYNJ's Office of Litigation Counsel, 4 World Trade Center, New York, NY 10007, has represented PANYNJ in my previous litigation.

15.     Northwell Health ("Northwell"), Mr. Michael J. Dowling, and the other Northwell individual Defendants are being served c/o their attorneys HPMB.  Northwell's corporate headquarters are located in Manhasset, Nassau County, New York. According to its IRS form 990, Northwell Health Laboratories is located at 972 Brush Hollow Rd., 5th Floor, Westbury, NY 11590-1740.

16.     UnitedHealthcare Community Plan of New York (UHCPNY) and its attorney Mr. Matthew Mazzola Esq. are being served c/o Mr. Mazzola's employer, law firm, Robinson & Cole LLP, 666 Third Ave., 20th floor, New York NY 10017, which is a Defendant too.  There was also

a Jane Doe telephone customer service representative involved from UHG.  UnitedHealth Group and Ms. Harlan are at headquarters, 9900 Bren Road East, Minnetonka, MN 55343.

17.     Former US Congressman Peter Thomas King, Esq., has or had an office at 1003 Park Boulevard, Massapequa Park, NY 11762-2741, and his home address is reportedly 1442 Roth Rd, Seaford, NY 11783.  His former staffer Michael Schillinger, Esq. is at 142 Freeman Ave, Islip, NY 11751, according to the latter's website.  They are being sued in their individual capacities.

18.     The City of New York ("NYC") is being served at 100 Church St., New York, NY 10007.  It is a Defendant, along with the EMS technician known as "Frank 50" (shield #5613/2586), who is being served at 9 Metrotech Center, Brooklyn NY 11201. His John Doe supervisor is also included.  They are being sued in their individual capacities.

19.     Ms. Judith A. Pascale, Suffolk County Clerk, is being served at 310 Center Drive, Riverhead, NY 11901.  She is being sued in her individual and official capacities.

20.     Mr. Jonathan B. Bruno, Esq. is a Partner at Rivkin Radler LLP, 477 Madison Ave, Suite 410, New York, NY 10022.  He was formerly at Kaufman Borgheest & Ryan LLP ("KBR"), Northwell's former defense firm, located at 120 Broadway, 14th floor, New York, NY 10271.  Both are Defendants.

21.     Mr. Daniel S. Ratner Esq. is the Managing Partner and Mr. Daniel G. May, Esq. is a Partner at Heidell Pittoni Murphy & Bach LLP ("HPMB"), which is Northwell's current defense law firm.  Both are at 99 Park Ave, New York NY 10016. Graham T. Musynske Esq., and Rachel Bloom Esq. are Associates, at 1050 Franklin Ave, unit 408, Garden City, NY 11530.  David A. Rosen Esq. is a former Associate of HPMB, now at EmPRO Insurance, 1800 Northern Blvd, Roslyn, NY 11576.

22.     Mr. Jeffrey Carucci is Director, Division of E-Filing, Mr. Justin Barry is his supervisor, and Ms. Sherrill Spatz, Esq., is Inspector General, Office of Court Administration

("OCA"), part of the New York State Unified Court System (UCS), 25 Beaver St # 8, New York, NY 10004. All OCA Defendant are being sued in their individual and official capacities.

23.     Mr. Bret Parker, Esq., Executive Director of the City Bar Association, and the City Bar are both Defendants.  They are located at 42 W 44th St, New York, NY 10036.

24.     The New York State Attorney General's office ("NYSAG"), is c/o The Capitol, Albany, NY 12224-0341.  "Alex" of the healthcare bureau and his John Doe supervisor are being sued in their individual capacity.  Ms. James is being sued in her individual and official capacities.

### III.     <u>JURISDICTION</u>

25.     The Court has jurisdiction over the aforementioned claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).  It has supplemental jurisdiction over the state claims under 28 U.S.C. §1367, as these claims arise from the same set of facts and circumstances and form part of the same case or controversy which give rise to the federal claims.

26.     Venue is proper under 28 U.S.C. § 1391(b) and (c) because the majority of the Defendants are located in Manhattan.  The rest of the Defendants are located in other places in New York State, as well as New Jersey and Minnesota.  All of them do business in this State.

### IV.     <u>INTRODUCTION TO MY LITIGATION</u>

27.     My decade of litigation leading up to the instant case stems from a tragic series of events that took place in June 2011. It is important for this Court to know about the events, because the Defendants' violations were based in part on them.

28.     To summarize the facts, I am a 59-year-old, disabled mother of two, with no history of violence, who was arrested and perp-walked by police at JFK airport in New York City for no valid reason.  I was sober, unarmed, and only trying to buy an airline ticket – politely – from British

Airways at Terminal 7.  However, I was abducted and transported to a private psychiatric hospital without probable cause, notice, warrant, charges, legal advice, hearing, requisite paperwork, or time limit on the detention. I was detained for 18 days in a psychiatric ward in a Northwell hospital, from June 12th to 30th, 2011. At that time Northwell was called North Shore Long Island Jewish Health System (NSLIJ), and the ward where I was incarcerated was at Zucker Hillside Hospital in Glen Oaks, Queens County, NY – one of the 23 hospitals under this corporate umbrella.

29.     During this incarceration, I was drugged, victimized by various types of medieval physical and psychological cruelty, subjected to illegal surveillance, harassed by other "patients", and mistreated by poorly trained and unsupervised hospital staff – several of whom could barely communicate in English. This is despite the fact that I had no history of arrest, contraband, substance abuse, police warnings, psychiatric detention or even of public demonstration.  There was not even a Terry stop in my history, there was no reasonable suspicion in this instance. There was no signature or approval in the hospitalization process, issued by any individual, committee, or court that was authorized to adjudicate.  It was as though I had been catapulted back to 1948, to join Olivia de Havilland in *The Snake Pit*.

30.     Northwell staff falsified a so-called "financial agreement" that committed me to paying for an unlimited amount of their so-called services, by signing it on my behalf without my knowledge, and another one requiring my health insurance company UnitedHealthcare (part of Defendant UnitedHealth Group) to pay them for their services, although I did not receive these documents until six years later (Exhibit A).  This situation made Britney Spears' conservatorship look like a generous and flexible arrangement.  Northwell's fees of $3700/day were usurious – more than twice the average hospital day rate.  The City of New York also fraudulently charged me $600 for the ambulance that transported me in handcuffs to Northwell's human parking garage, after confiscating and towing my vehicle.  Northwell and its conspirators discriminated against me on every conceivable basis: age, disability, gender, genetics, body habitus, religion, politics,

national origin and parental status.  The fact that they used violence on me made their crimes so much more despicable, because they knew that I was a domestic abuse victim and rape survivor. Northwell also confiscated the artwork that I had made in the hospital and never returned it; this was theft of my intellectual property.  Clearly, Northwell and its conspirators do not treat all of their customers so abysmally; this was discriminatory abuse.

31.    This was only the beginning of the relentless cruelty to which I have been subjected at the hands of Northwell, UnitedHealthcare, British Airways, and their conspirators in city, county, state and federal government over ten years. I have never received an explanation for why this torture was inflicted on me, by whom, or why, although it was likely a grotesque overreaction to my being a whistleblower. Few victims ever work so hard for such a long period of time to obtain information about their perpetrators, with such poor results.  Every rock I turned over had another Pandora's Box of corruption underneath it.  The preponderance of public sector actors involved shows that I am living proof of former President Reagan's saying, "The nine most terrifying words in the English language are: I'm from the Government, and I'm here to help."

32.    I learned that organized crime takes many different forms, and these Defendants have all played a part in what I will refer to as the "Cuomo-Northwell racketeering enterprise".  I will explain the aspects of it that pertain to former Governor Cuomo in the aforementioned new related case.

33.    This was not some run-of-the-mill trip-and-fall-into-the-bughouse situation. Involuntary psychiatric detention is not something that typically happens to people like me.  My occupation is as Founder and Chairperson of a medical technology company in the UK, which is a role that I have held for 23 years.  I have worked in this industry nearly my entire career, in the US, Europe and Asia.  I am a peaceable, Christian (Protestant), Ivy-educated professional, with dual British and American citizenship.  My family has lived on Long Island since the late 1800s, and we have no history of serious troublemaking.  My ancestors left England on the Mayflower to

find peace and religious freedom on this side of the Atlantic, so I come from the sort of people who are so pacifist that they would rather leave the country than start a war. So, for my adversaries to imprison and torture me was like a declaration of warfare on Switzerland. I only pursued this litigation after the most extreme form of provocation imaginable – the type that is so outrageous that it would incite violence in many people. It did not do so in me.

34.     If this Court wishes to get a fuller understanding of the facts of my prior litigation, I call its attention to the Second Amended Complaint from my Nassau Supreme court medical malpractice case against Northwell Health ("Northwell") (*Andersen v. North Shore Long Island Jewish Health System (NSLIJ) et. al,* index no. 602687/2015), and the Petition for my 2019 Queens Supreme court Article 78 proceeding (*Andersen v. Sullivan, et al.*, index no. 3252/2019) because they update the facts from my first case, a 2012 US District Court 42 USC §1983 action in EDNY (*Andersen v. North Shore Long Island Jewish Health System (NSLIJ) et. al,* index no. 12-CV-1049). I incorporate those sets of facts here by reference, to avoid having to restate dozens of pages of material. Additionally, my ex-husband sued Northwell in a related matter (*Ritchie v. NSLIJ et. al.*, Suffolk County Supreme Court, index no. 009211/2014). These cases are replete with sensitive personal health information – as med-mal cases often are. The Nassau and EDNY cases were e-filed, but *Ritchie* was not, and Queens did not permit e-filing of Article 78 cases at that time.

## V.     **FACTS AND DISCUSSION**

35.     The federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule refers to personal health information as PHI, so I will use that abbreviation here. This Rule restricts disclosure to "Covered Entities" which are (generally speaking) healthcare facilities and their Business Associates that perform functions such as claims processing and billing. It also restricts disclosure to the minimum necessary amount of information to suit the

particular purpose.   According to HIPAA, "individually identifiable health information" is "information, including demographic data, that relates to: the individual's past, present or future physical or mental health or condition, the provision of health care to the individual, or the past, present, or future payment for the provision of health care to the individual, and that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual."

36.    I will discuss each of the Defendants in the approximate chronological order of their arrival on the scene.

**British Airways**

37.    British Airways' (BA's) parent is International Airlines Group (IAG), an international company registered in Madrid, Spain, and listed on the London and Madrid stock exchanges.  It was formed by a merger with Iberia in 2011.

38.    BA started the snowball rolling at JFK airport on June 12th, 2011, when I unsuccessfully attempted to purchase an airline ticket from its counter staff at Terminal 7.  BA's counter staff told me that I could not buy a ticket without a passport, but I explained that I was enrolled in the Iris Recognition Immigration System (IRIS), which was an initiative by the British government from 2004 to 2013, to provide automated clearance through UK immigration for certain frequent travelers.  Furthermore, I had the right to return to the UK without a passport by virtue of my British citizenship, and I was carrying many additional forms of identification which amounted to more ID than most people ever have in their lifetimes.  The conversation did not become heated, but BA's heavy-handed overreaction was to call the "heat" to the scene anyway… its staff called the Port Authority police (PAPD) to have me arrested and abducted.  The real reason for this was because I suggested that we call the media to the scene to discuss the matter because

I thought it might be of interest to other travelers; this convinced BA to do some illegal damage limitation.  I believe it was a malicious form of gamesmanship.  BA Staff observed, smirking, without intervention while the police and EMS confiscated (*inter alia*) my phone, computer, ID and all travel documents.  I gave my car keys to BA staff, which they must have given to PAPD or EMS, who had my car towed; there remain unanswered questions about the chain of custody of both my belongings and my person.

39.     I complained to the US Dept. of Transportation, and its General Counsel's office told British Airways in 2015 that it must provide a "substantive" response to the complainant (i.e. me) within 60 days, under 14 CFR § 259.7(c).  However, the airline failed to do so, and DOT failed to prosecute.

40.     I subpoenaed BA as a nonparty in NYS Supreme Court in 2017, and its attorney Anthony Battista of the aptly-named Condon & Forsyth LLP provided a few documents, and certified them to be in full compliance with my subpoena, but it was not a complete response (see Nassau case, docket #177, 223 and 288).   BA failed to identify any of the staff involved, including its own staff and the purported UK Border Force (national immigrations authority) agent to whom it connected me on the phone at the airport who self-identified as "Nick 2257", and who gave me false information about passport control.  (NB: "Nick" is British slang for prison, which was to all intents and purposes where he and the BA wiseguys sent me.)  This conversation may have been recorded or monitored, but I have not yet been able to obtain the recording or Nick's full name.

41.     Although BA is not a government entity, the Border Force told me in an email that the carrier is responsible for passport checks conducted on passengers.  This is a quasi-governmental function, making BA part of the groupthink of officialdoms in the Cuomo-Northwell enterprise.  The Border Force told me that the operation may have been "intelligence-led", and I need whatever information BA has to explain that, beyond what I will discuss on page 83 et. seq. (NB: I believe I have grounds to sue the British government as well, but this is not something

within the capabilities of a US-based litigant without an attorney.)  If I had walked or driven across the Canadian border, for example, or departed Long Island by sea on a raft, none of this would have happened and I would have had no problem leaving the US.

42.     BA needs to explain why it allowed my son to fly to Europe as an unaccompanied minor on an expired US passport in January 2017, whereas by contrast it had me **arrested for merely trying to buy a ticket** without a passport in June 2011.  Clearly the rules are not as inflexible as BA had purported in 2011.  Nobody has alleged that they changed in the interim.  A recurrent theme in this litigation is that the people who make the rules have also been breaking the rules.

43.     BA failed to provide me with its relevant policies and procedures.  BA says on its website, "We assess your fitness based on internationally accepted criteria by the World Health Organisation so we can be sure you have a safe and comfortable flight." However, the WHO's guidelines did not include any reason for BA to have denied me passage, and BA has not alleged that any existed. Further, BA's published policy on passports fails to mention anything about being arrested if you try to buy a ticket without one. In fact, on its website, BA cheerfully said "If you'd like help with your [passport] application, British Airways has partnered with VisaCentral, a company that will do all of the hard work for you."  Nobody mentioned this to me at JFK.

44.     According to BA, you don't even have to be a customer for its policies to apply to you, which is vast overreach.  Through its Privacy Policy, BA permits itself to share your personal information without your knowledge or consent with a host of third parties – a list that is so broadly worded that it could easily have included the Port Authority and the Defendants, among others. Conspiring with other companies to dupe and involuntarily detain a nonviolent individual, then steal and disseminate the individual's confidential information to third parties, is bad faith and violates many due process and privacy laws. However, I was not given a copy of this policy or even heard it mentioned until I stumbled on it on the internet six years later.

45.     The BA staff's conduct did not comport with its policies.  There must have been an internal investigation, to comply with regulations, but BA did not provide me with anything about that.  I sent a letter in 2014 to BA's Chairman and CEO in the UK, which Mr. Battista produced in 2017 marked with a "RECEIVED" stamp.  A document trail should have been created to comply with quality assurance regulations.  I also asked for a record of previous complaints to BA and serious adverse events of this nature, which I did not receive.

46.     Given how discriminatory the airline's conduct has been revealed to be by other female former plaintiffs against it (e.g. Jessica Starmer, Nadia Eweida, and Michele Langton et. al.), it is plausible that BA's misogynist executives and attorneys considered me to be just another problem woman. It is worth noting that the BA's board of directors in 2011 was 90% male.  When a British businessman was arrested on a BA flight for video-recording up a flight attendant's skirt in November 2016, he was let off with nothing but a £13 ($17) fine.  These experiences exemplify why, in Britain, BA is widely reputed to be an abbreviation for "Bloody Awful".

47.     BA has been shown to discriminate based on religion, too, and practices retaliation. Ms. Eweida, a Coptic Christian, won a European Court of Human Rights case against BA in 2013 for preventing her from wearing her crucifix necklace at work with the company.  She launched a new case against BA in August 2018, alleging victimization and harassment for whistleblowing.

48.     BA has also previously been accused of insensitivity to disabilities of both passengers and staff. 14 CFR Part 382 pertains to nondiscrimination on the basis of disability in air travel, but BA failed to comply with it.  In brief, this regulation requires specified training (§ 382.61), documenting complaints (§ 382.70), and reporting complaints (§ 382.157).  BA's counter staff entered some defamatory narrative about me into their computer terminal – of which BA's attorney Mr. Battista gave me a copy – showing that either they had not been properly trained, or they didn't care about complying with policies.  The flippant, mocking tone of the narrative evidenced gamesmanship.

17

49.      While BA may not be as routine a participant in the psychiatric detention racket as the other Defendants, and it did not charge me any fees, it certainly caused me to incur many expenses that I would not have incurred in the absence of BA's misconduct.  It was clear that BA staff intended for me to be arrested when they called the PAPD.  They sealed my fate by making that call.  BA participated in the conspiracy with PAPD to falsely arrest, kidnap me, falsely imprison me, and steal my belongings.  It is a matter for discovery to find out what BA said to the PAPD, and with whom else BA shared my private health information.

50.      BA and Battista are included in all causes of action except §1983:  §1985, TVPA, RICO, ADA/rehabilitation act, negligence, negligent hiring/supervision, discrimination, NY human rights law, deceptive business practices, defamation, fraud, abuse of process, breach of fiduciary duty, unjust enrichment, IIED.  Battista is included under Judiciary Law §487.

**The Port Authority (PANYNJ)**

51.      PANYNJ is "a body corporate and politic" created in 1921 by an interstate compact between New York and New Jersey. PANYNJ is to "be regarded as the municipal corporate instrumentality of the two states for the purpose of developing the port [of New York] ...," N.Y. Unconsol. Laws § 6459 630 (McKinney 1979) and N.J. Stat. Ann.

52.      The Port Authority Police (PAPD) officers Danielle Liantonio, Michael Corwin (#2524), and Tour Commander Daniel Carbonaro, arrested me pursuant to BA's phone call, without a warrant, charges, Miranda rights or any legitimate justification for doing do; they handcuffed me, perp-walked me through the airport to a NYC ambulance, and abducted me.  This was frightening and humiliating, marked me as an offender for no valid reason, and was a form of extrajudicial punishment.  Once they slapped the cuffs on me, the process became a Hobson's choice.  Northwell's emergency room became to all intents and purposes a police station, and the

PAPD officers were effectively federal border control (USCBP) agents since they detained me ostensibly because I was trying to travel without a passport.   (NB: Were they actually deputized, or merely walking metaphors for USCBP?)

53.     In 2012, PANYNJ produced an arrest report dated June 12th, 2011 at 4:30pm, which looked official on the surface, but was bizarrely called an "aided report" (Exhibit B).  However, the report couldn't hide the fact that the PAPD's conduct was predatory, and involved a false arrest, so it amounted to abuse of process.  This was a grossly custodial setting, about which there was nothing consensual.  I was effectively robbed at gunpoint, and the PAPD and EMS gave me no receipt of any kind to confirm that they had sequestered my belongings.  The report refers to me as a "possible EDP", but does not say anything about dangerousness to self or others, which is the definition of an EDP (Emotionally Disturbed Person).  The PAPD officers inappropriately asked me what medication I was taking, and I was so stunned that I didn't realize they had no right to ask me this question.  I answered that I was taking a professionally prescribed antidepressant medication at the time, called Effexor@ (Venlafaxine, the 40th most commonly prescribed medication in the US), and they used this to initiate a pretextual arrest.  Apparently PAPD officers have not been trained that about 13% of the US population takes antidepressants; clearly not all of those people are arrested and detained. These drugs are almost as ubiquitous as aspirin nowadays. I take this opportunity to warn the traveling public to avoid mentioning their Prozac® or Lexapro® to the authorities, unless they want their travel plans to take a three-week detour through a psych ward.  I obtained some of the PAPD's policies under FOIL, to which they had not even come close to adhering.

54.     The PANYNJ wrote to me on October 26th, 2012 – pursuant to my complaint – saying that it was doing an investigation. It assigned an investigator, Lieutenant Michelle Serrano, but she never produced a report.  She emailed me several times saying that the OIG had a backlog of cases, but that was 8 years ago.  After promising me a report, in 2013 she told me that the only

way I could get the information I wanted was by subpoena.  Much later, I received a letter from

Huntley Lawrence, dated December 8th, 2014, Mr. Lawrence was Chairman of the Civilian

Complaint Review Board (c/o the OIG) when I wrote to him in 2013; he took his new role as

Acting Chief Operating Officer in January 2021.  Mr. Lawrence's letter said that PANYNJ didn't

have enough information to complete its investigation.  I believed this to be a red herring.  So, just

to be certain, I sent Mr. Lawrence my entire evidence file.  I never heard from him again, even

though I followed up with several more messages in 2015 and 2016.

55.    I subpoenaed PANYNJ as a nonparty in my Nassau case (see Nassau case, #227),

and in response it provided an incomplete set of documents. Notably, the investigation report and

security camera video were still missing.  The Magistrate in my EDNY case against Northwell

(Judge Boyle) had put a litigation hold, on May 8, 2013 (docket entry #95), on the security camera

video of the incident.  However, a PANYNJ FOIL clerk claimed it destroys such recordings after

a month.  I do not believe that it could have legitimately destroyed such an important document.  I

ask this Court to order PANYNJ to release the video immediately.

56.    I wrote to Mr. Kevin O'Toole, the Commissioner of PANYNJ in September 2021,

and received a response from Ms. Karen T. Connelly, Assistant Director, Office of Inspector

General, Police Integrity Division. She did not answer my questions or provide any documents,

but only acknowledged receipt of my letter.  Again, I asked for the investigation report, security

camera video, and other missing documents, but received nothing further.

57.    I want to know how PANYNJ is getting away with covering up this investigation,

which appears to have been a sham.  The organization's website says, prominently, "The Port

Authority of NY & NJ is committed to ending Human Trafficking."  This wasn't true in 2011 and

it still isn't.

58.    PANYNJ has been criticized in previous litigation for spoliation of evidence (see

*Chin v. Port Authority of New York & New Jersey*, 685 F. 3d 135 – 2nd circuit 2012).  I believe that

PANYNJ doesn't want to produce the video because it will show that the PAPD handcuffed me even though I was not agitated, so that would prove its officers committed battery by handcuffing me.

59.     Is tormenting tiny peaceful mothers of young children within the PAPD cops' job description?  Inconsistent performance has been a problem for the PAPD in the past (see *Raysor v. Port Authority of New York & New Jersey*, 768 F. 2d 34 (1985)).

60.     PANYNJ has been sued for discrimination in the past, many times – even by its own black, Asian, Hispanic and transgender staff.  The EEOC sued PANYNJ for gender pay disparity and age discrimination in 2010 (10-cv-7462, SDNY).

61.     PANYNJ has repeatedly been found liable for absence of safety devices on work sites, (e.g. *Bonanno v. Port Authority of New York and New Jersey*, 298 AD 2d 269, and *Ramos v. Port Authority of New York and New Jersey,* 306 AD 2d 147 (2003)).  Such cases are relevant, because there was no apparent safety mechanism in place – procedural or otherwise – to prevent the PAPD officers from making the disastrously erroneous decision to label me as an EDP, arrest me, and transport me to be incarcerated at Northwell.  The procedure for this type of encounter apparently hadn't been fool-proofed or adequately trained.  Nobody has alleged that I was doing anything dangerous at JFK that could have been the proximate cause of my injury, and when PANYNJ produces the security camera recording it will be clear that I was not.  Master of illusions Lieutenant Carbonaro (coincidentally sharing a name with a TV show about hidden-camera illusions) was one of the PANYNJ's 100 highest paid employees in 2010.

62.     The PAPD has been sued by some of its own officers for denying promotions in retaliation for criticizing Port Authority policy. (*Port Authority Police Benev. v. Port Authority*, 698 F. 2d 150 (1983)). This is important because there are signs that a retaliatory animus existed in my case.  PAPD has been the target of many false arrest and battery cases too.

63.     PAPD also had my car towed, at a cost of several hundred dollars, but it never produced the documents pertaining to that, to which I am entitled.  I heard that JFK security was also involved but I have no evidence of that. Nobody instructed me to move my car, and as far as I know, I was not ticketed although I later received a large bill for towing (see page 125).

64.     PANYNJ deprived me of my Constitutional rights, discriminated against me, and participated in the Cuomo-Northwell racketeering enterprise.  The individual Defendants are included in all causes of action: §1983, §1985, TVPA, RICO, ADA/rehabilitation act, negligence, negligent hiring/supervision, discrimination, NY human rights law, deceptive business practices, defamation, fraud, abuse of process, breach of fiduciary duty, unjust enrichment, IIED.

65.     PANYNJ should produce the remaining relevant documents that I am seeking.  I ask the Court to order PANYNJ and its staff never to bother me again.

**Northwell Health and Northwell Laboratories**

66.     Next on the scene was Northwell.  The PAPD cops deposited me, still in handcuffs, behind the locked doors of Northwell's psychiatric emergency room at about 5pm on June 12th, 2011, where I was further denied Miranda rights, and prohibited from making a phone call. Northwell's website says its mission is as follows: "we strive to improve the health of the communities we serve and are committed to providing the highest quality clinical care; educating the current and future generations of healthcare professionals; searching for new advances in medicine through the conduct of biomedical research; promoting health education; and caring for the entire community regardless of the ability to pay."  In my experience, Northwell's so-called "care" was abusive, its staff were poorly trained, it used unapproved treatments without my consent, it practiced illegal surveillance (see page 104), and it created fraudulent financial

agreements behind my back (Exhibit A, pages 1-2) that coerced me to pay for its abuse, with laundered money from HHS and the State via UHCPNY.

67.     Northwell is registered as a charity, with $14B revenues, 76,000 employees, 23 hospitals and 830 outpatient facilities.  As the State's largest private employer, with political tentacles everywhere, it epitomizes New York's nickname, the "Empire State".   When the company removed the word "Jewish" from its name in 2016, its former Chairman, Mark L. Claster, wrote an article for the Jewish Star newspaper saying that the foundation of the company remains Jewish *("Northwell: "We're sticking with 'Jewish' and 'Long Island'"*, January 27, 2016).  But it isn't the religion itself that is important here; it is the fact that this company is doing human trafficking in the guise of charity – which is supposed to be a contradiction in terms – while borrowing the good name of Judaism to boost its brand.  Northwell is a practicing a hybrid of racketeering and *tzedakah*.  Consider the hypocrisy of a Jewish organization located in the shadow of the Statue of Liberty, behaving eerily like the Nazi SS.  If we polled Holocaust survivors to ask what they think about the Defendants' conduct, what would they say?  I am not suggesting that my story is as serious as the Holocaust was; no, that would be offensive.  I'm only saying that some of the Defendants' abusive (albeit less deadly) conduct bore alarming resemblances to that of the Nazi SS medical corps.  Our society is doomed to repeat the human rights abuses of the past if its faulty collective memory fails to adequately remember them, or if new generations fail to learn anything from them.

68.     Northwell's powerful Board of Trustees is a hotspot of what one might call a "cronyvirus" – stacked with wealthy Jewish individuals like Donald Zucker who make large donations to political candidates (mainly Democrats), including at least one of my judges. Northwell raises vast sums from charitable donations in addition to its revenue from operations (e.g. Northwell Foundation's revenue from donations in 2019 was $93.5m).  The Zucker family donated vast sums to have the School of Medicine at Hofstra University renamed after them, which

is part of Northwell.  In 2012, the Zuckers built a $120 new pavilion at Zucker Hillside Hospital, which was also named after them, while Northwell was lying, cheating and draining me of my savings in court at EDNY.   (NB: Ironically, Zucker means "sugar" in German… as in "sugarcoating".)

69.     Northwell has appeared to be protected by a Teflon shell of immunity as if it were an "arm of the state", although legally it is separate, and as far as I know it has never claimed any official immunity.  But the real estate law concept of "preexisting nonconforming" does not apply to healthcare.

70.     Northwell also provides emoluments by stealth to the judicial system by funding institutions like Touro College Law School, where the clinic refused to help me with my case after the NYS Justice Center referred me there.  (NB: Two of my federal judges at EDNY – Joseph Bianco and Arlene Lindsay – were on the faculty at Touro Law, as was former Nassau District Attorney Kathleen Rice, now US Congresswoman, Democrat).  These emoluments would not necessarily be a problem if Northwell did not use its power and money improperly, to protect itself from liability.  But as it was, Northwell hospitalized me illegally against my will and contrary to law, billed me unlawfully to create fraudulent medical records, collected money by lying about this to UnitedHealthcare, and used that laundered money to ensure Touro's loyalty and the allegiance of Northwell's legions of other cronies.   The politicians who should have helped me – such as Ms. Rice, US Senator Chuck Schumer (Democrat), US Senator Kirsten Gillibrand (Democrat), former US Congressman Pete King (Republican), US Congressman Lee Zeldin (Republican), and former NY Senator Carl Marcellino (Republican) – did not do so, because their pockets were stuffed with Northwell's money.   This matter started under the Obama Administration, which did nothing to resolve it, and has continued all the way through Trump and into Biden.  So, although the malefactors in New York are concentrated on the left, the deliberate indifference to the problem has stretched across both sides of the aisle… so I am a bipartisan

complainer.  I have described a politically-motivated criminal enterprise that contains elements from both sides of the aisle.  My adversaries have been driving wildly over the lines under the influence of baksheesh from both left and right.

71.     I will try to avoid overlap with my previous cases against this villainous company, to the extent of my *pro se* abilities.  Defendants Michael Dowling, John Kane, Mark Russ, Melissa Dudas, and the other individual Defendants were not parties to my other litigation.  I learned the extent of their importance during EBTs in 2017-2018, but was unable to do anything about it due to the obstructive conduct of Northwell and its crony, Judge Leonard Steinman (to be discussed further here, and in the sequel).  Judge Steinman's cronies at Northwell had financially supported in his campaign for the bench, notably former Congressman Tom Suozzi.

72.     Northwell's conduct bears a resemblance to the sex abuse scandals involving Catholic priests.  The degree of privacy and trust that is supposed to be inherent in the psychiatrist's relationship with his patients is even more firmly rooted in law as that of the priest with his parishioners.  The extent of the cover-up here has been as bad as some of the priest scandals, if not worse due to the shocking number of high-profile third parties involved.

73.     Dr. Kane, Facility Director and Chairman of Psychiatry, failed in his duty to provide me with an attorney and a hearing (see Exhibit A, page 8, which speaks for itself).  I discovered that several of the Northwell staff who hospitalized me had been unregistered to practice their professions in New York State for many years, including an astonishing number of physicians – including Dr. Kane (ten years) and others in senior management (*inter alia,* Drs. Russ, Levy, Mendelowitz).  The usual reason for a professional's failure to do the State's mandatory periodic re-registration is that he has not completed his required continuing education credits.  This needs to be investigated further in discovery.  I will discuss Dr. Kane further, page 93 et. seq.

74.     Dr. Russ signed a fraudulent form stating that he had met with me, which he absolutely had not done (see form in Exhibit A, page 7, which also speaks for itself).  He used this

an excuse to detain me further, which gave the ward staff enough time to severely traumatize me with physical and emotional abuse.  I will discuss Dr. Russ further, pages 83 and 101.

75.     Dr. Russ and Northwell were sued by a patient called Rosemarie Ilardi in 2010 (index #21342/10, Supreme Court of Queens), in which the defendants tried to extend discovery time as a stalling tactic, just as they did to me in Nassau Supreme Court.  Northwell's many stalling tactics and other sneaky litigation subterfuges should toll the SOLs.

76.     Dr. Dudas, the ER resident, admitted me to the hospital against my will under false pretenses, lied in the official forms (see form in Exhibit A, page 4, which speaks for itself), and lied in her deposition 7 years later.  *Inter alia*, as she sat in the deposition room in her horizontally-pinstriped suit, she implausibly stated she couldn't remember the name of her supervisor in the ER.  This was a transparent ploy to protect management, and I am entitled to discover the supervisor's identity because it was obvious in EBTs that someone higher up had given the order to detain me.  I didn't mention Dr. Dudas in my EDNY or Nassau complaints because I did not know her name at the time either.   This junior varsity doctor testified that she spent two to three minutes interviewing me before committing me.  The conversation was the closest thing I ever received to a hearing; she then "remanded" me to the psych ward with no paperwork.  The training (or rather, lack thereof) of residents like Dr. Dudas was the responsibility of Dr. Bruce Levy, the Residency Training Director (see EBT transcripts: Dudas, p. 76, Schulman p. 35, Hanna p. 70).  I discovered that Dr. Levy had been unregistered to practice medicine for nine years.

77.     Additionally, Northwell failed to produce any of its internal correspondence or correspondence with third parties about the matter.  Among other things, I am entitled to know whether Northwell thinks I owe it anything for its so-called services, and if so, how it calculated that.   If Northwell comes up with a balance due, then I ask the Court to declare it null and void.

78.     Northwell's paralegal Renee Lifshitz (mentioned repeatedly in EBTs) did not do her job to file the §9.39 and §9.27 papers that MHLS failed to file with the Mental Hygiene Court.

I would have had to leave the hospital to be able to file the paperwork by myself with the Mental Hygiene Court, which was impossible, since I was not allowed to use the computer, internet, paper, pens, printer or stamps and there was no commissary, staff did not give me the relevant forms or access to postal service, they had maliciously confiscated my contact lenses, and I was not allowed to leave the locked ward.  Furthermore, this was not proper protocol for a §9.39/§9.27 committal; it looked more like an Article 81 guardianship proceeding because I was prevented from meeting with an attorney and having a hearing; I was treated as if I were mentally incompetent, and the hospital took its fees from my insurance account without notifying me.  I have the right to know what Northwell thinks it did for me that NY State's guardianship role demands, which is to keep me safe, provide me with suitable housing and health insurance, manage my finances, and generally act in my best interest.

79.    Keeping gratification just beyond the grasp of a detainee – and then mocking his attempts to reach it – is one of the most fundamental psychological torture techniques, and Northwell staff employed it with mastery.  In addition, they utilized other classic torture techniques such as attempts to destabilize me by eliminating my control over my environment, along with various forms of provocation including violence and threats of violence, deprivation of human essentials (food, water, sleep, clothing, fresh air, corrective lenses, contact with loved ones), drugging, forced nudity, bait-and-switch tactics, loud noises, intimidation, gratuitous hostility, harassment, unpatterned and nonsensical questioning sessions, ignoring my attempts at cooperation, open enjoyment of my distress, disruption of sleep cycles, and threats of violence and other punishment (see *Sullivan* Petition, ¶142).

80.    Northwell employed gamesmanship in abundance both in the hospital and in the courtrooms. For example, when I complained to one of the head nurses, Jessyca Berkman, that my detention was being done for political reasons, she said "I know, but we're going to pretend that it isn't."  She then delighted in my horror at what she had said.

81.     Dowling received my complaints addressed to him — as his secretary J. Gabriel confirmed — in the form of nine emails between November and February 2012, and passed them to his underling Mitchell Shuwall, who dead-ended them by sending two letters to me.  Northwell's quality assurance department's response was almost completely obstructive, thanks largely to Dr. Shuwall.  Former defendant Joseph Schulman, former Executive Director of Zucker, testified that the quality department — under Dr. Shuwall, a psychologist — was responsible for reporting such incidents to the State Office of Mental Health (OMH) (see my Nassau case, docket #355, pp. 125-126).  But a high-ranking OMH official told me that Northwell did **not** file an incident report pertaining to me.  This was a very serious omission, and bolsters the racketeering link between Northwell and OMH (to be discussed in the new related case).  Dr. Shuwall made statements in his letters to me that were revealed in discovery to be untrue, such as "our investigation did not find evidence supporting the allegations referenced in your complaint", and "our investigation into your concerns has not revealed any deviation from the standard of care" (Exhibit A, page 9).  That is to say, Shuwall's statements could only have been true if his investigation had been inadequate. Dowling subsequently rewarded Shuwall for his talent in deliberate indifference by promoting him to Executive Director of Zucker.

82.     It was my understanding from research and EBTs that the nursing staff ultimately reported to Ms. Marybeth McManus, Chief Nursing Officer at Zucker Hillside.  In an interview posted on Northwell's website, she says that nursing at Zucker is trauma-informed and evidence-based.[1]  This was absolutely false, in my experience.  She talks about patient-to-patient and patient-to-staff aggression, but ignores staff-to-patient aggression, which is the real problem.  She boasts about the hospital's Art Therapy, but Zucker staff confiscated my artwork and never returned it. This company spins a web of lies and omissions in its publicity to protect itself from liability.

---

[1] https://jobs.northwell.edu/blog/2020/01/22/cno-corner-a-conversation-with-marybeth-mcmanus/

83.     Northwell makes Theranos look like a relatively ethical company, because at least the latter didn't force itself on its customers.  But unlike Theranos, nobody at Northwell has been charged, because it has such politically powerful protectors, and its business is almost entirely in New York.   This is the most corrupt State in the US, according to the Washington Post, which pointed out that since the 2006 election, out of 18 people who have served in major statewide elected positions (governor, lieutenant governor, attorney general and comptroller), 11 ultimately succumbed to scandals.  But those statistics don't even take account of NY's private sector corruption such as Northwell's, which remains under the radar.

84.     Ten years after I reported Northwell's misconduct, Mr. Dowling – New York's answer to Cecil Rhodes – is still taking his $10m+ a year pay package from Northwell and greasing politicians' palms left and right, while none of the cowards involved in either the public or private sectors has been willing to label what his company did to me as illegal.  My case should have been Dowling's Dieselgate, but due to his rampant cronyism, unethical litigation practices, and the false statements of his staff, he is still laughing all the way to the bank.  He has publicly stated that Northwell's mental healthcare business is unprofitable and blamed his low margins on Medicaid patients, but Northwell effectively has achieved a monopoly on Long Island in private inpatient mental healthcare, and monopolistic players in general are rarely unprofitable, so I believe these are false statements.

85.     Chapter six of Mr. Dowling's 2018 book[2] ("*Health Care Reboot: Megatrends Energizing American Medicine*") is devoted to Behavioral Health (i.e. mental healthcare), and is a work of fantasy devoted to the superiority of approaches such as the collaborative care and evidence-based models, the use of standard screening tools to measure depression, and keeping patients out of the hospital. The problem that in my experience – and that of other former Northwell

---

[2] "*Health Care Reboot: Megatrends Energizing American Medicine*", Michael Dowling and Charles Kenney, Forbes Books, November 2018.

psych patients I have interviewed – is that Northwell doesn't use these techniques, despite their effectiveness (*Reboot*, p. 110).  So, this book evidences Dowling's deceptive business practices. He stated that major depression is "the leading cause of disability" in the US, acknowledged the importance of environmental factors and diet in mental health, and "a lot of what's been done in the ER can safely and effectively be done in the home" (id., p. 85).  However, these messages have not gotten through to his staff, who seemed oblivious to the toxicity of the ward environment, and were only interested in detaining me, tormenting me and filling me up with drugs.  Dowling's hubris is only exceeded by his hypocrisy, as demonstrated in his *Becker's Hospital Review* article dated Jan. 2nd, entitled *"Michael Dowling: A call for civility and decency"[3]* in which he advises hospital staff to (*inter alia*) show empathy, respect diversity, and be willing to compromise.  In my experience, Northwell staff do none of those things.

86.     Dowling's next book,[4] published in 2020, showcased a testimonial printed in large type above the title on the front of the jacket – **"A clarifying must-read in these uncertain times – Governor Andrew Cuomo"**.  The former Governor literally commanded the audience, using his formal title, to ante up for the book.  It would be difficult to find more visible proof of the close commercial relationship between these two wiseguys – excessively close, from the point of view of RICO claims.  But I have split my claims against them between two cases because I was advised that courts don't like to read gigantic complaints.  (So, dear audience, you may support the federal government by buying the sequel to this case – available soon on PACER.)

87.     Dowling told *The Intercept* in December that he was unafraid of media visits to his hospitals.[5]  And yet, I have been obstructed for ten years in trying to generate media interest in my

---

[3] https://www.beckershospitalreview.com/hospital-management-administration/michael-dowling-a-call-for-civility-and-decency.html?origin=BHRSUN&utm_source=BHRSUN&utm_medium=email&utm_content=newsletter&oly_enc_id=6300G1440278H8A

[4] "*Leading Through a Pandemic: The Inside Story of Humanity, Innovation, and Lessons Learned During the COVID-19 Crisis*", Michael Dowling and Charles Kenney, Skyhorse, Aug. 2020.

[5] https://theintercept.com/2021/12/19/covid-hospitals-journalists-michael-dowling/

litigation.  Further, journalists are not allowed to visit locked psych wards, which all of Northwell's are.  It was clear in my conversations with journalists that some third party or parties behind the scenes was interfering, and I want to know who that was.

88.     Northwell owns a separate laboratory testing company – called Northwell Health Laboratories (the "Labs"), with its own separate form 990, its own executives, and reported revenue of nearly $500m.  It has not been a defendant in my previous litigation.  Representatives of this company (who have not yet been identified) took blood and urine samples from me, with no informed consent, and without an apparent warrant; Northwell billed me for the tests, and I obtained the test results in discovery for my Nassau case.  Northwell defendants have tended to omit information without explaining how or why they are doing so, and it concerns me that information about the Labs has been omitted on the basis that it is ostensibly a separate company.  That explains its appearance on the caption here.  Northwell should have nowhere to hide.

89.     Northwell Health is within the SOL for the TVPA, RICO, the civil rights act of 1964, abuse of process, breach of fiduciary duty, and unjust enrichment, which are causes of action that I have not previously used against it.  To avoid overlap with the causes of action that were in my previous (dismissed) cases – §1985, ADA/rehab, negligence, negligent hiring/supervision, NY human rights law, deceptive business practices, defamation, fraud, IIED – I include this company in those causes of action for the instant case for its conduct since June 2011.  All causes of action apply to the new Northwell individual Defendants and Northwell Laboratories, which are within SOLs because most of the documents were not produced in discovery until 2016-2018, I did not depose Drs. Russ and Dudas until 2018, the misconduct is ongoing, and key information is still being withheld from me. (This excludes §1983 since according to the Second Circuit, the company's employees are not state actors.)

**Northwell is a repeat privacy offender**

90.     There is a long-established pattern of mishandling of my PHI by Northwell, which started in the hospital in 2011 and has not yet terminated.  This bully company and its attorneys have repeatedly used the privacy to which I am entitled by law as a means of coercion, knowing that because I am a mother, and I come from a conservative family, I will be likely to back down to protect my loved ones, because I have done that before.  I do not think that the HIPAA Privacy Rule and NYMHL Article 9 and §33.13 – the laws that protect the privacy of patients' privileged records in New York – were intended to be used as a truncheon against vulnerable individuals by law enforcement, regulators or the courts.  The only provision of §33.13 that could theoretically be used in this context to deny a seal is §33.13(c)(1), which requires a court order "that the interests of justice significantly outweigh the need for confidentiality".  But no such finding was made in any of my litigation, or my ex-husband's, in ten years.

91.     Hypocritically, while refusing to protect my privacy, Northwell staff and their conspirators have been operating from behind a wall of secrecy, several wearing partially concealed identities to protect themselves from liability.  They have been  protecting others whose right to secrecy has not been established (to be discussed, page 83 et. seq.).

92.     In addition to the private information about my family and me, there were many false and defamatory statements about us in the medical records.  *Inter alia*, Northwell stated that I had a history of a disease that I had never had before – Bipolar Disorder – and accused me in the medical records of having an affair with a government official in the UK.  Neither of these was true.  Northwell did not do any objective testing to arrive at its phony diagnosis, and it did not inform me of it while I was in the hospital.  Although objective testing exists, staff explained in EBTs their subjective methods, which only involved discussion with the patient.

93.     When you pay for mental healthcare, you implicitly are also paying for the confidentiality that the psychiatric profession is supposed to guarantee.  So, for it to deny you that

privacy is a form of fraud.  And because psychiatry is a regulated profession, for it to deny you both authenticity and privacy at the same time is a double fraud whammy.  For attorneys who represent mental healthcare providers to deliberately deny you that privacy is also fraudulent, especially when it is done as a form of harassment.

94.     Not only did Northwell inappropriately docket privileged documents, it also did the opposite too, by failing to file documents that it was statutorily obligated to file with the Mental Hygiene Court (see *Andersen v. Pheffer*, Supreme Court of Queens, index no. 717495/2021). Instead of filing my privileged health information within confidential proceedings as it was supposed to do at Queens Supreme Court Mental Hygiene Part, Northwell filed them unsealed in open proceedings in Nassau and Suffolk Supreme Courts.  This was so brazen that it could only have been deliberately designed to harass me.  It should have been the kiss of death for Northwell in my litigation, but so far, I have been a magnet for judges who were too biased to punish this immoral company.

95.     I ask the Court to order Northwell to close my account, and never to detain me, force any services on me, confiscate my belongings, surveil my family or me, or violate my privacy again. I would rather be chained to my kitchen table, or have to wear a house-arrest GPS ankle bracelet than be hospitalized in one of Northwell's psych wards again. Among Dowling's punishments should be educating the public about eliminating the stigma of mental illness, preventing hospitalization of psych patients, and treating them in the community – for the rest of his life.

**UnitedHealthcare Community Plan of NY (UHCPNY) and UnitedHealth Group (UHG)**

96.     Next to arrive on the scene was UnitedHealthcare.  The deliberate indifference from public entities was echoed by Northwell's conspirator, UnitedHealth Group (UHG), which was to

all intents and purposes a branch of the State in this instance.  Although UnitedHealth Group was the name on the caption in my Nassau case, UHG's attorneys responded on behalf of the group's New York subsidiary, UnitedHealthcare Community Plan of New York (UHCPNY). I believe this was an underhanded attempt to reduce the size of my target – thereby cutting my potential settlement.  They attempted to falsely limit the matter to intrastate commerce, and thereby protect executives at headquarters in Minneapolis from liability. It was also a ploy to bamboozle a *pro se* litigant.  Judge Parga cooperated with UHG's trick.  But I had corresponded with executives in Minnesota, including Gail Boudreaux who I had known in college, and who was CEO of UnitedHealthcare at the time, the largest of the UHG companies.  I received an email in response in 2014 from Madeline Harlan (Director, Clinical/Legal Risk Management), saying "Thank you for sending this information. I have shared with other team members" who would "coordinate with senior leadership, as appropriate".  We also talked cordially on the phone.  I was dismayed to find that UHG's attorney e-filed several of these emails, including my private contact information.  I need to know with whom Ms. Harlan shared my information and what was discussed.

97.      The year that I was detained, 2011, was the year that Forbes named UnitedHealth Group's then-CEO (now Chairman) Stephen J. Hemsley the highest paid CEO in the country; in 2013 his net worth was estimated at $480m.  Angry policyholders have repeatedly picketed Hemsley's home in Minnesota because the insurer routinely rejected bills for critical procedures such as chemotherapy, while overpaying its CEO.

98.      UHCPNY is the bagman of the NY mental healthcare "mafia", with an exclusive contract to collect money from the state and federal governments, to pay Northwell's and other hospitals' fees for trafficking the State's managed Medicaid patients by hospitalizing them involuntarily.  After taking possession of me by force – along with my UHCPNY insurance card – Northwell effectively "rented" me to UHCPNY, so that the latter could collect the money to pay the former and take its cut. This is analogous to the fake charity collection boxes that have been in

the news on Long Island, where items donated were in reality being sold by a third party for profit. Northwell trapped me into entering the palpably fraudulent "financial agreement" (see Exhibit A) with both it and UHCPNY, which I was required to repay by submitting to a shakedown in the psych ward, although they did not show me this document for six years.  This cemented the racket between the two companies.  By sentencing me to peonage, Northwell obtained funds from UHCPNY to pay the hospital bill (see id., page 3), which the latter laundered from NYS Medicaid and HHS.

99.     Mr. Matthew Mazzola, Esq. (atty. lic. # 4558292) of Robinson & Cole LLP, represented UHCPNY in my Nassau Supreme case against NSLIJ. He obtained dismissal of his client from the case by lying and cheating. He refused to substantiate his repeated contention – which was false – that I needed to leave the firmly locked ward and go to Nassau County's Social Services ("NCSS") office in order to cancel my UHCPNY insurance policy.  This was a ridiculous assertion that I was first told on the phone by a Jane Doe customer service agent from UHG or UHCPNY while I was still in the hospital (see Nassau case, docket #154), it was contrary to UHCPNY's policy manual, and contrary to what NCSS subsequently told me in a letter.  It is to be determined for which of the UHG companies this Doe worked.  Mazzola refused to state whose ludicrous purported requirement this was – UHCPNY's, Nassau's, or somebody else's. He said "Andersen was not entitled to terminate her coverage as a matter of law" without substantiation. This was a false statement, but Judge Parga wasn't listening. I will discuss Judge Parga and his conflicted law clerk in the sequel.

100.     The fact that I still do not have my Administrative Record from UHCPNY ten years after the catastrophe occurred is a travesty and an obstruction of justice. An Administrative Record contains every form, record, letter, and other type of document provided by the claimant or created by the plan administrator.  Mazzola lied to the Nassau court when he said he had properly served me with this document (see Nassau case, docket #282); I never received it.  UHCPNY's failure to

serve important discovery materials on me, in order to undermine proceedings, was harassment and frivolous conduct, in violation of *inter alia* the Standards of Civility (22 NYCRR part 1200, Appendix A). Judge Parga's order stated that I am entitled to the Administrative Record under the NY Public Health Law 18(2)(a) and CPLR 3102(c). I am also entitled to it under the HIPAA Privacy Rule.

101. Under GINA, policyholders with hereditary health conditions such as mine are protected from discrimination inflicted by their insurer.

102. I believe that UHCPNY resisted production of its Administrative Record because this document would have demonstrated that the company falsified its claim to HHS and the State when it collected money to pay Northwell. I am entitled to know whether UHCPNY or its counterparties at the State Medicaid department and federal government (HHS/CMS) think I owe them anything for my former health insurance, and if so, how they arrived at that. If UHCPNY does come up with a balance due, the Court should declare it null and void.

103. UHG conveniently forgot to mention anything about its funding of peonage in its annual ethical and regulatory compliance declarations for its NYSE stock market listing.

104. UHCPNY is within the SOLs for the TVPA, RICO, the civil rights act of 1964, abuse of process, breach of fiduciary duty, and unjust enrichment, which are causes of action that I have not previously used against it. The company is still obstructing justice by withholding my Administrative Record, which violates §1985, ADA/rehab, negligence, negligent hiring/supervision, NY human rights law, deceptive business practices, fraud, IIED. UHG is included for all causes of action because Judge Parga only dismissed UHCPNY as a Defendant. Mazzola and Harlan are new Defendants under all causes of action, and Mazzola as an attorney is also included under Judiciary Law §487. Discovery will reveal whether these Defendants made any defamatory statements about me behind my back.

105.    I ask the Court to order these Defendants to produce the Administrative Record, identify all staff involved, close my account, and to order UHCPNY and UHG never to force any services on me again.

**Former Congressman Peter King**

106.    Former US Congressman Peter Thomas King, Esq. (NYS atty. lic. #1232743) and his former staffer Michael Schillinger, Esq. (Lic. #5501911) are on the caption because I called King's office from the ward at Northwell to say that I was being abused and asked for help to be released, and Mr. Schillinger told me that my only recourse was to the State department of health. (I believe that he said "department of health" rather than "department of mental health", but am not sure, so Mr. King should produce phone recordings if he has them; these are two different departments of State government).  Schillinger's statement was false, as I discovered several years later, because the police are supposed to respond to calls for help from a psych ward on a par with calls for help from the street, even though they have a custom of not doing so.  Also, I later discovered that State agencies are egregiously slow to respond, so they absolutely should not have been my only recourse.  I realize that the Congressman did not have a formal obligation to help me, however, given that he decided to do so, he did have a responsibility to give me correct information.  He caused me to despair unnecessarily, and caused my confinement at the hospital to continue longer than it would likely otherwise have done.

107.    Mr. King is a superspreader of the cronyvirus.  When he retired a few months ago, Newsday announced that he would become a "government affairs and federal policy consultant" for his old pal Michael Dowling at Northwell.[6]  I would like to find out the history of King's

---

[6] https://www.newsday.com/opinion/newsday-opinion-the-point-newsletter-1.50146929

relationship with Northwell, in discovery.  It appears there may have been some conflict of interest involved, in addition to incorrect information, which is a double whammy.

108.    King and Schillinger are included in several causes of action: §1983, §1985, TVPA, RICO, ADA/rehabilitation act, negligence, negligent hiring/supervision, discrimination, NY human rights law, Judiciary Law §487, deceptive business practices, fraud, abuse of process, breach of fiduciary duty, IIED.  Discovery will reveal whether they made any defamatory statements about me behind my back.  Not knowing whether I should sue a former federal legislator under Bivens or something else, I have included these two Defendants under §1983 (*inter alia*) because they were fulfilling a State function by referring me to a State agency.

**The City of New York**

109.    After ten years I still do not even know the City of New York EMS technician's real name (identified as "Frank 50", shield #5613/2586), because there has been such an arctic blast of information chilling from NYC.  Frank 50 signed a defamatory form called a "pre-hospital care report" illegibly on my behalf (Exhibit C), saying that his reason for signing was because I was handcuffed, but he never showed me the form or asked me to sign – effectively taking possession of my person on an emergency basis, by fiat.  The form stated falsely that I had received a copy of a Notice of Privacy Practices and another document, fraudulently authorized the release of my PHI, and assigned insurance payment to the NYC Fire Dept without my permission (for which I was later billed and dunned $600, which amounted to fraud and money laundering).  Frank 50 never asked me my opinion about what this form was authorizing him to do, and yet there is no indication in his notes that he might have thought I wasn't *compos mentis*.  However, Frank 50 wrote: "She left home without informing anybody", as if that were a sign of mental illness.  (NB: I am a patriot who supports emergency services.  But this is a throwback to the 1950s.  If I were a

man, would he have said that? I think not.) Frank 50 conspired with PAPD to falsely arrest, kidnap and falsely imprison me, and steal my belongings. When we arrived at the hospital, he handed me over to the Northwell staff who brazenly signed forms on my behalf without informing me, including a form stating falsely that I had received a Notice of Privacy Practices. I did not receive the forms from Northwell until 2016, and from NYC until 2018 – after many requests and complaints about the delay.

110.    My experience shows the cruel reality behind the City's superficially helpful attitude toward mental healthcare patients. NYC has discriminated against people with mental disorders as a matter of practice if not policy (see *Henrietta D. v. Bloomberg*, 331 F. 3d 261 (2nd Circuit 2003)). Not only does the City use its ambulances to transport patients to private psych hospitals like Zucker, but it also mistreats patients in its own HHC hospitals (e.g. *Morgan v. City of New York*, 32 AD 3d 912 (2006)). Patients discharged from psych wards are not granted any of the amenities that former prison inmates have, such as housing subsidies or employment support; this is discriminatory. Patients aren't offered any Confidential Informant deals either, which many would receive if they were charged with crimes instead of detained under the NYMHLs.

111.    NYC, Frank 50 and John Doe are included in all causes of action: §1983, §1985, TVPA, RICO, ADA/rehabilitation act, negligence, negligent hiring/supervision, discrimination, NY human rights law, deceptive business practices, defamation, fraud, abuse of process, breach of fiduciary duty, unjust enrichment, IIED.   I believe that the cover-up of key documents such as the NYPD report should toll SOLs. The extent of NYC's chilling will be further discussed in the related case I am filing.

112.    NYC needs to produce Frank 50's identity and current whereabouts, the IDs of supervisors who signed off on his work, the policies that are applicable to his actions, and the itemized billing records. I ask the Court to order NYC never to bother me, transport me against

my will again, or bill me for any services I have not requested.  I will address the matter of the NYPD's misconduct in the sequel to this case.

**Jonathan Bruno, the Suffolk County clerk, and doxing on the paper docket**

113.    Northwell's defense attorneys first doxed me in 2014 in a paper case in Suffolk Supreme Court (*Ritchie v. NSLIJ et. al.*, Suffolk County Supreme Court, index no. 009211/2014). My ex-husband James Ritchie, who was the plaintiff, filed a motion for protective order, on which Judge Gerard Asher failed to rule before he dismissed the case.  Mr. Ritchie decided not to appeal because he did not have a lawyer, and then he relocated to Ohio.  Judge Asher subsequently retired. However, Mr. Ritchie failed to move for a seal on the case, and I still have the right to seek a seal. After I informed Northwell's defense counsel – Jonathan B. Bruno (NY attorney license # 2715423) and Alex Niederman (license # 4646600) at defense attorneys Kaufman Borgheest & Ryan – of the gravity of the firm's error, they should have removed my records from the docket, or at least redacted them. But they did not do so, and the records are still there.  KBR did not have a signed HIPAA release form from me, so it effectively grabbed control of my medical records by fiat and took them for a joyride, just as its kleptomaniac conspirators at the hospital had committed larceny by false pretense and felonious breach of trust, by confiscating my car, money, computer and all of my other belongings arbitrarily.

114.    **The fact that Northwell doxed me twice, using two different sets of lawyers, indicates that the idea originated with the clients rather than with their attorneys,** and I would like to do some discovery to determine who instructed the attorneys to dox me.  I was told by the clerks in Suffolk Supreme Court that removing the records from the docket necessitated a special proceeding to ask a court for the Suffolk clerk to remove them, hence the inclusion of the Suffolk clerk on this caption.

115.    The court system's Rule 202.5(e), introduced November 4th 2014 and effective January 2015, pertains to omission of confidential personal information from court filings, which it refers to as "CPI".  CPI and PHI are different but there is some overlap.  This rule states that a person filing a document "shall omit or redact" any of the following: a Social Security number (except the last 4 digits), a financial account number (e.g. credit card or bank account number, except for the last 4 digits), an individual's month and day of birth, a minor child's name, or documents or testimony in a matrimonial action.  Parties who in good faith believe that inclusion of the full CPI in a court filing is material and necessary to adjudication of the action or proceeding before the court, may apply for leave of court to serve and file together with "a paper in which such information has been set forth in abbreviated form a confidential affidavit or affirmation setting forth the same information in unabbreviated form..."

116.    I wrote to Judge C. Randall Hinrichs in May 2018 – who was Administrative Judge in Suffolk at the time but is now retired – to gain clarification of the process, and his law secretary Christina Geraci responded (*inter alia*, see Exhibit I) "please be advised that removing your other personal information and medical records from public access in the court file would require a court order sealing those records.  In order to seek this relief, you would need to make a formal motion to seal the subject records, made on notice to all parties to this litigation."  I did not know how to do this since I wasn't a party to the case, and she did not offer any further instructions, or cite statutes or case law.  I was embroiled in the Nassau case against Northwell at the time, and thought that I might be able to get the records sealed by Judge Steinman as part of that action or my subsequent Article 78 proceeding, thereby avoiding extra fees.  So, I delayed further applications in Suffolk.  Then Judge Steinman's bias as a Northwell crony began to emerge, wreaking havoc on my case, and COVID arrived, wreaking havoc on everyone's schedules.

117.    The KBR attorneys knew that once my medical records were filed on the public docket, I would have to pay to have them removed, so they were committing fraud and extortion

by filing them.  They knew perfectly well that the records contained both false and privileged information.  Filing and serving a motion to remove the records requires paying fees; this was extortion because I could not avoid the expenditure.   These vicious attorneys were analogous to journalists writing defamatory and excessively private information about me in a newspaper, then charging me fees to print a retraction.  Or bullies spray-painting the walls of the schoolyard with lies about their victim, then making her do all the work to scrub off the paint.

118.    A court which charges a victim fees solely to have her mental healthcare records removed from a public docket is also committing extortion, because it is like charging a victim fees to initiate a police investigation.  The records not only contain PHI but are also privileged in their entirety under HIPAA, and NYMHL Article 9 and §33.13.  They are easy for the clerk to identify as mental healthcare records.  So, they should be removed free of charge, especially in a case like this where the attorneys are repeat offenders. I am not saying that Ms. Geraci was knowingly defrauding me, if she was only telling me about the court's policy.  But if it is indeed the court's policy to charge fees to all individuals who need to have their medical records removed from the public docket, then the policy is unlawful because it violates *inter alia* HIPAA and the NYMHLs.  This expenditure becomes much more unreasonable when there are many victims of a corporate predator, as in the case of HPMB.

119.    If the Suffolk court clerk had bothered to look at what the defense filed in the first place, it would have been obvious that the papers contained medical records with both CPI and PHI, and the clerk could have rejected them.  I have observed on several occasions that the court clerks do in fact check through a document page by page before accepting it for the docket.  Although they do not read every page in detail, they do enough scanning that it should be obvious to them when they are looking at medical records, which should raise a red flag.

120.    I informed one of the Suffolk clerks in 2018 that the KBR attorneys had put my Social Security number on the docket in 2014, and she said she would remove it, but she did not

do so.  Unfortunately, I did not take the clerk's name at that time, and I did not discover until August 2021 that she had failed to redact the numbers.  This was a bad oversight on her part, and poor supervision on the part of the chief clerk.  It emerged in the interim (2018 – 2021) that I was a victim of identity theft, likely as a result of the PHI on the docket.  That exposure has caused damage to my credit ratings and my banking relationships.  I discovered that an individual whom I did not know had applied for a loan using my credit.  I had to take out a new loan at considerable expense and hassle just to rebuild my credit rating.

121.  Section 7 of the Privacy Act of 1974 (at 5 U.S.C. §552a note (Disclosure of Social Security Number)) provides that: "It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number."  Sec. 7(a)(1).

122.  I have seen no evidence that Northwell ever applied to the courts for leave to file my confidential information, in the Ritchie case or any of the others.  Further, Northwell did not argue in any of my cases that the amount of disclosure it did was restricted to Covered Entities, or that it was the minimum necessary disclosure.  Covered Entities are defined in the HIPAA Privacy Rule; they basically include healthcare providers, health plans and clearinghouses.  The courts themselves are not Covered Entities – as the Deputy Suffolk County Clerk, David Grier, pointed out in an email to me dated August 23rd 2021.  Therefore, Northwell and its attorneys do not have the right to overshare to the court clerks either.  However, the defense attorneys themselves were also Covered Entities to the extent that they were representing Northwell, which is a Covered Entity.  And they are also officers of the courts, so there is some disturbing overlap here between the courts and Covered Entities.  Certainly, deposing me about every private detail of my life, e-filing an entire unredacted deposition transcript for no valid reason, and paper-filing nearly my entire stack of unredacted, unedited, uncorrected medical records – as delinquent Northwell's lawyers did – failed to meet the "minimum necessary" criterion.  And publishing my PHI

indiscriminately on the public docket – as they did – failed to meet the Covered Entities criterion. This was predatory behavior unbecoming of officers of the court and the State's largest private employer, and is worthy of this Court's censure.

123.    After I notified Mr. Grier at the clerk's office in August 2021, he informed me that he redacted the Social Security numbers in two places.  Mr. Grier also told me that the Suffolk clerk does not keep a record of redactions to a file, which shocked me, as it seems entirely too informal.  Shouldn't this be implemented systemwide?  So even if the nameless clerk had done the redaction in 2018 when I asked her to do so, there would not have been any record in the file that she had done so.  This is important, because any member of the public can retrieve a case file just by asking for it and leaving their ID with the clerk.  It would be relatively easy to mark pages of a file without the clerks noticing.

124.    I also asked Mr. Grier what if any training the clerks receive in these matters, but did not receive a response.  Given how inconsistent the practices are between Nassau and Suffolk, I wager there isn't much training.  OCA and Ms. Pascale should produce a record of training that the clerks and attorneys are supposed to receive in the matters discussed herein.  It seems to me that privacy is one of the most important subjects on which a clerk should be trained, isn't it?

125.    I ask the Court to order the Suffolk clerk to seal the Ritchie case file in its entirety. If that seems excessive, I ask that the clerk be ordered to seal the pleadings that contain my medical records, and the discovery demands that should not have been docketed, which contain additional PHI – this amounts to about two-thirds of the total docket (approximately 1000 pages).   If there is going to be a delay in sealing the file, I ask that it be removed from the docket temporarily, while we are waiting for the Court's Order to seal it.  I asked Mr. Grier whether there was a procedure or a form to remove a document temporarily as there is in Nassau's e-filing procedures, but he said no… another inconsistency between the two counties' systems.

126.    Mr. Bruno is included in several causes of action:   §1985, TVPA, RICO, ADA/rehabilitation act, negligence, negligent hiring/supervision, discrimination, NY human rights law, deceptive business practices, defamation, fraud, abuse of process, breach of fiduciary duty, Judiciary Law §487, unjust enrichment, IIED.

127.    Ms. Pascale is included in §1983, §1985, ADA/rehabilitation act, negligent hiring/supervision, discrimination, NY human rights law, deceptive business practices, defamation, fraud, abuse of process, breach of fiduciary duty, unjust enrichment, IIED.   However, I am not seeking compensation from Ms. Pascale, only declaratory relief and an order that the situation at her office be rectified as discussed *supra*.

**Heidell Pittoni Murphy & Bach, and doxing on the electronic docket**

128.    Northwell's defense firm in my Nassau case was Heidell Pittoni Murphy & Bach ("HPMB"), of which Daniel S. Ratner Esq., is Managing Partner (NY attorney license #2332963). The team was led by Daniel G. May, Esq. (license # 2740967), Partner, at 99 Park Ave. in Manhattan.   This pair must have been the inspiration for the word "Domdaniel".   The firm's Long Island attorneys also participated, including David A. Rosen Esq. (license #4917159), Graham T. Musynske Esq. (license #4894176), and Rachel Bloom Esq. (license #4647467).   This is a mid-sized firm, with 100+ attorneys, in NYC, Long Island, Westchester and Connecticut. It has plenty of resources to train its staff, so it has no excuses to break the rules.

129.    The defense maliciously filed a confidential deposition transcript on the Nassau electronic docket (docket #493, defendant's "Exhibit G") without a seal – knowing perfectly well that it contained several types of PHI, as well as other sensitive personal and financial information. I told the defense during the corresponding EBT (a.k.a. arbitrary fishing expedition) during which I had no attorney, as a preamble, "what I'm about to say is confidential", and I repeated this warning.   Defense attorney Mr. Rosen voiced no objection.  He deposed me on false pretenses,

prohibiting me from bringing anyone else into the room for support, in a partisan witch hunt that lasted three months, the intended end result of which was defamation and invasion of privacy. HPMB knew or should have known that there had been no justifiable legal or factual basis for my detention, or their intrusive interrogation which amounted to 730 interviews (or plea bargain conferences, or Article 81 guardianship examinations, depending on how you look at this outrageously unlawful process).   Northwell and HPMB knew that this transcript was not only protected under civil practice rules and the NYMHLs, but also that the US Treasury Dept. wanted it to be treated as confidential because part of it pertained to a US Tax Court whistleblower case. It also contained genetic health information which falls within the scope of the ADA and GINA (the Genetic Information Nondiscrimination Act of 2008). The latter law protects people with hereditary illnesses from discriminatory treatment – including mental illnesses.  Many of my family members – including my sons – likely have the gene for hereditary psychiatric illness even if they have not yet suffered from it, so we are all protected by GINA.  Our genetic history of which we are aware goes back at least three generations, to the early 1900s.

130.    However, Rosen and the Daniel duo e-filed the transcript unsealed anyway.  The judge – Leonard Steinman – was too slow to seal it pursuant to my request.  He dragged the process all the way from November 2018, through the Christmas holidays and into the New Year, deliberately causing me anxiety.   This sideshow went on for so long that I had to repeatedly file forms with the clerk to keep the document off the docket temporarily – no fewer than seven times, because each form was only valid for 10 days.  It went beyond bureaucracy into the realm of aggravation.  This was a serious violation of the ADA and NYMHL Article 9 and 33.

131.    Part of the problem was that Mr. Rosen of HPMB told Judge Steinman's law clerk that his clients had never publicly released my unredacted medical records. This was a manifestly false statement, which I pointed out in a January 2018 letter to Judge Steinman (Nassau case, docket #338), after visiting the Suffolk clerk and taking pictures of the file to show my judge that

my medical records were there.  He ignored me, for reasons that will become apparent in the related case I will soon file.

132.    The goals of doxers often include gamesmanship, financial gain, retaliation, defamation and politics.  HPMB used gamesmanship extensively in my litigation, especially in depositions – where they took advantage of my *pro se* status to break every rule in the book. Despite the fact that I had not been able to retain an attorney at the time, HPMB attorneys coerced me into enduring three full days of depositions alone, in which they pried into every aspect of my private life, going far beyond the necessary amount of questioning, as a means of harassment. They also coerced me to conduct my own depositions solo, which was an extremely stressful experience.  Mr. May lied to me by saying court rules specify EBTs have to be conducted in the order that names appear on the caption; I later discovered there is no such rule.

133.    These attorneys were like the biggest bullies in the schoolyard tormenting the most vulnerable victim they could find.  They refused to resolve any discovery matters directly with me, and instead forced me to repeatedly complain to the law clerks, dragging the discovery process out for an excruciating two years.  The Court may peruse HPMB's panoply of illicit, evasive discovery tactics, which were more evidence of gamesmanship, and an extension of the gaslighting that was inflicted on me by their clients (e.g. see Nassau case, docket # 356, 362, 364, 379, 400, 402, 406, 408, 418, 422).  HPMB succeeded in severely curtailing my questioning of the witnesses by misusing Northwell's inappropriately close relationship with Judge Steinman and his law clerk, so many of my important queries from EBTs remain unanswered.

134.    Even worse, HPMB is a repeat offender – I found at least 20 plaintiffs (both living and deceased) who have been victims of this firm's cowboy doxing practices, but there are likely to be more because I only studied the cases in Nassau Supreme Court, and HPMB operates in all of the metro NYC and Long Island courts.  Here are some sample index numbers: 0600428/2016 (*Williams v Levine*), 0600232/2012 (*Chiusano v North Shore*), 0600536/2016 (*Pasquale v*

*Goldstein*), 0606226/2018 (*Drozd v Suratwala*), 0605735/2018 (*Gregor v Eysler*), 0603150/2017 (*Petrolito-McCort v Latefi*).  There was no evidence of selectivity in how HPMB e-filed the records – they were dumped, in their entirety, unredacted (or inadequately redacted), onto the docket, as exhibits to a motion.  There was no apparent need for the records to be docketed in their entirety.  Additionally, there may be cases that I didn't find because the problem was rectified after the medical records were e-filed.

135.    I don't know in how many of its other cases HPMB e-filed the plaintiffs' medical records with malicious intent as opposed to mere error, but the latter is bad enough.

136.    The HPMB attorneys are included in several causes of action: §1983, §1985, TVPA, RICO, ADA/rehabilitation act, negligence, negligent hiring/supervision, discrimination, NY human rights law, deceptive business practices, defamation, fraud, abuse of process, breach of fiduciary duty, Judiciary Law §487, unjust enrichment, IIED.  I believe that these attorneys should be subject to §1983 because they were representing government actors posing as private ones (to be discussed further, pages 83 et. seq.), and that needs to be explored further in discovery.

**The Office of Court Administration (OCA)**

137.    The NYS Unified Court System's (UCS') mission statement says, "We affirm our responsibility to promote a court system free from any and all forms of bias and discrimination and to promote a judiciary and workforce that reflect the rich diversity of New York State."  I discovered the reality is something closer to *Squid Game*, where litigation in NYS courts is a dangerous form of gambling, due to judges who discriminate in favor of VIP defendants and practice gamesmanship.  They turn a blind eye to the VIPs' misconduct, which includes meting out unlawful, toxic punishments to disfavored plaintiffs.  (This will be discussed further in the sequel.)

138.    New York State Courts Electronic Filing (NYSCEF) is the "back end" of E-Courts, administered by UCS.  It is a program that permits the filing of legal papers by electronic means with the County Clerk or appropriate court and offers electronic service of papers in those cases.

139.    I wrote to NY Chief Administrative Judge Marks on November 30th, 2020, to tell him what I had discovered about unlawful filing of medical records in my med-mal case and other plaintiffs' cases.   The official in charge of NYSCEF, Mr. Jeffrey Carucci, subsequently contacted me, which resulted in some additional correspondence and a teleconference in December 2020 with his colleague Phyllis Mingione Esq.  Perhaps I should refer to him as Judge Carucci, since he seemed to consider himself the ultimate authority on this matter.  However, the problems were not resolved.

140.    According to the OCA's FOIL official, Mr. Carucci reports to Justin Barry (atty. lic. # 2310514), OCA's Chief of Administration.  I did not interact with Mr. Barry, but he is on the caption because he clearly has a supervision problem.

141.    I wrote again to Judge Marks with an update, in February 2021.  I also wrote to the OCA's Inspector General, Sherrill Spatz Esq. (atty. lic. # 2085843), and was contacted in response by Carol Hamm (atty. lic. # 2569051), Deputy Inspector General.  She suggested that I contact the relevant attorney grievance committees, but this is an urgent matter and my experience with these organizations is that not only are they painfully slow, but they are also politically motivated and deliberately indifferent to serious misconduct.  Surely, she knew that, and this was a chilling tactic designed to prevent the OIG from having to do anything.  For example, I have had a matter pending since February 2020 with the First Judicial District – 23 months and counting.  Moreover, these committees are effectively captives of the State; this has been visible in their decisions, which have echoed the cover-ups issued by State agencies.  So, they are by no means impartial when a complaint pertains to misconduct by the State.  Furthermore, there are several plaintiffs who have been victimized in addition to me, so multiple attorney grievance committees in different judicial

districts would have to be involved, potentially creating a bureaucratic logjam.  That does not seem like the best solution.  OCA needs to cut the red tape.

142.    I probably cannot ask here for case-specific information on behalf of the other doxed plaintiffs, because they are not parties to this proceeding.  OCA should notify them or their next of kin about the decision of this Court.

143.    I recommend that this Court order Ms. Spatz to do an audit of all e-filed medical malpractice cases to find out in how many of them the plaintiff's medical records have been e-filed unsealed and/or improperly redacted.  Ideally this should be an **independent** audit, to ensure fairness, given that the charges are serious, multiple litigants have been affected, and there has already been significant concealment and foot-dragging.

144.    There is only so much that I can do without an attorney.  I do not have the resources to do all this work by myself; I have been doing the combined work of a law firm's Partner, Associate, Paralegal, Librarian and Secretary, so my progress is slow.  It is a distraction from my other work, I am not an expert, and I am receiving no remuneration for my efforts.  The doxed plaintiffs with whom I discussed this tended not to know very much about e-filing, and some were quite naïve as regards computers.   Others did not return calls or respond to letters, and I do not have the resources to chase people.  I do not have the time or the staff to teach a Computer Science 101 course, and I can't provide litigants with internet access.   There are an astonishing number of people in New York who still do not have access to internet service.  NYC's comptroller stated in 2020 that 27% of the households in the City (730,000) do not have internet, and 17% of households do not have a computer at home. More than 1.5m New Yorkers reportedly have neither a mobile connection nor Wi-Fi.  If the court system is going to continue to demand that litigants e-file med-mal and other types of cases as it is currently doing, then those individuals' lack of internet service is a real problem to address.  However, OCA is currently making their situation worse by not only

demanding that litigants e-file, but also shutting the law libraries and the court information centers which could help these litigants, to be discussed below.

145.    The New York State Education Dept. (NYSED) is currently surveying parents of students to find out about what it calls "digital equity", i.e. students' access to computer equipment and internet access.  OCA should survey its users similarly if it has not already done so.

146.    If I had not been obstructed in retaining an attorney, we might not have this problem, because I would have been able to add other plaintiffs to my case from the outset. However, if OCA secretly wanted to avoid a class action case, ensuring that I would not be able to retain an attorney would be an efficient way to do that.  Without an attorney, I could not add other plaintiffs to my case, so preventing me from hiring a litigator ensured that my case would be limited to one plaintiff.  However, this prejudices all of the docket doxing victims, especially me because I have put in hundreds of hours of work on this subject.

147.    My research indicates that there are about 9000 medical malpractice actions filed every year in New York State, which could add up to over 50,000 cases since e-filing became mandatory in 2014.  I do not know in how many of these cases the plaintiff's medical records were filed on the docket.  However, at that scale, with approximately $600 minimum (not including attorney's fees) required to file and serve the necessary paperwork to get the records removed from the docket in each case, it starts to look like a lot of trafficking to ignore if even 1% of cases were affected.  It could become a bureaucratic nightmare to fix, without the rapid cooperation of OCA. And Mssrs. Carucci and Barry would start to look like Travis Scott continuing to play at the Astroworld concert while attendees were injured in a crowd surge.

148.    In an e-filed case, individuals can sign up for the court system's e-Track service, which automatically notifies them if a new document is filed.  This is a powerful tool, but when the docket contains defamatory information, e-Track can be akin to a newspaper publishing a defamatory article online and sending out email notices inviting recipients to click through to the

story.  Readers can easily download and save the documents free of charge.  Compare that with the traditional, paper-based docket, where visitors need to go to the courthouse and show photo ID to see documents, then pay to photocopy them.  Those are big hurdles, which can cut traffic to the docket, thereby theoretically giving a paper case a privacy advantage.

149.    Can OCA tell us how many people have signed up for e-Track for my med-mal case?  If they cannot, then NYSCEF may have limited my potential compensation for the Defendants' vindictive e-filing tactics.

150.    NYSCEF makes identity theft using e-Courts so easy, because viewing cases is free of charge, it can be done remotely from anywhere, there is no user account needed to view the docket (unlike the federal courts' PACER system), it has relatively user-friendly search tools, all files are in standard (PDF) format, and there is no apparent tracking of cyberstalkers.  It is possible that OCA does some covert tracking or other analysis of misuse of the system that it has not yet disclosed, and that should be revealed to this Court because it could be helpful to the doxing victims.

151.    Members of the public reading this might not realize that access to court dockets is as unrestricted as access to books in a public library.  The difference is that visitors don't even need a library card to see the docket.  A visitor can enter the clerk's office with photo ID to view a paper case, and the office is open to minors.  However, on E-Courts, you don't need any ID at all, so doxing is a quantum leap easier to do.  You can effectively check out material from the adult literature section, and leave it in the children's department. Back in the old days, shops that sold pornographic magazines would keep them on the top shelf where they were out of sight of children, and under the watchful gaze of the shopkeeper.  But not at NY's E-Courts.  The adult material is on public view, unsupervised.  This could violate the Federal Enticement Statute, 18 U.S.C. § 2422, among other laws.  The commercialization of E-Courts' adult material is by definition interstate, since it can be viewed from anywhere over the internet.  NYSCEF's resistance to change

makes E-Courts look like an aging pervert exposing himself to youngsters, unwilling to change his behavior.  It also appears to be making the work of data miners and hackers easier, through its lax conduct.

152.    Why doesn't NYSCEF require user accounts as PACER does?  Technically, this could be easily done.  PACER can be expensive for users to download documents, but such a service doesn't absolutely **need** to be costly, because it is fully automated.

153.    NYSCEF is loosely controlled in other ways.  A lawyer called John Charles O'Brien from NY Presbyterian, which was not a party, was able to enroll himself with NYSCEF as representing the defendants in my Nassau case, thereby enabling him to receive the documents. I have been unable to determine how he did this or why, and when I asked NYSCEF it did not respond.  All lawyers listed on the electronic court filing systems as representing the current and former Defendants should be required to explain their roles.

154.    For OCA to pretend the problems do not exist is discriminatory.  In my experience as a litigant, OCA has been quick to resolve other types of problems, so why not these?  Litigants in other types of cases in the same courts do not have to endure such invasion of their privacy. OCA is discriminating against people of limited financial means who do not have the resources to hire an attorney.  It discriminates based on disability as well.  I am a disabled person – as many med-mal plaintiffs are – and for my adversaries to file my confidential medical records on a public docket with the deliberate indifference of OCA is a violation of my rights under the Americans with Disabilities Act, which is echoed in NYMHL Articles 9 and 33.  Litigants in other types of cases do not have to endure that type of abuse.

155.    Additionally, individuals other than myself have a vested interest in the security of my records.  The privacy of one person who was mentioned in my records was protected by the Sexual Orientation Non-Discrimination Act, "SONDA".  The privacy of two people mentioned in my records was protected by the ADA, and NYMHLs Article 9 and §33.13 due to substance abuse.

156.    OCA is also discriminating against me based on my parental status.  I am a mother of a high-school-age child – of whom I have had sole legal custody for years – and the document that my Defendants e-filed was inappropriate for viewing by minors.  I have spoken with other unhappy HPMB doxing victims who are in similar situations, with young children at home and their private information splashed all over the dockets.  However, there are currently no mechanisms to prevent minors or anyone else from visiting these dockets.  User accounts such as PACER employs are the logical solution to keep minors (and miners) out of E-Courts, other than the obvious measure of requiring clerks to take litigants seriously when they complain that certain inappropriate documents need to be removed from the docket immediately.

157.    OCA's procrastination also discriminates against me as a Christian and violates my First Amendment rights as regards religion.  I believe in taking a conservative approach about sharing adult information with youngsters, and in doing my utmost to protect their young ears and eyes.  Clearly the Defendants and OCA do not share that point of view, but the law demands that they respect mine.  I am not asking for much – only that OCA should avoid placing the sex and the confidential personal material on the "shelves" that are at children's eye level.  When this nightmare started, my younger son was at the tender age of seven.  Northwell started doxing me then, and KBR repeated the process on the docket when he was ten, and HPMB did it when he was fourteen.  Now, as a high schooler, my son is at arguably an even more vulnerable age, because he understands adult vocabulary and has the technical skills to find almost anything on the internet, but there are things that the Defendants published which my family and I think are still inappropriate for him to see.  In fact, they published information that we didn't want anybody at all to see – child or adult.  Consider that these files could even be viewed from student computers at any school in the country with internet access.  What mother of a young child would want everyone at the PTA coffee hour to know how she was locked in a psych ward, stripped, carried

like a cadaver and forcibly injected by a federal agent?  That is enough to be ostracized for a lifetime.

158.    I am afraid that Northwell's defense attorneys will repeat their misconduct, because OCA has not punished the offending lawyers or instituted any mechanisms or procedures to prevent attorneys from repeating such violations.  At the moment, **there is no deterrent**.  I ask this Court to create one.

159.    Ignoring this problem is a dangerous choice for OCA to have made.  One could envision a worst-case scenario like a "fork bomb" (denial-of-service or DoS attack) in computing, wherein a process continually replicates itself to deplete available system resources, slowing down or crashing the system.  The longer the problem goes ignored, the more plaintiffs become victims, and the more difficult and expensive it becomes to solve the problem.  Procrastination risks crashing the entire NYSCEF system, so OCA is not only forking plaintiffs like me whose pleas for help it is ignoring; it is also effectively forking itself.

160.    OCA's inaction has made me fearful to pursue additional litigation that might involve Northwell and its conspirators, which has prejudiced me as a litigant and violated my due process rights.  Does OCA think it is acceptable for litigants to bully their adversaries into silence by threatening to spill private information all over the dockets?   Even if I had a judge with a greater sense of urgency than my previous ones, that would not help much, because the very moment a confidential document is e-filed, it is too late, due to the instantaneous way that NYSCEF makes documents publicly available.


**Records of access to the civil dockets**

161.    A little-known interesting fact, which I learned on a visit to the Nassau County clerk's office to see my divorce case docket, is that the clerk actually keeps a record of every

individual who has requested access to a docket, on forms that the clerk calls "Document Retrieval Forms". The record of visitors to the docket is considered public information, even though the docket itself in some cases (e.g. matrimonial ones) is not. These forms were helpful to me in another case, because I caught my former divorce attorney – who was no longer the attorney of record – in the act of snooping on my matrimonial case docket (index #2011-202134) by posing as the attorney of record.

162.    However, I found that courts are inconsistent from one county to the next about keeping these records. Mr. Grier at the Suffolk clerk's office did not want to show me the list of visitors to the *Ritchie* docket; he told me that the list was incomplete, and that furthermore these records were for the clerk's internal use only. He did rattle off some names from the list verbally, but two of the visitors to the *Ritchie* docket did not even use their surnames, which seemed to me entirely too casual. The rules should be clarified, these "Document Retrieval Forms" should be kept in complete and consistent form across the State, and they should be available for public inspection. This should either be a service that the courts provide, or not; it should not be offered halfway. This exemplifies the inconsistent attitudes about privacy that I encountered across New York, in many courts and agencies.

163.    The FOIL clerk at the Nassau County Clerk's office – Tom Foley – told me verbally in May 2021 that **there is no such record kept for e-filed cases**. If they heard this, lawyers who do not litigate cases involving privacy would probably say "so what?" However, as a *pro se* litigant who has been victimized by defense attorneys who filed confidential documents without a seal, I was astonished by this discrepancy. Obviously, litigants in e-filed cases have the same right to information from the court administration as do litigants in paper-filed cases. I have not yet obtained a straight answer about why this dichotomy exists.

164.    Therefore, if what the Nassau clerk told me is indeed true, then when Chief Administrative Judge Lawrence Marks ordered at several points over the past seven years that

certain types of cases be converted to e-filing on a mandatory basis, **he was also eliminating litigants' ability to track both legitimate and illicit visitors to their dockets**. This was extremely prejudicial, since some types of cases (such as matrimonial ones) are acknowledged to be confidential and are typically full of sensitive information such as mental health and substance abuse, personal finances, and sex and relationships. In a civil case involving allegations of defamation or invasion of privacy, for example, a plaintiff might reasonably want to know how many people had viewed a particular private or defamatory document that had been maliciously e-filed, to be able to quantify damages.

165.    Mr. Carucci told me that **he didn't know whether OCA does any tracking of visitors to the e-dockets.** I believe this to have been code meaning that he was not allowed to talk about it, because I was asking a fundamental question that any official in his position should have been able to answer. If it wasn't code, it was a sign of negligence. This needs to be explored in discovery.


**My FOIL request to OCA, and the meaning of "incident"**

166.    Shawn Kerby Esq., Assistant Deputy Counsel at OCA, sent me a few documents in response to my initial FOIL request in January 2021, but it was not a complete set, and I wrote some follow-up questions which I sent on April 12th 2021 (see Exhibit C). These included *inter alia* the thorny issues of user authentication, visitor tracking, compulsory training of NYSCEF users, and compliance with the NYS Shield Act. On May 14th, 2021, Ms. Kerby said "We are still processing the request and expect to respond within 14 days." I never received a response. I emailed her again on August 5th, and she at last responded with the material in Exhibit E, F and G. I have discovered in ten years of correspondence with several State agencies that this is typical

behavior vis à vis deadlines: bureaucrats are quick to object if you fail to meet their arbitrary timetables, but they hardly ever meet their own.

167.   Ms. Kerby sent me OCA's data security policy manual ("CourtNet Security Policy", Exhibit G) pursuant to the first FOIL request.  This is a long document, but I am attaching it in its entirety because it could be important for many litigants and potential litigants.  I found that **the policy had not been updated since 2004 and did not comply with the New York State Shield Act of 2019**, which pertains to data security.   However, NYSCEF was not carved out of the Shield Act.   In NYSCEF's glossary, the term "incident" (p. 24) approximates the idea of a breach and is defined as "any adverse event that threatens the confidentiality, integrity or accessibility of information resources".   Ms. Kerby opined on the meaning of data breach in a letter to me (Exhibit E, page 2), "E-filings and user access by attorneys and parties of publicly filed records in NYSCEF do not constitute unauthorized access or a data breach".  But she did not state whose opinion this was – her own or an expert's.  Her statement showed she probably did not really understand my question – which is likely because she is an attorney, not an IT specialist – and this points to possible supervision problems at OCA.  The Shield Act[7] expanded the definition of "breach of the security of the system" to include unauthorized "access" of computerized data that compromises the security, confidentiality, or integrity of private information, and it provided sample indicators of access. Previously, a breach was defined only as unauthorized acquisition of computerized data.

168.   The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, requires HIPAA Covered Entities and their Business Associates to provide notification following a breach of unsecured protected health information.  The Rule says, "A breach is, generally, an impermissible use or disclosure under the Privacy Rule that compromises the security or privacy of the protected health information."  There are a few exceptions that do not apply in this context, and the burden

---

[7] https://www.nysenate.gov/legislation/bills/2019/s5575

of proof is on the leaker to show that an exception applies.[8]  Any bad-faith use of the information – such as Northwell's – is not eligible for an exception. While OCA is not a Covered Entity, Northwell certainly is, and by extension so are its lawyers.  This Rule demands that notification be given to the affected individuals and the US Dept. of Health and Human Services (HHS) Secretary in the event of a breach (See 45 CFR §164.408).  The media must also be notified if more than 500 individuals have been affected by the breach.  (NB: if the loved ones of all the HPMB doxing victims were included, the number could quickly reach 500.)  I have seen no evidence that OCA, Northwell, HPMB, KBR or any of their business associates have done any of the required notification.

169.     It is possible that OCA could be considered a Business Associate under HIPAA's rather broad definition[9], which is a person or entity who performs functions or activities on behalf of a covered entity that involve access to protected health information.  The HIPAA Rules generally require that covered entities enter into contracts with their Business Associates to ensure that the latter will appropriately safeguard protected health information, and there must be language describing what happens in the event of a breach.  The "Stipulation and Consent to E-Filing" form that litigants and attorneys have to sign every time they file pleadings in NYSCEF could be considered such a contract.

170.     For an attorney to improperly file confidential documents containing privileged health information – and personally identifying information such as Social Security numbers of plaintiffs – should certainly be considered an unauthorized use under the Shield Act, and meet both OCA's and HIPAA's definition of an incident or a breach… especially so when the offending attorney has been made aware of the situation and declines to remove the documents from the

---

[8] https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html
[9] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/index.html

docket, as the defense did in my litigation.   OCA should confirm for the Court that what I describe is an unauthorized use.

171.    OCA sent me its procedure for dealing with cybersecurity incidents (Exhibit C, p. 4 et. seq.).  Were any reports filed about the matter about which I notified NYSCEF, concerning my case and/or the other plaintiffs'?  It appears not, but I have not been able to obtain a straight answer from OCA, so it is a matter for discovery.  OCA should not be allowed to escape this malignant problem simply by refusing to call a complaint an "incident".  That is both an ambiguity fallacy (pretending there is some ambiguity in nomenclature that is actually quite clear), and a burden-of-proof fallacy (alleging that the burden of proof lies with someone else, other than the victim himself).  The NYS court system is creating an omertà about its discriminatory practices by silencing any discussion of them, and is setting a bad example to encourage leakers such as the HPMB and KBR attorneys.

172.    When litigants pay fees to the court system to file a case, they are also paying for the data security that should be guaranteed.  If the NYS court system makes no attempt to comply – or enforce compliance – with data security laws like the Shield Act, it is defrauding litigants.

173.    This parallels the conduct of delinquents like Northwell and its conspirators, who have spent ten years trying to bury my complaints or wiggle out through loopholes, rather than resolve matters.  Justice delayed is justice denied.  I asked OCA whether there had been other complaints similar to mine, and it replied that there had not – which is undoubtedly because it refuses to accept that the problem even exists.  This is analogous to the global warming debate, where the longer that the authorities wait to take the problem seriously, the more difficult it becomes to solve because so much damage has been done by government and industry being in denial.

174.    The internal audit reports that OCA provided me said that part of the audit methodology is to ensure that confidential information is protected, and showed for example that

failing to redact a Social Security number is considered a violation (NB: it is also a violation of NYS General Business Law §399-dd).  While this particular audit report was not directly relevant to civil medical malpractice cases, the methodology used was likely applicable.  I told Mr. Carucci and Judge Marks that e-filing of Social Security numbers has been a problem for several of the other plaintiffs who are victims of HPMB lawyers' misconduct, along with other sensitive information such as financial account numbers, driver's license numbers, full birth dates, names of minor children, prescriptions, and a lot of other healthcare info.  I am trying to avoid exacerbating these plaintiffs' privacy problems by including examples here, but I have given OCA the details, and I can show some examples in conference if required.

175.    The Shield Act defines a breach (in its lines 50-56) *inter alia* by "indications that the information has been downloaded or copied"; or "indications that the information was used by an unauthorized person, such as fraudulent accounts opened or instances of identity theft reported." So, surely, the fact that I have reported identity theft, and have shown OCA how easy it is to access my PHI on the docket, should have been adequate for OCA to consider this instance a breach.  For it to fail to do so would be *de facto* whitewashing.

176.    NYSCEF is vulnerable to cyberattacks because its data security is poor.  It has been promoted with great fanfare by the court system, and some of the public pronouncements about it have been true, but others have been a bit misleading.  It is not as safe and secure as the advertising about it suggested.  For example, NYSCEF does not yet use basic security techniques such as multi-factor authentication.  With this type of authentication, extra layers of security are added to a user account to prevent a would-be hacker from logging in, even if they have the password.  This technique is so ubiquitous nowadays that I cannot even communicate with my dentist without two-factor authentication, and I do not consider my dental correspondence to be confidential.  So why doesn't NYSCEF use it, where so many documents are privileged?

177.    Consider the risks inherent in the global nature of NYSCEF's audience –
defamatory documents could disappear to anywhere in the world, and there is no way to retrieve
or track them.  Private financial information could be stolen from the docket and used for identity
theft anywhere in the world.  I have seen several medical malpractice cases where plaintiffs'
medical records have been inappropriately e-filed, containing Social Security and financial
account numbers.

178.    UCS announced in March that it would begin charging a 2.99% service fee along
with all credit card payments submitted through the NYSCEF system from April 1, 2021.  So now,
a doxed litigant can not only suffer having his private information disseminated around the world
from the docket because NYSCEF doesn't have the technology or procedures to prevent this, but
he can also be forced to pay extra for it through credit card fraud and money laundering at the
hands of NYSCEF.  UCS said in its release that it does not retain the service fee, which I can only
interpret as an indication that the credit card companies are invited to sup at this mukbang of fraud
on the litigant.

179.    The money flow in my situation was as follows: (a) UnitedHealthcare collected
money from the State (Medicaid) and federal government (HHS) and laundered it to pay Northwell
to create my medical records, (b) Northwell paid its doctors to document my privileged
information (with extra remuneration added by pharmaceutical companies, which is an additional
level of conflict of interest because some of them are my business competitors), (c) it paid HPMB
to depose me, and write and e-file the motion, (d) HPMB paid NYSCEF to publish my privileged
information (after submitting a Part 130 form stating that the documents filed are not false or
designed for harassment), and (e) NYSCEF laundered this through the credit card company to
process the fees.

180.    This process becomes an orgy of racketeering, when the medical records have been
illegally created and disseminated as they have been in my case.  It probably only applies to a few

of the millions of pages filed on NYSCEF.  But it only takes a handful of pages to create millions of dollars' worth of problems and years of heartache for doxed litigants.

181.    **I ask the Court to state affirmatively that the nature of the problem I describe meets OCA's own definition of an "incident".**  This is a logical conclusion in the absence of any additional testimony, but if the Court feels that an independent expert's opinion is necessary, I ask that this be facilitated.   The Court should instruct Mssrs. Barry and Carucci to propose a plan to prevent this type of incident from happening again.

182.    I request that the Court order Mssrs. Barry and Carucci to either produce the record of accesses to my confidential transcript during the several weeks before it was sealed (Nassau case, docket #493 Exhibit G) or confirm in no uncertain terms that it cannot be done.  If the case had been paper-filed, I would have been able to obtain the answer with a simple request to the Nassau County FOIL clerk.  If there is no record identifying visitors to the docket, there might at least be a record of page hits or number of downloads of the particular PDF file containing my PHI.  This issue is potentially important for thousands of litigants whose cases involve privacy or defamation.

**Data ownership**

183.    NYSCEF's terms of use say, "This system and all data are the property of the New York State Unified Court System (UCS)".  NYSCEF defines the term "data" very broadly (Exhibit G, see glossary p. 23), as "any information created, stored (in temporary or permanent form), filed, produced or reproduced, regardless of the form or media".  So, does that mean the court system **owns** litigants' dockets in their entirety, with all of their personal information? Does it effectively "buy" them from defense attorneys, who e-file them without the plaintiffs' knowledge or consent? I have not been able to get an answer to this from OCA staff.   Mssrs. Barry and Carucci should

explain this to the Court.  Does their employer own my PHI if it is filed on NYSCEF?  Or does it only own the "containers" that it is put in – the database structure itself?  Surely OCA has already commissioned a written legal opinion on this, and if so, it should share that with the Court.

184.    Instead of doing the responsible thing and taking quick and transparent corrective action, OCA has been acting like a bunch of sneaky teenagers after Mom caught them playing some naughty computer games… sulking in their untidy room, refusing to do their homework. Mom said they could only play the "Everyone 10+" rated version of the game, but they have been playing the "Mature 17+" version anyway.

185.    The Shield Act expanded the preexisting data breach notification requirement to any person or business that owns or licenses private information of a New York resident. Since UCS claims to own the data, it should be included in this requirement.

186.    The question of data ownership becomes particularly thought-provoking when you take into consideration the fact that mental healthcare records typically contain confidential narrative about the patient's personal life.  In my case, the situation was particularly bad because Northwell put obscene material in my records without my knowledge or consent, and then published that material on its IT system where it could be accessed by over a thousand people, and then published it again on the public docket at the Suffolk County courthouse, and then again at the Nassau court by e-filing.  This was clearly designed in all instances to harass and defame me, and met the definition of cyber-harassment under NY Penal law §240.30.  Not only did Northwell traffic my private life, but it also published what amounts to pornography – with me as the unwilling porn star.  The hospital stripped, drugged and bullied me into submission, which enabled it to create and publicly distribute explicit adult material in its medical records. Additionally, Northwell's policies astonishingly permit it to package and offer its medical records for sale without the patient's consent – a controversial practice – although it does not state publicly what information it sells, and my deponents claimed not to know.  I became an involuntary "strawberry"

– a woman who trades sex for drugs (in this case, both involuntarily).  When you add to that the fact that I was actually being billed for this so-called treatment, it becomes satanic.  Northwell must terminate its sales of my private health information; if it is indeed doing so as it publicly claims to do, this is fraud and money laundering.

187.    So, who owns this "pornography" before and after it is published on the docket?  Is Mr. Dowling the Larry Flynt of the bar?  Or Mr. Carucci?  Or do I own the rights to my own psychiatric "porn"?

188.    Lisa Bloom Esq., the attorney for the plaintiffs in the Jeffrey Epstein and Ghislaine Maxwell cases, told the BBC on Dec. 29th that in the Southern District of New York, a sexual abuse victim can see justice served no matter how long ago the abuse occurred.  I hope that is true. How is my situation much different from the Epstein-Maxwell plaintiffs, except that I was an adult when I was abused?


**More legislation coming soon, while Shield Act not yet implemented**

189.    What does OCA expect plaintiffs such as I to do?  Mr. Barry has published an article that says, "Judicial administrators have no authority to intervene in individual cases or classes of cases pending in trial courts."[10]  I cannot obtain this article, which is subscription-only – an unspoken statement on Mr. Barry's apparent view that *pro se* litigants do not belong in the courts.  However, my Nassau Supreme case is no longer pending, and many of the other plaintiffs' cases have been disposed.  Although NYSCEF has not yet complied with the Shield Act, which was enacted two years ago, meanwhile, the NYS legislature is already pushing a new bill, "The NY Privacy Act" (S5642), to require companies to disclose their methods of de-identifying personal information, to place special safeguards around data sharing and to allow consumers to

---

[10] New York Law Journal, Sept. 28, 2020.

obtain the names of all entities with whom their information is shared.  Passage of this law would be a good thing, because it would bring New York closer to current European regulations. However, New York still lags behind much of the US because it lacks an invasion of privacy tort law.  New York is all talk and little action when it comes to privacy.

190.    **Further, the Shield Act mandates – *inter alia* – that officials such as Mr. Barry and Mr. Carucci take <u>personal responsibility</u> for data security.**  These officials are not doing so, therefore I ask this Court to order them to do so.  They might say they are giving the doxed plaintiffs OCA's standard dose of red tape, but its procedures are way out of date; it still fails to comply with HIPAA rules which have been in effect since 1996, and GINA (2008), let alone the 2019 Shield Act.  OCA is becoming a dinosaur, and needs to be ordered to catch up.

191.    Resources must be provided urgently to improve NYSCEF's data security.  The legislature cannot ethically foist a new law on the court system that has the potential to bankrupt it through cost of implementation, which the Shield Act and the proposed Privacy Act might indeed be able to do if cost were not taken into consideration.  The Shield Act requires companies to adopt reasonable safeguards to protect the security, confidentiality, and integrity of private information. It necessitates implementing a data security program containing specific measures, including risk assessments, employee training, vendor contracts, and timely data disposal.  OCA should tell the Court what has been done toward NYSCEF's compliance with the Shield Act, what still needs to be done, and what obstacles exist.

192.    If the Court does not wish to question the OCA Defendants in oral arguments, then I ask permission to depose them myself.  Mr. Carucci and the other NYSCEF staff I have spoken to seemed to understand the problem and have been polite, albeit slow to respond.   So, I do not think this is purely an attitude problem – at least not at the lower levels of the organization.  I suspect there are budgetary problems, and if OCA could confirm that is so, perhaps that would be a first step toward solving them.  NYSCEF requires some investment, but in the interim, litigants

need to be informed, and damage-limitation measures need to be implemented.  There need to be alternatives to e-filing.  If it is possible for NYSCEF to offer some quick fixes with third-party applications (e.g. for multi-factor authentication) while it is waiting to build a permanent solution, it should do so.

193.    I request that the Court also consider what relief and/or compensation could be provided to other litigants like me who have had e-filed cases in which private documents have either been maliciously or accidentally exposed to public view, if OCA indeed currently has no easy way to quantify the damage that was done through that public exposure by providing a record of accesses to the documents.

194.    One might initially think that I am a Luddite because I argue for limitations on electronic filing, but in fact I am just the opposite.  I have an educational background in computer science, and even though I earned my degree decades ago I have a basic understanding of the technical aspects of e-filing, and how it ideally **should** work.  I have not done any coding since the 1980s so I am certainly not suggesting that I could personally fix NYSCEF.  However, I have enough IT training to perceive that NYSCEF is a perfect host for new technologies such as artificial intelligence.  A computer can scan documents for some types of privileged or fraudulent information more efficiently than humans can.  Electronic medical records could be tagged with anti-theft code, to make them more difficult to unlawfully disseminate, thereby making them safer to use.

195.    I ask the Court to order the OCA Defendants to provide responses prepared by a suitably trained individual, since it was clear that although Ms. Kerby tried, she does not have the specialized skills to understand these issues.  Mssrs. Barry and Carucci should explain to the Court what specific training OCA staff and NYSCEF users are required to have regarding privacy and e-filing.  Perhaps part of the problem is that users and staff are not sufficiently familiar with privacy

law.  Ms. Kerby told me there is no continuing education requirement for lawyers in New York State to do e-filing.  Shouldn't there be one?

196.    If I have a case involving privileged information (as nearly all my cases do), I believe I am entitled to be able to track visitors to the docket, if the court offers that service.  But if that feature is unavailable, I should be entitled to exemption from e-filing until NYSCEF brings itself up to date, in order to protect the security of my information.  Other litigants will surely feel similarly about this.  The Court might order a survey of all e-filing users if it prefers not to draw that conclusion on its own.

197.    E-filing is a great convenience, but not one that is currently suitable for confidential matters in New York.  It simply is not ready yet.  Somebody needed to say this to the courts, since the state and federal agencies I contacted have been unwilling to deal with it.  I waited in hope for over a year but as far as I can tell, nobody else has filed proceedings to alert the courts to the problem.  Please do not think of me as a Cassandra, but as a public service.

198.    The OCA Defendants are included in several causes of action: §1983, §1985, TVPA, RICO, ADA/rehabilitation act, negligence, discrimination, NY human rights law, deceptive business practices, defamation, fraud, abuse of process, breach of fiduciary duty, unjust enrichment, IIED.

**NYSAG's involvement in these matters**

199.    Exhibit H is a partial transcript of an alarming phone call that I received from the NYSAG's office on February 23, 2021, pursuant to my complaint to it about the docket doxing.  I had complained to the NYSAG's Internet Bureau, but the response came from the Healthcare Bureau.  The caller – a caricature of a State bureaucrat – identified himself as Alex (which was fitting, since his behavior was that of a Smart Alec).  The call was an example of the type of

incessant buffoonery that I have been enduring at the hands of State agencies during my ten years of litigation.  Alex called me on a cellphone after 6pm (two things that State apparatchiks almost never do) and made some outlandish statements.  He refused to give me his full name, employee number, supervisor's name, or phone number.  He said that the OAG does not have employee numbers.  When I asked who his supervisor was, he said "I **am** the supervisor".  Alex refused to divulge his surname or his supervisor's name in our first conversation, although in the second conversation he said the Bureau chief was Kim Berger and deputy Clark Russell.  However, the NYSAG's website shows these two individuals are chief and deputy chief of the Internet Bureau, not the Healthcare Bureau.  Nowhere on the NYSAG's website could I find out who is chief of the healthcare bureau, and it no longer accepts phone calls.  Therefore, I have included Ms. James herself as a Defendant, since both the Healthcare and Internet Bureaus report to her.  She should identify Alex's supervisor.

200.    Alex astonishingly told me that it is unimportant that the plaintiffs' Social Security numbers are posted on the docket because in his view **nobody uses Social Security numbers anymore.**  He also seemed confused about what a court docket is.  He said it is irrelevant that my personal contact information is on the public docket because the NYSAG's office has the best internet security available (as if this had anything to do with the problem).  He reiterated several times that in his opinion the "New York State **Unified** Court System" (his emphasis) is my only recourse.

201.    Alex's false statement about Social Security numbers is particularly shocking because there is no private right of action under New York General Business Law §399-dd; only the NYSAG can enforce it. So, if Ms. James' staff doesn't understand it, then there is no hope of it ever being enforced in New York.

202.    The NYSAG should identify Alex and his supervisor and confirm that they were from the healthcare bureau, as Alex said he was.  I request that the Court censure the NYSAG for Alex's misconduct.  This man is a public menace.

203.    I called back a few days later on the bureau's land line (which at that time was still answered by a human) and was surprised to find that Alex did indeed appear to work there.  In any normally-functioning government agency, Alex would have been subject to immediate defenestration.  But the NYSAG showed deliberate indifference to my complaint about his conduct.

204.    Alex's behavior was an example of gaslighting, which – as the Court probably knows – is a form of systematic psychological manipulation in which an abuser twists or omits information selectively to favor himself, or presents false information, with the intent of making victims question their perception of reality – or even their own sanity. Instances may range from the aggressor's denial that he had instigated any previous abusive incidents, to his staging of bizarre events intended to disorient, frighten, and disempower the victim. The sadistic questioning, intimidation, and manipulation techniques that Northwell's operatives utilized on me included gaslighting, and its conspirators have continued that pattern over the ensuing ten years.

205.    Alex is included in several causes of action: §1983, §1985, TVPA, RICO, ADA/rehabilitation act, negligence, discrimination, NY human rights law, deceptive business practices, defamation, fraud, abuse of process, breach of fiduciary duty, unjust enrichment, IIED. Ms. James and John Doe are included in negligent hiring/supervision, and Ms. James in Judiciary Law §487.  I will address her misconduct further in the sequel to this case. Ms. James' *modus operandi* is preferentially prosecuting celebrity cases and political foes, while giving victims who are ordinary folk the cold shoulder.

**The City Bar Association, and obstruction of legal representation**

204.   I am not self-represented by choice, but only out of desperation.  I have been successful in obtaining a litigation financing offer from a top-five litigation finance firm, but have not been able to find a suitable attorney, which is an unnatural situation that cannot be explained by supply and demand.  It is particularly discriminatory in my case because the NYMHLs require that the hospital provide an involuntary patient with a MHLS attorney if he wants one, but Northwell and MHLS denied me that right.

205.   Further, it has become apparent that my access to an attorney has been obstructed by my adversaries since I was discharged from the hospital too, for several years, so I have been doubly denied legal representation.  Given the discriminatory way that I have been treated as a *pro se* litigant, this has been a near-total deprivation of my due process rights.  As mentioned above, Northwell had a hand in this, and so did the NYSAG and MHLS.

206.   However, the City Bar told me it could only refer me to **one** attorney for the docket doxing victims, and after considering the case, that lawyer told me that he didn't understand this area of the law well enough to take the case.  Only one attorney, out of 24,000+ members??  And no attorneys at all from two other bars (Nassau and Suffolk)??  That is not plausible.  It evidences obstruction.  To test the theory that the City Bar was deliberately obstructing me, I asked for a referral to a matrimonial attorney (which I actually did need).  I received no response at all.  The Bar's obstruction of my right to file a new False Claims Act case has been complete, because according to Judge Bianco in my 2013 whistleblower (*qui tam*) case, index no. 13-cv-2795, a petitioner cannot proceed without an attorney.  The obstruction of my younger son's due process rights has also been thorough, since as a minor he can't represent himself, and as a non-lawyer I can't represent him.

207.   The City Bar is acting as an extension of Defendant NYC to not only protect it from liability but also underhandedly neutralize its adversaries.  In past years the NYC Bar referred me

to other lawyers, but now suddenly it purportedly can't.  Other litigants I know have not experienced this type of difficulty.  In the past decade that I have been litigating, I could have gone through law school **three times**.  I didn't want to do that and shouldn't have to – it was the responsibility of MHLS and Mr. Parker to provide me with lawyering services.  I am a businessperson with an MBA, not a lawyer.

208.    You would never know this based on the City Bar's conduct, but its mission is "to equip and mobilize a diverse legal profession to practice with excellence, promote reform of the law, and uphold the rule of law and access to justice in support of a fair society and the public interest in our community, our nation, and throughout the world."  On the contrary, the City Bar demonstrated to me that the word "bar" in its name actually means "obstruction".

209.    The Bar Association's response is discriminatory.  It says on its website home page, "The City Bar was founded in response to growing public concern over corruption in the justice system in New York City.  Several of its early officers were active in seeking the removal of corrupt judges and in leading prosecutions of the notorious Tweed Ring."  The Bar seems to have lost sight of its roots, and reverted to participation in a racketeering enterprise rather than fighting against it.  It talks at length about its diversity and inclusion programs on its website, but in reality it is only interested in promoting minorities and women in law practice, not in helping litigants fight discrimination.  Hypocritically, its Lawyer Assistance Program offers free advice and support to attorneys who are struggling with addiction and mental health issues.  The Nassau and Suffolk bars are much smaller; they have been able to find me referrals in the past but mysteriously not this time.

210.    NB: I note that engagement of counsel is a ground for adjournment of proceedings under Section 125.1(a) of the Administrative Rules.  It should have been grounds to postpone all of the proceedings which I have been coerced into doing solo.

211.    The City Bar and Mr. Bret Parker, Executive Director of the Bar could be included in several causes of action: §1985, TVPA, RICO, ADA/rehabilitation act, negligence, discrimination, negligent hiring/supervision, NY human rights law, deceptive business practices, defamation, fraud, abuse of process, breach of fiduciary duty, Judiciary Law §487, IIED.   Some declaratory relief would be welcome.  However, I am not seeking damages from the City Bar, only an order for it to practice what it preaches.  Mr. Parker should personally take charge of finding me a talented, unconflicted litigator.  Otherwise, the Court should order the Bar to remove all of the anti-discrimination and anti-corruption statements from its advertising, change its name to the "City's Bar", give up its monopoly position, and lose its Section 501(c)(6) nonprofit status.

**Let's try to be fair, please**

212.    I will add – to be fair to my adversaries, even though they have not been fair to me – that I am not alleging **all** of Northwell Health employees are corrupt.  My family did business peacefully with this company and its predecessors for more than sixty years – since North Shore Hospital was built in the late 1940s.  I was born at that hospital, and so were my siblings and my first child.  My mother practiced internal medicine on Long Island for over 40 years, and referred dozens of patients to Northwell hospitals; my father is a surgeon who also practiced at a Northwell hospital for several years.  I had no reason to suspect that Northwell would defraud me and stab my family and me in the back repeatedly, as it has done.  I have had some good care in the medical specialties at Northwell in past years – such as the excellent obstetrician who in 1994 delivered my first of two premature babies, and the neonatologist who cared for him in the neonatal intensive care unit, and my superb former gastroenterologist.   However, Northwell's inpatient mental healthcare was shockingly abusive, and the company's senior management did nothing but attempt to conceal that.

213.    A plaintiff called Stacie Sullivan, a former nurse at Northwell, sued the company for false imprisonment because she was involuntarily hospitalized in the same hospital where I was detained, for two days. After a three-week trial, in June 2019 a Nassau County Supreme Court jury awarded Sullivan $3.5 million in damages. (*Sullivan v. North Shore Manhasset Hospital,* index no. 601819/2015).[11]  Calculated only on a *per diem* basis based on *Sullivan*, my case against Northwell would have been worth over $30m, for 18 days' detention. However, this plaintiff didn't have any of my other causes of action.  Why was Ms. Sullivan's case successful and mine was not?   In my case, the defense attorneys lied and cheated, chilled the information flow and obstructed justice, and there were conflicts of interest and corruption on the benches. There was no evidence of any of that in Stacie Sullivan's case. **But there was one key similarity: like me, Stacie was a whistleblower too.**

214.    There have been many other plaintiffs against Zucker and Northwell for *inter alia* false imprisonment, med-mal and battery: e.g. Prasanna Goonewardena, (Queens Supreme Court, index no. 6959/13), Dennis Harris, (Queens Supreme Court, index no. 27501/07). Sidney Zeitlin (Bronx Supreme Court, 22011/1995); William J. Donovan (Queens Supreme Court, index no. 018206/2011), Mike Severin (Queens Supreme Court, index no. 6924/2016), and Pearl Robinson (13-cv-4439, EDNY).


**Conclusion**

215.    I don't see what other recourse I have except to this Court.   The deliberate indifference that I experienced at the City and State agencies and State courts was more or less echoed at federal agencies. **The advice that I received from Washington agencies about docket**

---

[11] http://longisland.news12.com/story/40723595/former-nassau-nurse-wins-dollar35m-in-false-imprisonment-lawsuit

**doxing was that either the NYSAG should get involved or the court system should solve its own problem.  The federal agencies pointed the finger at the NYSAG, and the NYSAG pointed at the courts.**  It seems to me the best solution for the matter at hand would be for these Defendants – and the Defendants in the related case that will be filed shortly – to cooperate to solve the docket doxing problem, rather than continue this carousel of finger-pointing.  As the late Justice Ginsburg has been quoted as saying, "I think it will take true patriots on both sides of the aisle to say 'enough of this nonsense, we should work together for the good of the American people.'"  Further delay is likely to be damaging for litigants and their loved ones, not to mention public officials.  With the amount of resources that the Defendants' organizations have wasted on disingenuously deflecting my inquiries, they could already have made good progress toward fixing the problems.

**Further relief requested**

216.    It has been extremely difficult for me to write my own properly structured legal documents and adhere to court deadlines, without assistance, while suffering from disabilities and trying to raise a child solo. The fact that I have had to do that in order to achieve any form of due process is a catastrophic failure of the justice system. The medications that I have to take for PTSD and depression adversely affect my sleep, my energy and ability to focus.  (And no, these are not Oxycontin or other narcotics; I take only the typical prescription medications for depression and PTSD.)  In addition, I had half of my digestive tract surgically removed, and have had to live with that resulting disability too. And I had major spine surgery in 2009, which has also been disabling. All of this affects my productivity. The justice system did not cut me any slack due to my disabilities, although the law requires that it do so. Being a disabled *pro se* litigant is a double disability.  So it has taken me six months to write this complaint, and I still feel that I am stumbling around in the dark.

217.    Northwell's defense attorneys have hypocritically and repeatedly accused me of exceeding deadlines, while they were representing clients who detained me for 18 days for no valid reason without a hearing (to which I was statutorily entitled within 5 days under 14 NYCRR 27.8 and 27.9), and who never bothered to file any of the mandatory court paperwork for the detention. This was ludicrously unfair.  In a decade, the only hearings I have had have been about discovery and other procedural matters pertaining to my civil actions and Article 78 proceedings.  The cases were dismissed before the fundamental issues could be discussed.

218.    According to a release on nycourts.gov dated October 20th, the Nassau, Suffolk, Kings and Queens County law libraries still remain closed due to COVID.  They have been closed since March 2020.  The Nassau Court Information Center staff told me that the library could be used by appointment since about July, but it was completely closed for about 15 months, and there was no general announcement made about the selective reopening.  The Suffolk Court Information Center was supposed to be open but the representative did not return my calls or emails so it might as well have been closed.

219.    The libraries in the federal courts on Long Island and at Foley Square also remain closed.  The closings discriminate against *pro se* litigants, who cannot normally afford a good case law database subscription.  By contrast, law firms routinely have Westlaw subscriptions for their staff's use.  Google Scholar and other free services online are helpful but do not begin to approach Westlaw in their database size and search capabilities.  The closings also discriminate against unrepresented litigants because the State courts' libraries' information centers have been closed too, for a long period, meaning that no court staff have been available to help these litigants prepare papers for filing.  NB: As far as I can discern, these State court system staff ultimately report to the same people as those who have been making the bad decisions about how to react to the improper filing of medical records.

220.    In my experience with the court system, being a *pro se* litigant is like being a Dalit. We are a caste of untouchables, who are treated with disdain by judges, clerks and attorneys – no matter how competent we are at litigation.  However, if a litigant does not have an attorney, there is usually a good reason why he doesn't.  If *pro se* litigants are not already a protected class, we should be.  We deserve the courts' sympathy, not their scorn – especially during difficult times such as a pandemic.  But during COVID, education and library access for us Dalits was cancelled. This echoes the experience of involuntary patients, because the mental healthcare system also operates based on a caste system.

221.    The lack of law library access and the general shutdown of the courthouses during the pandemic caused such undue delay and confusion that my Brooklyn appellate court cases were dismissed for failure to perfect.

222.    The judicial system has been so dysfunctional during this period that I have not even been able to get a referral to an acceptable attorney.  This is extremely unfair, and the uncertainty has caused me undue stress.  Every one of my ex-husband's and my civil cases arising from Northwell's and its conspirators' crimes has been dismissed, except for a small Nassau proceeding against my former attorney Kevin T. Mulhearn Esq. to get a $10,000 retainer refunded, which involved so much delay and hassle it was hardly worth the effort.  I had legal representation from 2013 to 2016, but since then I have not been able to find an attorney despite contacting all of the metro NYC and Long Island bar associations, legal aid organizations and law schools. Attorneys have told me off the record that this is not due to any failings in my evidence or in my analysis.  It has been carefully orchestrated to obstruct justice.

223.    The obstruction and prejudice that I have been subjected to by my adversaries including the Defendants has worsened my depression and PTSD.  I request that the Court instruct the Defendants to stop trying to make me even more miserable than I already was.  Not only have

they taken steps that have clearly been designed to cause me emotional distress, but they have done this in a publicly visible way, to cause me further embarrassment and pain.

224.     The NYSAG and my other adversaries have caused me many personal problems. They crippled the British company of which I am Chairperson, by preventing me from being in the UK for the past ten years.  It nearly went bankrupt in 2015 while I was trapped in New York, over 3000 miles away, banging my head against the courthouse walls, where I could not do much to help it avert a crisis.  My elder son developed a health problem, and I could not help much from the other side of the ocean; this caused the entire family a lot of anxiety.   I cannot discuss the nature of the problem here for privacy reasons, but could explain it in conference.

225.     The culprits have not only been blockading me from obtaining a settlement, but have also simultaneously prevented me from doing almost anything remunerative to be able to support my younger son and myself.  This causes me chronic stress.  There is almost no medical technology industry remaining on Long Island where I might be able to find a suitable position, because these companies have all departed for more business-friendly states.  I ask the Court to instruct the Defendants to stop their lies and indifference, reduce the stress they have heaped on my family and me, and resolve this matter in haste.

**Leniency requested re deadlines**

226.     I request that the Court grant me leniency on procedural rules and deadlines, due to (a) the repeated obstruction of my legal representation, (b) the State agencies' failure to meet their own deadlines, (c) the abuse that I have endured at the hands of OCA and the Suffolk clerk as regards the public filing of my privileged records, (d) the NYSAG's false statements in my Queens case, and Northwell's false statements in my cases against it, (e) the lack of courthouse and library access for *pro se* litigants during COVID, (f) my status as a disabled litigant, and the fact that my

adversaries' outrageous behavior has caused me more medical problems than I already had, (g) the unclear language of former Governor Cuomo's Executive Orders as they pertain to how the emergency affects such deadlines (e.g. Exec. Order 202.8 and 202.60 which say it actually "tolls" SOLs or Exec. Order 202.38 establishes a "grace period" by suspending the deadline), and (h) the fact that the instant case is likely to be informative for the many other victims of docket doxing.

227.    These Defendants need to have their clocks cleaned.  They should not be granted any reprieves on deadlines.  They do not deserve any more breaks.

228.    Surely these must have been problems for other litigants, so it could be beneficial for the whole system if the Court issued a public statement on this topic and gave other med-mal and *pro se* litigants an extension also. It could relieve the anxiety that I am sure these other litigants and their families are suffering too.  I note that Rule 202.5(e) pertaining to omission or redaction of confidential personal information specifically states that "the court shall consider the *pro se* status of any party in granting relief pursuant to this provision."  Extraordinary times such as these call for measures by the courts that are less doctrinaire than usual.  I am not going to review all the deadlines in detail at this time, but simply request that the Court be magnanimous about the timetables in the instant case, and make a statement that other Courts and administrative processes should be generous with me as regards time, due to the extenuating circumstances.

229.    If the Court is reluctant to accept my arguments for flexible deadlines, then it should apply the insanity toll of CPLR 208.  The statute does not specify what insanity means, but courts have interpreted it as being available to "those individuals who are unable to protect their legal rights because of an over-all inability to function in society" (*McCarthy v Volkswagen of Am.*, 55 NY2d 543, 548 [1982]).  Generally, whether a plaintiff is insane for purposes of tolling the applicable statute of limitations is resolved via a hearing (*Santana v Union Hosp. of Bronx*, 300 AD2d 56, 58 [1st Dept 2002], *Giannicos v Bellevue Hosp. Med. Ctr.*, 42 AD3d 379, 379-380 [1st Dept 2007].  CPLR 208 says the statute of limitations is extended "by the period of disability",

and that the toll must not go on for more than ten years.  Surely the fact that I was committed for 18 days and drugged for no valid reason without a hearing, that I have had no other substantive hearing, that I was prevented from retaining counsel, that all of my *pro se* cases have been dismissed, that my adversaries have found it so easy to get away with lying to and about me, that people have difficulty believing me because my adversaries have stigmatized me so severely…. surely all of these must be signs of an "inability to function in society".   (NB: Meanwhile a Tennessee jury recently awarded a man $4.3 million merely because he was served a glass of sanitizer instead of water during a visit to a Cracker Barrel restaurant.  Clearly, I am in the most unsympathetic State in the country.)

**HIPAA fines; litigation fees and costs**

230.    I hoped that a federal court with its understanding of the HIPAA Privacy Rule might be better able to comprehend the severity of the privacy violations in this case, which even the Chief Administrative Judge of the NYS court system does not seem to have been able to grasp. I realize that HIPAA is a regulatory statute; no private cause of action exists under it.  However, the Court and the NYSAG have the ability to impose fines on litigants who expose plaintiffs' PHI, and I ask them to do so.

231.    "Tier 4" HIPAA violations are the most serious type and the kind that has been committed here; they involve willful neglect of HIPAA rules and no effort made to correct the violation within 30 days of discovery (42 USC §1320d-5, 42 USC §1320d-6).  The maximum fine for a Tier 4 violation is $50,000 per violation, up to $1.5m per year.  Offenses committed under false pretenses – which is surely the case here – allow penalties to be increased to a $100,000 fine, with up to 5 years in prison.

232.    The DOJ interpreted the "knowingly" element of the HIPAA statute for criminal liability as requiring only knowledge of the actions that constitute an offense.  Specific knowledge of an action being in violation of the HIPAA statute is not required.[12]

233.    Offenses committed with the intent to sell, transfer or use individually identifiable health information for commercial advantage, personal gain or malicious harm permit fines of $250,000 and imprisonment up to 10 years.  This applies in my case, since Northwell admits in its policies that it collects and sell patients' PHI to data brokers for profit, as discussed *supra*.  My adversaries have also used my PHI and other confidential information maliciously and unfairly to gain advantage in the courtroom, such as in the aforementioned saga over HPMB's infamous publication of "Exhibit G" in my Nassau case.

234.    I do not know how to calculate the number of violations that would incur fines in this particular case, and I seek the Court's guidance on that.  The question is: what constitutes a discrete violation?  Does a violator need to be on the caption in order to be fined?  I request that the Court impose fines, or if it thinks that it cannot do so, to ensure that the NYSAG does so.  I ask the Court to explain to me how the fining process works and how long it would take for me to receive funds.  Northwell could be fined, and so could Michael Dowling, and Dr. John Kane, who were also parties to the *Ritchie* case, and all of the individual defendants.  The two offending law firms – HPMB and KBR – and the City could also be fined, as well as the individual attorneys who committed the violations, and their supervisors.  The records have been on the *Ritchie* docket since 2014, so the fines could be imposed for that year, and each and every intervening year.  None of the judges of the various actions ever ruled on whether HIPAA fines should be imposed, so there is no claim preclusion or collateral estoppel problem.  I did attempt clumsily to use HIPAA in my first action (at EDNY), but my attorney withdrew it in a subsequent iteration of the complaint after he stated there was no private right of action.  I do not know why he failed to ask for HIPAA

---

[12] https://www.ama-assn.org/practice-management/hipaa/hipaa-violations-enforcement

fines to be imposed, but the important thing is that he did not do so.  Neither the two defense law firms nor their attorneys have been parties to any of the related actions.

235.    I also ask that my fees and costs for this application be refunded to me by the Court, which I will quantify at the end of proceedings.    The aspect of this matter that pertains to OCA and Ms. Pascale should have been handled internally, so I should never have had to pay to bring it to court.   Therefore, charging me for the process amounts to fraud and money laundering. Furthermore, I am doing a public service by bringing this proceeding, since these issues are of interest to other litigants.

## VI.   <u>DISCOVERY REQUESTED</u>

236.    I ask the Court to permit me to conduct discovery.  All Defendants need to be tested for the cronyvirus.  Every last document request that I have made of these Defendants – whether administratively or through prior discovery – was either denied, or delivered in incomplete form. I asked with specificity for information or document, but only received samples, or nothing at all. I have learned the hard way about my adversaries' trickery, by receiving thousands of pages of ambiguous, incomplete and misleading documents over ten years.

237.    I request that the Court order Defendants to submit specific but simple pleadings devoid of coded language until I have an attorney, since they have been preventing me from retaining an attorney who might otherwise be able to translate things from opaque legalese to plain English. The Court should also require them to comply with Local Civil Rule 7.2. (Authorities to Be Provided to Pro Se Litigants), with which my previous defendants in EDNY did not comply. I have learned a lot about litigation in ten years, but I still make mistakes because I am not part of a law firm, I have no staff, and I have no easy access to law libraries.

238.    I request that the Court instruct Defendants to refrain from using the bad-faith tactics which several of them have used on me in related litigation, such as information chilling in EBTs, declining to confer with me, withholding witnesses, misrepresenting the facts, misquoting the rules, submitting incomprehensible pleadings full of fallacies, requesting unnecessary adjournments, refusing to provide discoverable documents, failing to return calls or answer correspondence, seeking unnecessary formal authorizations, conducting *ex parte* conversations with law clerks, cutting me out of scheduling decisions, pretending to serve documents that don't arrive, producing illegible, redacted, or unauthenticated documents, and other forms of discovery obstructionism.  If documents existed but cannot be found, that should be disclosed, with details. Defendants should not be permitted to complain that documents are in archives, because they contributed to the chilling and obstructive processes that have caused this litigation to take so long. Moving documents from one organization's computers to another entity's or individual's servers to try to escape the scope of discovery – is Clintonesque cheating and the Court should consider that an unacceptable tactic.  If documents are archived, or require data recovery services in order to be accessed, I ask the Court to order the Defendants to do whatever is necessary to retrieve them.

239.    I have enclosed a HIPAA release form (Exhibit K) to enable the Defendants to release documents containing my own PHI to me, although this should not be necessary by this late stage of the matter.  I specifically forbid these organizations and individuals from releasing my privileged documents to each other, or to anyone else.  The Court should consider any release of my records without a HIPAA form to be defamation and invasion of privacy.

**Wearers of too many hats**

240.    Discovery is important in this context, if for no other reason than that one of the Northwell defendants – Abraham Lopez, this company's incarnation of Nurse Ratched from *One Flew Over the Cuckoo's Nest* – testified that he was working directly for the federal government when he assaulted and drugged me at Northwell, and that an "Agency" had sent him, but he implausibly couldn't remember its name.  This was a partial breadcrumb trail, not a deposition.  Another defendant (Dr. Lauren Hanna) testified that she had a security clearance, and was being paid by the government for her work at Northwell; she read from a "cheat sheet" in EBTs because she couldn't remember her cover story, while theatrically applying and reapplying lip gloss.  Another character out of the central casting department (Defendant Dr. Mark Russ) also intimated that he had a concealed role with the intelligence services.  (See Petition in *Andersen v. Sullivan*, ¶129).  But at no time did anyone suggest that this matter belonged in the FISA court instead of civil court.  This is either a matter of national security or it isn't.  If it is, then it probably belongs in the FISA court, and if it isn't, then these individuals should have spoken openly in EBTs.

241.    These impostors were the metaphorical equivalent of "ghost guns" – designed to evade detection.  My experience shows that the wall between the security services and ostensibly private mental healthcare is a mirage.  That should come as a surprise to most Americans, but it is a shock that needs to occur.  We need to have a public discussion about the problem that there is apparently nothing in the system to prevent illegal hybrid mental healthcare workers such as Lopez being deployed, as easily as a ghost gun can be created on a 3D printer.  It is a slippery slope from here to tyranny.

242.    I have not yet been able to depose anyone who was willing and able to explain why these masqueraders were working at Northwell.  Lopez did not exercise the fifth amendment privilege to avoid self-incrimination during EBTs, and neither did the other witnesses.  They only lied, or answered questions in a manner that was deliberately vague, and their attorneys prevented

them from providing more detail.  I need to know the nature of the impostors' relationship with their partially concealed third-party benefactors.  Consider that because I was detained by federal agents, Zucker hospital was to all intents and purposes a US Marshals' holding facility.   Lopez's federal employment magically transformed Zucker from a looney bin to a federal pen.

243.    The menu that I was served at Northwell's psych ward consisted of an only partially identifiable recipe, with some mystery ingredients – like a human version of Spam.  Mr. Lopez testified he was employed by the US Veterans Administration, and the VA sent me proof of this, but he also said he was sent by a nameless "Agency" to inject me with psychoactive drugs at Northwell.  So, I must have been conscripted because I had no history of military service.  I am making an educated guess that the agency to which he referred was **the** Agency – the only one that goes without a name.  The involvement of one federal agency was bad enough, but two of them turned Lopez into a three-headed military monster doing research on a civilian target.  Contemplate the hypocrisy of a Jewish hospital that has violated the Nuremberg Code.

244.    My family has had a working relationship with the Central Intelligence Agency, going back to the Reagan administration.  That is in the national press archives.  CIA is the **only** government agency from any country with which my family has had a material relationship, so my wager is that Lopez was referring to that Agency, even though I do not know of any legitimate reason it might have had to abuse me.  If he wasn't from CIA, then he was improperly insinuating that he was, which is almost as bad.

245.    Defense attorney Jonathan Bruno alleged in his pleadings that I said I had done work for the CIA, which was untrue.  However, if I had indeed said something of that nature, then there would have been some truth to it.   I did not bring this up prior to *Pheffer* (filed in September 2021) because I hoped I wouldn't need to, and because the Agency has done some unpleasant things to individuals who have talked about it publicly – even its own people.   (Some readers are now likely muttering "Oh, that explains everything. Spies."  But the problem isn't that simple.)

246.    There is more to my family's Agency relationship than I have stated here, and CIA has been close to this matter, but that is all that I feel comfortable saying in public pleadings; if the Court would like to have more information, I suggest that it ask me in conference.    I am not a CIA employee or contractor, I have never personally signed a CIA nondisclosure agreement, I was not working for the Agency at the time that Northwell detained me, and I am not a terrorist or a foreign government operative – so CIA has no official jurisdiction over me.  It might have been able to argue that it did have jurisdiction during a period of years in the past, but I have no information that it ever did argue that.  The Agency never complained about my conduct to me (or anyone else, as far as I know) at any time.  However, my Agency contacts hardly ever tell me anything, and whatever they do say tends to be shrouded in a gray fog of metaphors and parables.

247.    Nevertheless, I confirm that – unlike some of my adversaries – I am authentic. Lauren Andersen is my real name, and it is on the only birth certificate I have ever had.  My former married name is Lauren Ritchie.  I have only one identity, and have never worn any cover stories. I have written a book under a pen name of my own choosing, but that is not the same as having an intelligence cover.  I would appreciate it if the Court would order the Defendants to avoid further smearing of my persona.  Theirs may be disposable, but mine is not.

248.    When I wrote to Langley to ask for any documents it had pertaining to my Northwell detention, it said enigmatically in a letter dated September 21st, 2016, "we did not locate any responsive records that would reveal an openly acknowledged affiliation with the CIA".  It also said that the Agency could neither confirm nor deny any classified association between it and me.  I also wrote to the Director of National Intelligence under President Trump, John Ratcliffe, in September 2020 but received no response.

249.    Procedural due process does not have a "legacy mode" like software does, as far as I know, that would allow it to continue to operate in an outdated manner.  However, given the way that everything in this matter has been stolen from me by fiat – including my belongings, my PHI,

and even my person – it would not surprise me if the federal government improperly exercised jurisdiction over me, and I am entitled to information about that so that I may try to terminate it and obtain compensation.  I cannot find anything in CIA's recruiting literature about abduction, psychiatric detention, drugging and peonage as a path to employment.

250.    The extent of the federal government's involvement is highly relevant to this case. My experience shows that the feds conspire with the State to take a citizen's passport away from her if she dares to politely disagree with it.  What is the point of the US offering crowd-pleasing gestures like genderless passports, if a citizen's ownership of his own passport can be revoked in a heartbeat?  This is not progress, it's one step forward two steps back.

251.    The intelligence agencies have a history of over-classifying documents for various reasons, including predatory over-classifying to cover up misconduct. Federal legislation was passed in 2010 to try to prevent this: The Federal Over-Classification Act, signed by President Obama.  Since Obama introduced the concept, it would be terribly hypocritical cheating if a federal agency was involved in over-classification in my case, since I was detained only a year after the Act was signed.  Federal agencies must not be permitted to conceal documents pertaining to me, unless they can prove that they have jurisdiction and there is a genuine need for classification.  If information was classified, I would need to have been informed for any agency to avoid violating my due process rights, because I do not believe any of them have jurisdiction over me.  I wasn't informed.  If documents have been removed from my files by an undisclosed third party (e.g. a federal Agency), Defendants need to explain the details, not give me the runaround like they have previously done.  It's as though I can hear something scratching and nibbling behind the walls, but I can't tell exactly what it is yet.

252.    So, I ask the Court to order these Defendants to reveal what they know about classification of information pertaining to me, which agency did it, why and when.  Otherwise they will continue to undermine my due process rights, leaving me stumbling around in the dark not

knowing where to go to obtain declassification.  If I need to sign a release or sue somebody else to get the information, I first need their name, title and employer.

253.    The testimony of defendants Lopez, Hanna and Russ about their government connections (see *infra*) appeared to have been motivated by gamesmanship, which is a sad statement about the government's view of the limits – or lack thereof – on its powers.  There was no legitimate reason for the Agency or any other federal government entity to be involved in my detention at Northwell. Witnesses and attorneys for Northwell, the City and the State have behaved like a tribal court, or a band of fraternity brothers and sisters conducting a sadistic hazing, in a Greek system run amok.   They sent me on a "snipe hunt" – a fool's errand, designed to make me fail at obtaining information that was deeply concealed.  This was part of the pattern of bullying that has characterized the behavior of my adversaries and their conspirators for the past decade. The harassment continues to this day.

254.    Coincidentally, I was discharged from the hospital on the same day that former CIA Director Leon Panetta resigned in a press release – June 30, 2011.  Mr. Panetta was the author of the "Panetta Review", a secret CIA internal review that cast a harsh light on the Bush-era enhanced interrogation program.  The Senate Intelligence Committee released an explosive 6700-page report in December 2014 (see Petition, ¶142 et. seq.), with 20 key findings, including *inter alia* that "The CIA's use of its enhanced interrogation techniques was not an effective means of acquiring intelligence or gaining cooperation from detainees" and "The CIA's justification for the use of its enhanced interrogation techniques rested on inaccurate claims of their effectiveness."  This was relevant to my experience, since Northwell used enhanced interrogation techniques (EITs) such as "DDD" and induced regression (see *id*.) to torment me, its conspirators destroyed evidence, and the company has also made inaccurate claims of effectiveness of its so-called "treatments".  The terrorist Abu Zubaydah was subjected to only 14 days of EITs; I endured 18 days.  Admittedly I was not waterboarded or chained to a wall, and EIT experts would probably call what I experienced

the "EIT lite" version – but I was a victim, not a terrorist, so any form of interrogation was completely unjustified.  And it makes for a particularly shocking comparison when you realize that although I was not a terrorist, I was charged fees to undergo EITs.  Did the CIA bill Khalid Sheikh Mohammad up front on his credit card for waterboarding? On that basis, Northwell's techniques should be considered even more shameful than CIA rendition.

255.    The New York Times said on November 1st, 2021, discussing the trial of Al Qaeda courier Majid Khan, "seven senior military officers who heard graphic descriptions last week of the brutal treatment of a terrorist while in the agency's custody wrote a letter calling it 'a stain on the moral fiber of America.'"[13]  Mr. Khan "spent two hours describing in grisly detail the violence that C.I.A. agents and operatives inflicted on him in dungeonlike conditions… including sexual abuse and mind-numbing isolation"… The letter said, "This abuse was of no practical value in terms of intelligence, or any other tangible benefit to U.S. interests" and called it "a source of shame for the US government".  Similarly, the abuse that I endured should be a source of shame for both the New York and US governments.  It looks especially bad at a time when the US military is simultaneously publicizing its efforts to protect civilian casualties.

256.    Ironically, Northwell and some of its conspirators are located along the stretch of Northern Boulevard on Long Island that the State prominently signposts as the "Washington Spy Trail".  If they had been driving a car with only one headlight working, they would be stopped and fined.  So why aren't they being punished for ostensibly being healthcare providers, but with an additional mystery driver at the wheel, with a hidden agenda?

---

[13] "U.S. Military Jury Condemns Terrorist's Torture and Urges Clemency", by Carol Rosenberg, *New York Times*, 11/1/21.

**My FBI "rap sheet"**

257.     Determining the true origins of the Defendants and their attorneys is also important because thanks to them I now in all likelihood have a rap sheet with the FBI, however if this indeed happened, it did so in a completely opaque manner.

258.     The Brady Handgun Violence Prevention Act of 1993 (18 USC §922(4)(d)) permits the FBI to enter the name of any patient who has been hospitalized for alleged mental illness, into its NICS (National Instant Crime Statistics) database. Astonishingly, this is without the individual's knowledge, and regardless of whether or not the patient has been violent or self-harming. There are over 6 million active mental health records in the FBI NICS indices.[14]  That's a big number – about the same number of people who perished in the Holocaust.  How many of those people even know they are in the NICS?  I have talked to dozens of other former patients in the past decade and none of them knew about the NICS database, or the likelihood that they might actually be in it.

259.     However**, according to 18 USC §922(g)(4), you have an "affirmative defense" if you were committed by a federal agency, and you have been found to be "rehabilitated"[15]** – whatever that means.  Due to the involvement of Lopez alone – even without his suspiciously federal-looking colleagues – I should theoretically be able to use this affirmative defense to escape being entered into a permanent state of purgatory in the FBI's computers.  But there is no explanation in the statute of how one is supposed to go about using this affirmative defense.  It seems to be a weapon with no handle, so I ask the Court to explain it.  Presumably one first has to know which federal agency was involved, and in the case of Northwell defendants Lopez, Hanna, and Russ, it isn't entirely clear.

---

[14] 2019 FBI NICS operations report, p. 28.
[15] https://www.atf.gov/file/58791/download

260.    I am entitled to know what happened to my right to own a firearm as a result of this rap sheeting process, and FBI didn't have the decency to tell me when I asked it.  If I no longer have such a right, or there is any uncertainty about it, I want to know why, and what I am now expected to do with the Beretta shotgun that I have owned since 2006, and which has been gathering dust in storage because I do not know whether I am forbidden to use it.  The Defendants have been unwilling or unable to tell me.  I am currently being held captive with my Beretta in the "donut hole" of society where the justice system fails to operate (or perhaps "bagel hole" would be a more appropriate metaphor, since I was detained in New York).  This is an apartheid system: the privileged who reside on the bagel, versus the deprived who exist in the hole.

261.    The millions of people who have had temporary symptoms of mental illness – for which they might have sought care voluntarily but were then bait-and-switched to an involuntary psych ward admission – would probably be furious to find out that their healthcare for a temporary problem resulted in a permanent rap sheet thanks to the Brady Law, and that their only recourse to remove it is to sue the government.  I hope this case will shed some light on these underhanded practices.  (NB: There are aspects of Brady that need to retire.)

262.    What is the difference between a criminal charge and a diagnosis which results in a FBI rap sheet for the patient?  What is the difference between bail, and involuntary hospital fees?  What is the difference between a sentence, and psychiatric detention?  What is "healthcare" about any of this?

263.    The commercial transactions change everything in this picture, because they become tying arrangements with the government, which are illegal in both the US (under the Sherman and Clayton Acts and 12 U.S.C. § 1972) and Europe (under Article 101(1)(e) and Article 102(2)(d)).  The so-called "private" hospital fees are no longer fees; they become an unlawful form of taxation without notice.  I believe these arrangements are transparently illegal, but even if you had to apply a Rule of Reason analysis, as USDOJ says "Although the elements of a *per se* tying

violation have been articulated differently, courts generally require that: (1) two separate products or services are involved, (2) the sale or agreement to sell one is conditioned on the purchase of the other, (3) the seller has sufficient economic power in the market for the tying product to enable it to restrain trade in the market for the tied product, and (4) a not insubstantial amount of interstate commerce in the tied product is affected."  Consider that I was being billed by Northwell via UnitedHealthcare – both monopolistic players – for shady agents of the federal government with fake IDs to drug me against my will, at an unspecified dollar amount that was part of a usurious overall fee, with no notice, no informed consent, and for no valid reason.  This was abundantly fraudulent.

264.     Northwell was like a DARPA contractor stealing my credit card and charging the rental costs of a government spy robot called Lopez on it, which I didn't order, without giving me a receipt, a manual, or any means of getting a refund after the robot turned on me like HAL9000. The cost of the robot became a tax, and Northwell effectively became the IRS.  The additional tie with UnitedHealthcare made this not only a tying arrangement but a champertous one too.

265.     Additionally, if there was a warrant application pertaining to me, I believe I have the right to see it, and the court order too.  I should be able to verify that the Woods Procedures had been followed, and obtain details of the process so that I could evaluate it for conflicts of interest.  As this Court knows, the Woods Procedures are strict checks and balances that require every fact submitted in support of a wiretap application to be verified all the way to the top of the FBI, but USDOJ found that FBI had not been adhering to them in dozens of cases. The FISA court approves almost every single application that is made to it.  Of nearly 10,000 applications over the period 2011-2016, it approved all but 13, so FISA warrants are effectively a rubber-stamp process.

266.     The existence of an incorrect FBI record could not only adversely affect my gun rights but also my future ability to obtain employment, financing or life insurance.  These Defendants – who surely understand this process  – need to explain how a patient's information

gets to the FBI (e.g. via NYMHL §7.09(j)(1) or otherwise), and produce my FBI NICS record if they have it.  The Court should explain how I can get my FBI record corrected.  I was unable to make any progress with this in State court.

**Other interlopers: the Treasury, Big Pharma, and the British**

267.    There are several other potential interlopers in this matter that are important to consider because they signpost the need for discovery.  The US Treasury has also been close to this matter, which is important because this might point to additional improper federal meddling in my litigation.  My ex-husband Mr. Ritchie and I were involved in a US Tax Court whistleblower case (no. 26195-16W, sealed) with the Treasury Department from 2009 to 2019.  This was a large case (over $100m) compared with the average of its kind.  IRS actually told us in no uncertain terms that the information we had given it was useful. However, IRS deliberately botched the investigation, ignoring the facts and feigning insufficient resources to handle the international aspects of the inquiry, thereby torpedoing the case.  The matter went to the top of the Treasury Dept. under Geithner and subsequently Lew, so it is possible that Treasury also was interfering in my Northwell litigation.  Importantly, the taxpayer under investigation in this whistleblower case has donated large sums to one of Northwell's big charitable causes, so it is plausible if not likely that Northwell was trying to help its fellow benefactor by harassing me.  I also received a death threat in May 2014, a few days after I sent a complaint to former Senator Carl Levin (Democrat), who was Chairman of the Senate Permanent Subcommittee on Investigations (retired 2015). The IRS announced that it intended to audit my family's North Carolina-based medical technology business, shortly afterward, without even so much as a pretense. IRS spent six weeks auditing our company, and did not find anything wrong, so this was an example of the type of pretextual harassment that IRS has been criticized for practicing.  If the Treasury/IRS indeed had contact

with Northwell about me, that would retroactively transform Northwell's intrusive EBT questions about my finances into an illegal audit.

268.    Also potentially close to this matter are several pharmaceutical and medical technology companies, including *inter alia* J&J, Pfizer, Lilly, Roche, Medtronic, Bayer and 3M. These companies' top executives dominated the board of my industry's Washington-based trade association, AdvaMed (formerly HIMA), while I was also a Director of that organization. Lobbying organizations such as this are cronyvirus superspreaders.  Northwell doctors receive financial compensation and benefits in kind (e.g. expert-led forums, meals, gifts, travel benefits) from companies such as these, and have been doing so for many years (*Andersen v. Sullivan* petition, ¶21).  Northwell refers to these companies as "Business Associates", which is HIPAA terminology – and ironically also racketeering terminology – for those who work in affiliation with a mafia organization but are not official members. Northwell states in its policies that it grants its Business Associates access to its computer system (id., ¶20), although I was unable to obtain details in previous discovery on how that process works.  Can you imagine your doctors effectively selling sideshow tickets to your business competitors, to allow them to read your medical records? This policy amounts to aiding and abetting industrial espionage of the most intrusive type.  I want to find out what if anything my competitors were allowed to do with my privileged files, as Northwell Business Associates, because if they were allowed to access my files at all, it would transform their emoluments to Northwell doctors into blatant trafficking and money laundering. Even if a particular pharma company does not currently sponsor a particular doctor, it may have done so in the past, and with a doctor such as Kane, who is near retirement age, this activity may have been going on for several decades, creating loyalty to the company.

269.    Anti-competitive palm-greasing by the big pharma players has periodically been a subject of fierce debate on "K Street" – the nickname for the area where the lobbying activity takes place in Washington – for decades.  For example, Pfizer paid $60m in fines in 2012 for bribing

doctors in eight countries. Lilly paid fines in 2013 for corrupt practices in China.[16]  But these companies are so huge that they shake off these fines like an elephant with a fly on its back, and there is almost no oversight of K Street's misconduct.

270.    I made the mistake of thinking I should do what I had ostensibly been voted onto the AdvaMed board in the mid-90s to do – represent the interests of entrepreneurial companies in the industry, including my own.  But apparently, I was only supposed to pretend that I was doing my job and utter the occasional motherhood statement, while I quietly sat at the boardroom table looking feminine, watching the large companies lobby on the Hill for legislation that would hurt entrepreneurs.  I was forced to either be a silent token, quit and lose face, or stand my ground.  I unfortunately stuck with what I had been elected to do, not knowing these CEOs' history of brutal retaliation.  In response, the misogynist CEOs of these companies conducted invasive industrial espionage against me, crippled one of my startup companies at birth, Andersen Caledonia Ltd., and bankrupted another one (a software company).  I have not forgotten this, not least because I am still suffering the financial ill effects of the bullying.  It sent me into a depression that nearly killed me.  When I wrote a book about it in 2009, AdvaMed threatened to sue me, although it never denied my statements about the members' conduct.  It is plausible that these companies used their tame psychiatrists at Northwell to stage a continuation of their harassment campaign against me, and if so, I am entitled to know how they were involved because I was detained on the pretext of mental healthcare.  Pharma companies supply Northwell with drugs such as Effexor®, Trazodone, Seroquel®, Haldol® and Ativan®, which it coerced me to take, in potent multi-drug cocktails for which there was no regulatory approval.

271.    The irony is that AdvaMed's Directors tend to be politically conservative gun owners, whose worst nightmare would be incarceration at their own expense in a Democrat-run

---

[16] "Pfizer Settles Federal Bribery Investigation", Wall Street Journal, 8/7/12, J. Rockoff and C. Matthews.  "Eli Lilly 'deeply concerned' over allegations of bribing doctors in China", the Guardian, 8/22/13, T. Macalister.

psych ward that took away their firearm rights.  But K Street CEOs don't typically take on fights such as this by themselves; their custom is to throw one of their pawns under the bus.   It is entirely possible that K Street actors deliberately forced me into a situation where I would have to defend their gun rights – despite the fact that I do not owe them any favors.  They tricked me into defending their rights in the past.  However, until I discover more about Northwell's Business Associates, I have nobody from the pharma industry to put on the caption.

272.    Dr. Kane had an obligation to recuse himself, due to his conflict of interest arising from his paid pharma industry relationships, but he ignored Northwell's recusal policy – just as his staff ignored most of the company's policies.

273.    The British government has also followed this matter.  I have two letters from Number 10 Downing Street (see one in Exhibit J) in my file from when Prime Minister David Cameron (Conservative) was in office, saying that it was considering the matter.  This was at least better than the zero response I received from three White Houses.  Then Number 10 stopped responding.  It is likely that there was some correspondence between Number 10 and the US, but I have not been able to obtain it yet.  The subsequent PMs, Theresa May and Boris Johnson (both Conservative), failed to reply at all.  Ms. May had been in charge of the UK Border Force (immigration agency) in her role as head of the Home Office under PM Cameron, so the immigration agent who denied me passage at British Airways in NY ("Nick") reported ultimately to her. The Border Force and BA refused to identify the immigration agent or provide me with substantive further information.  The chilling on the other side of the Atlantic has hindered my quest for justice in America, and vice versa.  Any evidence of involvement from the UK would not absolve the US federal government of responsibility because foreign governments can't legally detain American citizens in the US without US government permission, however if the UK government was involved, I need to know about that.  (NB: I had not been resident in the UK for four years before I was detained at Northwell.)

274.    The Defendants are likely to have some information about government entities and third parties such as the pharma industry that may have been interfering in my litigation, which they should divulge; if they cannot do so, they should reveal who is blocking the disclosure.  It seems to me it would be in their best interest to disclose whether the federal government or some other third party has been interfering with their work, which might enable them to deflect some of the blame.

## 50 U.S.C. § 421 - the Intelligence Identities Protection Act

275.    If the employers of these government pranksters refuse to be publicly truthful about who they are and who employs them – then I would appreciate it if the Court would order them to either give me a security clearance enabling me to find out, or have me prosecuted under 50 U.S.C. § 421 – the Intelligence Identities Protection Act of 1982, which makes it a federal crime to disclose "any information that identifies an individual as a covert agent to any individual not authorized to receive classified information".  Does this law mean that a deponent who is an intelligence officer, and is asked to reveal his identity or those of his colleagues in EBTs would be committing a criminal offense if he answered?  Does it effectively give him permission to lie under oath?  And was I, as a *pro se* plaintiff, committing a crime by posing such questions to deponents?

276.    Perhaps this is the real reason that I was unable to find an attorney to conduct depositions in the Nassau case, and my adversaries pressured me to conduct EBTs without a lawyer.  If I had had an attorney, he likely would have known that he could not ask the questions aimed at unmasking the perpetrators, otherwise he would risk committing a crime under 50 U.S.C. § 421.  But if he failed to ask them, he would have committed malpractice because this information was material to the case.  So, he would have been between the proverbial rock and a hard place: his client, and a Tyrannosaurus Rex.  **This demonstrates why 50 U.S.C. § 421 is unconstitutional**

**in a case such as mine, if it results in a deprivation of procedural due process rights because it prevents the victim from fully identifying his abusers.**  I have not found any historical cases where this point has been raised.  Are there any?

277.    I am entitled to not only be able to identify the monkey who has been peeking under my skirts but also the organ grinder, so I do not intend to stop trying to unmask these individuals.  Therefore, surely, I must be violating this law, but I arrived at that through my adversaries' entrapment and violation of my 5th Amendment rights.   The whole country would surely be interested in a civilized debate about this, which goes to the heart of what Americans think about transparency and government accountability.  Americans have managed to find millions of available hours to discuss whether or not we should wear a scrap of fabric over our mouths, so surely the question of whether the mental healthcare workers who imprison us should be required to reveal their true identities is worth a meaningful number of hours of public debate.  Other questions include why our security services have the time and the freedom to torture nonviolent, disabled mommies rather than prosecuting terrorists.  Crimes such as extortion take on new meaning when they are revealed to have been perpetrated by officers of the US government (e.g. 18 U.S.C. § 880).  And law enforcement's failure to prosecute takes on new meaning if Northwell was really only a front for federal actors.  These topics demand serious consideration.

278.    **50 U.S.C. § 421 fails to take into account the real possibility that an intelligence officer has committed crimes and needs to reveal his true identity to a court.**  But if he isn't identified, the Court can't order him to stop his abusive conduct.  This could turn the entire litigation process into a scam – an advance-fee swindle designed to bait-and-switch the plaintiff, drain his bank account, and entrap him.  The Court cannot be responsibly mute about this.  I ask that it make a recommendation that does not involve continued deprivation of my procedural due process rights.

279.    In December 2020, the U.S. Supreme Court sided with three Muslim men who say they were forced onto the No-Fly List when they refused to become informants for the FBI.  With a unanimous ruling, *Tanzin v. Tanvir* reaffirmed the principle that individuals can sue federal agents for violating their rights – for money damages.

280.    But in order to sue such individuals in a Bivens action (which I have not yet the resources to fully research), one presumably needs confirmation that they are indeed federal agents, with some degree of specificity.  I have that paperwork for the individual who calls himself Abraham Lopez but not for his coworkers.  However, it is logical that since he was a federal agent, so were they.  And further, the documents that I have for Lopez only say that he was working for the VA, not the Agency.  This deception met the definition of medical quackery.  I have Dr. Jekyll, but I want Mr. Hyde as well, because together they are worth at least double.  (NB: At last!  An application of the pronoun "they" to an individual, that we can all understand.)  Lopez's supervisor and co-defendant at Northwell, Ms. Kompancarcil, fled the country and managed to escape depositions thanks to Judge Steinman's largesse.  The other deponents suffered from complete amnesia about who participated in the assault and battery incidents, however I established that Dr. Hanna was present and participated in the injection incident.

281.    Not only do I have the right to know where my adversaries really come from, since they detained me through ostensibly official channels using false information, but I also need to know who their attorneys and their benefactors really are.  Federal agents do not tend to be defended in court by privately-funded attorneys, but that is what the attorneys at HPMB and KBR have purported to be.  I do not believe them, not least because they have lied and cheated with impunity about many other things.  For example, Jonathan Bruno of KBR could not have failed to know that Lopez was a federal operative, but he nevertheless argued that Northwell was a private employer and therefore not punishable under §1983.  Lopez revealed in depositions five years later

that he was in fact a federal government employee.  The provenance of the lawyers in this matter – and the source of funds used to pay them – is as important as the origin of their clients.

282.    The Defendants' true identities and concealed employers could have a bearing on jurisdiction under 28 USC §1391(d) and (e).  In discovery, they need to fully identify themselves, their real employers and their clients.

283.    Taking documents from computers belonging to one organization and removing them to another entity's servers (or personal ones) to try to escape the scope of discovery – is of course Clintonesque cheating, but many documents in this litigation have mysteriously been reported as missing or inaccessible.  These Defendants have likely cheated in this manner.

284.    The chances are very slim that there was complete alignment of policies and procedures between the double-dealing Defendants' visible and concealed employers.  This needs to be studied in discovery.

285.    The attorneys' third-party connections also have a bearing on attorney-client privilege.  The American Bar Association says, "Either voluntary or inadvertent disclosure to outside or non-covered recipients, professional advisors outside the privilege, and experts and consultants, can result in waiver as a matter of law."[17]  "[T]he 'seal of secrecy,'... between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *United States v. Zolin,* 491 U.S. at 563, 109 S.Ct. 2619.  Consider this possibility: if either the client or the attorney doubled as a government or third-party agent/contractor/employee, then **any** communications to or from that attorney by definition automatically included a third party – the external benefactor.   Then by definition, the communications involved fraud, because the actor's true nature and motives had been concealed.

---

[17] https://www.americanbar.org/groups/litigation/committees/business-torts-unfair-competition/practice/2017/how-to-lose-attorney-client-privilege/

That applies *inter alia* to Lopez and Hanna, who failed to reveal their government employers until six years after litigation began.

286.     It would look almost as bad for my adversaries if the third party were a private organization rather than a public sector one.   Laundering of money or decisions through intermediaries is a common deceptive technique to avoid detection of government tampering, and I need the Court's help to be able to see through that type of trickery.

287.     The deposition transcripts (Exhibit L) show evidence of tampering, concealment and intimidation – but who was really behind the scenes of that interference?    The HPMB attorneys tested the outer limits of attorney ethics violations under Part 1200 Rule 3.4(c), §221.3 of the Uniform Rules for the Conduct of Depositions (see Nassau case, docket # 362, 364 and 379), and 22 NYCRR part 700.4 (Rules of Court Decorum).  They violated every conceivable rule about depositions, instructing their clients not to answer dozens of questions, testilying for them, taking them out of the room in the middle of questions, etc.  Mr. May promised to provide Lopez's resumé (Lopez EBT, page 14), then reneged on his promise.  He promised to produce Lopez' supervisor Ms. Kompancaril for an EBT, then reneged on that too.  The chances that there was no communication between these attorneys and their clients on many sensitive issues – such as how to answer questions about their government employment histories and security clearances, for example – are essentially nil.

288.     It is important for the interference of third parties in my litigation – and all funding sources – to be revealed with specificity, due to the potential for there having been violations of Judiciary Law §489, which pertains to the champerty doctrine.  It is not champertous when the purpose of the assignment is the collection of a **legitimate** claim.  But not a single penny collected in a decade of litigation about this matter has been legitimate, because they all stemmed from related fraudulent acts.

289.   The provenance of the private and government attorney Defendants is additionally important because they based their pleadings on documents that they knew or should have known were not notarized or authenticated, and that in at least one instance were in all likelihood forged. None of the dozens of signatures on the medical records that Northwell produced in discovery were notarized, and most of them were completely unidentified scribbles (e.g. see Exhibit A). The service of process of papers in the hospital was also improper, but I can find no statutes exempting psychiatrists from rules about service of process. A psychiatrist casually sliding across the table an official court document that deprives the patient of his liberty is palpably improper service of process, but that is how Northwell shrinks "served" papers on me.  However, their attorneys submitted these falsified documents to the courts as proper, authentic and official.

290.   The Defendant attorneys have committed misconduct, but it is unclear to me which regulatory or law enforcement body or bodies have jurisdiction over them.  I am entitled to know to whom I should complain about them administratively.

291.   Lopez was not the only Northwell defendant who had what one might refer to as a government appendage problem. Dr. Hanna amazingly told me in her EBT that she had a security clearance, was working for the government, and that her ostensibly **private** employer, Northwell, was actually paying for her to work for the government.  This would be a confusing situation for a plaintiff with an attorney, but for me as a *pro se* litigant it was utterly baffling.  As mentioned above, Dr. Mark Russ, the most senior manager from Northwell that I have questioned to date, said implausibly in his deposition that he could not recall whether or not he had a security clearance. It is common knowledge that security clearances do not tend to grow on local government or privately-owned trees; also, people tend to remember whether they have one.

292.   The Northwell deponents told me that they had no training in coercive techniques and induced regression (*Andersen v. Sullivan* petition, ¶¶122 et. seq., 142-149).  I believe they were lying, if for no other reason than because they used the same methods that the CIA uses on

terrorists.  Somebody must have taught the staff to use coercive techniques.  It was evident from the testimony of these individuals that they knew that there was no justification for using the techniques on me, but could not come up with any plausible explanation for having done so.

293.    The same conflicts apply to other individuals involved, such as the lawyers and law enforcement officers.  They have blessed the actions of doctors who conducted EITs on me, while in all likelihood knowing that they were conflicted by third-party tampering.

294.    I need authentic information about all of the individuals involved from Northwell and its conspirators – their real identities and all of their actual employers or contractors.  I should not have to jump through hoops anymore to get this.  I offered to take a polygraph test and requested that the Northwell defendants do the same, several years ago, but defense counsel refused.  I request that the Court demand that Defendants produce complete and authentic information for a change this time around.

295.    As I discussed in *Andersen v. Sullivan* (¶193), allowing mental healthcare workers, regulators and law enforcement to conceal conflicts of interest from an involuntary patient – as Northwell and its conspirators did to me – or to lie to the patient or mock him, or use false identities, is analogous to permitting stage actors to appear in blackface.  Such a monstrous act says to the world that a psychiatric patient's rights are not equivalent to a medical patient's rights, and that he or she belongs to an inferior class of persons that is worthy of ridicule.  It is ableism (i.e. discrimination against people with disabilities).  The misleading, sarcastic responses from Lopez, Hanna, Russ, and Alex, were examples of the use of this type of blackface.  This was particularly vicious given that these people knew that the day before Northwell detained and tortured me, I had left my home with nothing but my son and a suitcase because I could no longer stand the abuse that I had been enduring in my own home.  If I was insane for leaving that situation, then so are the millions of other women who report domestic violence every year.  I could say more about this *in camera*, but I prefer not to do so in public pleadings, having already had to say

more than I wanted to.  I felt embarrassed by the demise of my marriage, which I should have been able to keep private, but Northwell forced it out into the open as a means of harassment.

296.     These bad actors have put me in a situation where it is nearly impossible for me to litigate due to the amount of smokescreening.  The situation as it is looks like frontier justice – complete with cowboy aliases, masked vigilantes, extrajudicial punishment, and lack of law and order.

297.     I realize the Court might find my statements about the Northwell witnesses hard to believe, so I am providing these characters' deposition transcripts with this application, in case the Court wishes to see an example of the disingenuousness and chicanery that I have been forced to endure from these deponents and their attorneys.

298.     In the absence of any additional evidence, their insinuations about their government masters look like security camera video evidence with the important bits edited out… or a court officer illicitly signaling to a jury behind the plaintiff's back about how jurors should vote.  The allusions could also be misinterpreted as false tips about where I originated, which could mislead a court.  I am not a spy world insider, and I do deserve any reflected plame for their misconduct.

299.     The concealed origins of these bad actors are also important in the context of this application because Northwell conducts illicit surveillance.  This so-called private charity states in its Notice of Privacy Practices that it not only permits itself to perform surveillance of all of your phone, fax and internet communications from the hospital, if you are a psych patient – which is an egregious violation of wiretap laws.  But it also goes a step further, by confiscating your own phone and devices so that you are forced to use its monitored ones.  I do not believe it is possible to do such surveillance legally without a warrant. Even with a warrant, I don't believe it would be possible to do a *sub rosa* investigation on the ruse of mental healthcare in an ostensibly private hospital, where the involuntary patient is supposedly a valued customer but some of the staff are undercover federal agents. Northwell failed to produce the means and results of its surveillance in

prior discovery, but it needs to do so. It appears that this policy is still in place after ten years, even after I drew its illegality to the attention of the company. (NB: Any reader who isn't shocked by this paragraph has not understood it.)

300.     Is America a country, or a country club?  I am a patriot who believes the government does indeed need to be able to do some surveillance of citizens to ensure national security. However, there have to be limits on the scope. People tend to assume that if they are hospitalized in a private facility at their own expense, they will not be subjected to covert surveillance that is even more intrusive than a federal prison.

301.     Every bit of information Northwell collected from me was taken illegally, and that information was transformed into the unlawful medical records – the source of the information that the attorneys published on the docket, as part of their representation of undercover federal agents like Lopez. From the standpoint of legal procedure, this is a total trainwreck. It is hard enough for attorneys to deal with such a confusing mess, but for a *pro se* plaintiff it is harrowing.

302.     About six years ago, a Russian diplomat – who I will refer to by his first name, "Sergei" – told me unofficially that many countries still use psychiatric detention for political reasons (implying, of course, that Russia is one of them). But my observation is that the US is the only one which goes around the world falsely trumpeting that it doesn't use such practices and that it actively stamps them out. If the events that I have described had happened on the Ukraine border, the US would have broadcasted that they were not conducive to obtaining a diplomatic solution. By failing to punish offenders such as the Defendants, the US government risks becoming a target of ridicule by its adversaries. Sergei was quite obviously amused.

303.     President Biden said in a public address on January 6th, "Are we going to be a nation that accepts political violence as a norm?"  I ask this Court to send a message that we are not the kind of nation that harbors politically-motivated torture machines like the Cuomo-Northwell Enterprise.

304.    President Biden said in April 2021, "There should be no private detention centers. We are working to close all of them."  But his DOJ has ignored me for 13 months.  The Trump and Obama DOJs were no better.  Even though President Biden happens to be holding this hot potato when the music has stopped, the Obama and Trump administrations deserve to be held accountable too, for their deliberate indifference.

305.    All participants in a court of law should be authentic, shouldn't they?  Shouldn't they leave their cover stories home in the closet with the Halloween costumes?  I ask this Court to ban "masks" for these proceedings and all related proceedings, and by that I do not mean the type that one wears for COVID.   I am referring to the type of blackface mask that I have just described – the cover stories that have been used to conceal true motives in this matter, to stigmatize me, and to gain unfair advantage over me.  If the Defendants object to going "maskless", and appearing authentically, they should explain why.  In litigation such as mine, it is imperative for the parties and witnesses to wear their authentic identities.  To do otherwise would result in a deprivation of due process.  Unraveling of the Defendants' misrepresentations so late in the game has already complicated the identification of the proximate cause of injury, and risks continuing to do so – with the effect that causation may become bifurcated, and I will lose hundreds more hours of my time.

306.    Moreover, the threat of reputational damage from exposure of misconduct by a bad actor like Alex has no teeth, since he has not identified himself.  He could disappear tomorrow, and nobody would be any the wiser.  Even if he were punished under a false identity, justice would only have been half served.

307.    I need to know who issued the orders for Lopez and his colleagues to "mask up" with phony or half-concealed identities, and which additional conspirators have been masked.

**No collateral estoppel here**

308.     In *Montana v. United States*, 440 U.S. 147 (1979), SCOTUS defined the following three-prong test for applying collateral estoppel: first, whether the issues presented in the subsequent case are substantially the same as those involved in the first case; second, whether controlling facts or legal principles have significantly changed since the first case; and third, whether other special circumstances warrant an exception to the normal rules of preclusion.  Here, the issues are not the same as my previous cases against Northwell et. al. because at the time that they were filed, the docket doxing had not occurred yet, I had not yet received many of the documents on which I am basing this case, and the matter of the defendants' federal employers had not been discussed.  At the time of my EDNY federal case and appeal, none of the discovery documents had yet been produced, including *inter alia* the official §9.39 and §9.27 detention forms in Exhibit A.  The instant case focuses on the slipshod investigations, cover-ups and fraudulent paperwork, which was not fully discussed in previous litigation.

309.     None of the other Defendants were parties to my previous litigation except for NYC and Port Authority which were dropped from the final complaint, which was a decision made by my former attorney Mr. Mulhearn at the behest of Judge Bianco.   In a conference held on Feb. 13th, 2013 (docket #175), **Judge Bianco pronounced that the City and State officials should be removed as defendants, without explanation**.  He said, "it's not a pleading defect."  Judge Bianco told my attorney Mr. Mulhearn that taking these individuals out of the complaint was a condition to replead.  I think that Judge Bianco's instruction was improper, and Mr. Mulhearn was too weak to question him.

310.     Then after the EDNY case was dismissed, and Mulhearn included the officials as defendants in the Nassau complaint, Mulhearn failed to serve them with summonses (the Port Authority, City of New York and NY State investigators) before the 120-day deadline, even though

I reminded him multiple times about this. I will address Mulhearn's misconduct in the new related case.

311. **Further, the question of the defendants' multiple identities and/or employers may invalidate the usual preclusion rules.** It prejudiced me that the Northwell defendants failed to reveal their security clearances or their government benefactors until four years after the litigation started, and after I no longer had an attorney. I only touched the tip of the iceberg in depositions, after I had already spent thousands of hours of unpaid work merely on reaching the iceberg, plus $100k+ on legal fees. There should have been full disclosure. I need to know who has been in charge of this travesty. But the most important question is **why**? Why did they do this to me? Who made the decision to detain and torture me, and to keep persecuting me for another decade? That has not yet been revealed, but I am entitled to know it.

312. This aspect of my litigation raises so many questions. How could a court fully value damages in a case such as mine where the perpetrators are not who they purported to be, and no ID has been produced? How could a court properly evaluate a claim preclusion argument, for example, if the parties arguing it have not fully identified themselves? A party might be precluded for his visible identity, but his hidden identities or other employers who were involved but not parties to the action might be omitted from that discussion, and this would prejudice his adversary. For the purposes of such a discussion, he would effectively be multiple individuals.

313. The Rooker-Feldman doctrine is not applicable to these pleadings. This doctrine prohibits a federal district court from exercising subject matter jurisdiction over a claim that is a *de facto* appeal from a state court judgment. That is not the situation here. A "*de facto* appeal" arises where claims raised in the federal court are "inextricably intertwined" with a state court judgment, which is when the federal claim can succeed only to the extent that the state court wrongly decided the issues before it, or if the relief requested would effectively reverse or void the state court decision.

314.    I am not seeking reversal of my State court decisions with the instant complaint, although I wish I that could, because my State judges prejudiced me. Judge Steinman decided that I should give Northwell some HIPAA releases for my outpatient doctors' records; this would have enabled them to defame me and invade my privacy by publishing that information on the dockets too, as they did previously, This was a vicious decision, as if Judge Steinman was giving a rapist the key to my bedroom. So I did not provide the forms, so he dismissed the case.

315.    I might be able to seek review of my state court decisions in federal court, but I have nobody to advise me how to do this. New York does not have the Rooker Fraud Exception. So, while I am waiting for my ability to retain an attorney to be unblocked when someone in power eventually gets a dose of human decency, I decided to start afresh, since I have a huge new stack of facts which led to new injury arising from my adversaries' doxing and concealing behaviors.

**"Back doors"**

316.    The information about links with the national security services is also important in this context because it is widely rumored that these organizations have access to large databases such as NYSCEF via the infamous "back doors", which enable these agencies to access databases without a warrant[18]. I would like to know whether they in fact do have such access to NYSCEF, and how that works. Mssrs. Barry and Carucci should explain such access if it exists, and show documents pertaining to it. This has a bearing on how well sealed a document actually is after NYSCEF says it is sealed. If there are indeed "back doors", that could redefine what a seal really is, in an e-filing context. Other litigants would likely also be interested in whether their dockets have secret trap doors.

---

[18] https://www.reuters.com/article/us-usa-security-congress-insight/spy-agency-ducks-questions-about-back-doors-in-tech-products-idUSKBN27D1CS

**Confidentiality, flexibility, urgency**

317.     I request that the Court caution the Defendants that they must not produce discovery materials or anything containing my privileged information onto the docket, as HPMB and KBR did in the past.  I do not think we can trust them to make their own judgments about what is or isn't confidential, and I ask that they submit their documents with a letter from the Defendant him- or herself stating that he/she is taking care to comply with HIPAA, NYMHL Article 9 and §33.13.

318.     I ask in advance for leave to amend if the Court thinks that my pleadings are deficient.  There are 45 named Defendants and 18 causes of action, resulting in over 800 possible combinations, so it is difficult for me to give an exhaustive explanation at the outset for each and every one.  However, that does not mean that no explanation exists; it only means that I am trying to avoid this complaint ballooning to 1000 pages.

319.     This matter should not be derailed due to the petty rigidity of the Defendants' administrative complaint processes or any other dogmatism of the systems.  If access to documents is refused, then I or my family members will only repeat the process until we obtain the records, and it would be a waste of judicial resources if we have to repeat.  I ask the Court to disregard any minor errors that I might have made in this filing.

320.     There is no claim preclusion problem specifically within *Ritchie*, and nobody would be prejudiced by a seal on the records, or even a seal on that case in its entirety.  As far as I can ascertain from my historical files, neither I nor my ex-husband Mr. Ritchie ever moved for a seal specifically on the medical records that are filed on the Suffolk docket; we only moved for protective orders over various sets of documents.  If Northwell et. al. raise an objection to this application's request for a seal, I request that the Court then take a closer look at **why** they are doing so.  There really could be no other explanation than that they want to continue to harass my family and me.  Otherwise, why should they care if the case is sealed or not?

110

321.    I did not see any reason why I could not consolidate moving for a seal with the other matters discussed in this Complaint, but if the Court does see such a problem, then I would appreciate an explanation.   The Suffolk Deputy Clerk directed my attention to Rule 202.5-b(d)(3)(iii), which defines the type of information for which a seal can be sought as "including but not limited to trade secrets, information protected by confidentiality agreement, or personal confidential information as defined by statute or court rule – or otherwise to have been filed in error."  The *Ritchie* case clearly includes "personal confidential information as defined by statute". The clerk said Rule 216.1 is "essentially" the same process, applying to paper cases.

322.    I am entitled to sealing of my psychiatric clinical records created by Northwell. Section 33.14 of the NYMHLs deals with sealing of medical records "held by the office of mental health, a facility, or any other individual or public or private entity which has been made a party to the proceeding"… "The court may order that the petitioner's records be sealed, subject to such limitations or exceptions as the court may impose, upon a finding that... the petitioner was illegally detained by a facility by reason of fraud, error or falsified documents, and the records pertain to such illegal detention."  Those criteria apply to my records, so I ask the Court to order a seal on my records, with the caveat that I and my loved ones may use them in related litigation if necessary. Identifying the public or private entities other than Northwell which hold copies of my records is a matter for discovery.

323.    I ask this Court to avoid falling into the same knee-jerk dismissal trap as the preceding courts.  It is too easy to look at the combination of a psych ward and the CIA in the same complaint and think the author must be a tinfoil-hat-wearing conspiracy theorist.  But the evidence shows that there actually **was** a conspiracy.  The elements of conspiracy are there: (i) an agreement between two or more parties; (ii) an overt act in furtherance of the agreement; (iii) the parties' intentional participation; and (iv) resulting injury.  The two or more parties could include Northwell, the NYSAG, UnitedHealth Group, and any of the other city, county, state or federal

actors.  Metaphorically, I am indeed wearing a cap made of FOIL – the many Freedom of Information Law requests that have not been fulfilled.  This Court needs to look beyond the surface, which can be misleading, especially if a reader is prejudiced.

324.    Maybe my previous judges thought they were doing me a favor by dismissing my cases and thereby pushing them up the food chain where they might set a wider precedent.  However, I do not see that as a courtesy, because this process wasted years of my life, aided my adversaries in destroying my image, and forced me into financial deprivation and accompanying despair.  **I only wanted to be a catalyst for change – not a martyr.**

325.    I ask the Court to put an end to the vicious cycle of lying and cheating from my adversaries, which has turned a relatively simple matter into a contemporary *Jarndyce v Jarndyce*.

326.    I would appreciate it if this matter could be handled on an expedited basis, because it was already urgent 14 months ago when I initially reported the docket doxing, and there has been no progress, but countless damage may have been done in the interim, to me and to the other doxing victims.

327.    I ask that the Court prevent the Defendants, and the other bad actors involved in this Complaint from leaving the State until this matter has concluded.

328.    As a victim of crime, I request an order of protection to prevent further harassment.  I am theoretically protected by the NYS Crime Victims Bill of Rights, although one would never know it given the way that NY has abused me.  Ms. James' smiling face appears on the brochure[19], in which she says "My office is committed to protecting the rights of crime victims and their families", which I can only assume doesn't apply when the NYSAG itself is the abuser.

329.    If the Defendants produce any documents that need to be unsealed in order for me to read them, I ask that they be unsealed but not docketed.

---

[19] https://ag.ny.gov/sites/default/files/crime_victims_bill_of_rights.pdf

330.    I ask that the Court please explain its decision on a line-item basis if it chooses to dismiss any of my requests for relief.

331.    If the Court wonders about the veracity of any of my statements, or requires further information, I ask it to question me directly.   Please do not assume that if I have not stated something in writing here, it is therefore untrue.   There are things about which I have not provided detail in this Complaint because they involve sensitive information.   However, my adversaries have stigmatized me so egregiously with their false statements that I deserve the chance to set the record straight.

## VII.    CAUSES OF ACTION (and additional facts)

### First Cause of Action:
### Constitutional rights violations under §1983
### (against all public sector Defendants)

332.    I hereby repeat and reallege paragraphs "1" through "331" herein, as if each has been fully set forth at length.

333.    Generally speaking, there are three elements required to bring an action under 42 U.S.C. §1983. The plaintiff must prove the following: (1) He or she was deprived of a specific right, privilege, or immunity secured by the Constitution or laws of the United States; (2) The alleged deprivation was committed under color of state law; and (3) The deprivation was the proximate cause of injuries suffered by the plaintiff. The acts complained of were carried out by the aforementioned individual Defendants in their official or employment capacities, with all the actual and/or apparent authority attendant thereto.

334.    The acts complained of were carried out by the aforementioned individual Defendants, under the auspices of the corporate, government and municipal entities by which they were employed, all under the supervision of officers of these entities.   None of the Defendants'

policies or procedures had any expiration dates when I learned of them, either through the formal discovery process or through online searches. The Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective corporate, government or municipal entity, which is forbidden by the Constitution of the United States.

335.    It remains to be seen in discovery what additional actors are lurking under these characters' covers, as discussed *supra*.  I have never seen a government policy that would be applicable to this matter which would allow employees to wear fake identities, have hidden agendas or secretly work for a different employer.

336.    Defendants' actions in violation of my Constitutional rights were motivated by an improper purpose, namely their desire to harass, intimidate, threaten, oppress, coerce, and injure me, in retaliation for my criticism of them and their political cronies.

337.    Individual liability is premised on personal involvement under §1983.  However, a defendant may still be liable even if he or she did not commit the act that injured the plaintiff.  An official who is present and fails to intervene to prevent others from violating a person's constitutional rights is liable under §1983 (*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)).  In this case, supervisors/investigators were aware and even participated in the subordinate's misconduct or acted to conceal it (e.g. Mr. Lawrence and NYC).  Discovery is necessary to establish the extent of knowledge of each of the supervisors to establish their §1983 liability.

338.    The Statute of Limitations for §1983 is based on the State SOL of three years. These violations remain within the SOL since many of them are ongoing, and others would be tolled by the cover-up of key evidence (e.g. the missing NYPD police report, and the PANYNJ investigation report).

339.    The First Amendment states "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of

speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."   As discussed in the foregoing, the Defendants' irresponsible use of my PHI and other confidential information violates my First Amendment rights as regards religion.

340.    The First Amendment right to criticize public officials is also well-established and supported by ample case law; a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of §1983. It is apparent from the foregoing that I have been a victim of retaliatory conduct by public officials including *inter alia* the NYSAG.

341.    These Defendants should identify the party that placed the invisible gag order(s) on me many years ago, such that I have not been able to achieve any media coverage.  This was a violation of my right to freedom of speech, and has wasted thousands of hours of my time. Since I was unable to get a fair hearing in an actual court of law, I sought one in the court of public opinion.  Some journalists have spoken with me at length, but it was apparent they had been instructed not to publish anything.  I had some success with a radio advertising campaign that I initiated to find other abused patients in mid-2014, but suddenly the radio station stopped responding to my calls and emails until immediately after the 2014 election.  Then the station suddenly contacted me again, so it was evident that there was external interference with the radio stations that amounted to censorship. But I have not been able to identify the source of the obstruction, so I could not seek to remove it.  I ask this Court to help me identify the source of the media gag, and remove it.

342.    Defendants' conduct in commencing and continuing baseless investigations and fishing expeditions against me was intended to stifle my free speech because Defendants disfavored my political views.  Defendants' attempts to silence my free speech were both discriminatory and retaliatory in nature.

343.    The Defendants violated my Second Amendment rights as well. As discussed *supra*, according to federal law (18 USC §922(g)(4)), I could now be subject to ten years imprisonment and fines of $250,000 if I possessed any firearm, because I was involuntarily committed to a mental healthcare facility. I feel that I should not be prevented from owning a firearm, because the Defendants broke the law by conspiring with Northwell to hospitalize me unnecessarily, and without proper procedure.  They have violated my rights by dodging my questions and withholding paperwork about this, so that I do not have a clear answer about whether or not my firearm rights are intact, and if they are not, then how that happened, and what the procedure would be to restore them.  This amounts to a bunch of cowardly bureaucrats trying to dodge responsibility.  I ask the Court to order them to provide a clear explanation.  If there were any problem with my owning a gun, surely it would have come to light in the past 15 years that I have owned it.  Clearly, I am low-risk.  My Beretta doesn't have a magazine or any other modifications. I do not have a handgun, and have never applied for a pistol permit.

344.    I do not want to go down in history as the woman who tried to give guns to crazy people, because that would be unfair – it is not what I am trying to achieve.  I think that people who are dangerous should be prevented from having access to firearms, but I also know that they are as entitled to procedural due process as everyone else.  Millions of American firearm owners would likely be horrified to learn about New York's unconstitutional methods of surreptitiously besmirching them behind their backs, assigning a bunch of partisan hacks to take away gun owners' rights without due process, and without even informing them. I hope they will pay attention this time, although they didn't do so the last time that I discussed this, in my 2012 EDNY case.  But Judge Bianco dismissed that case, and New York has no Second Amendment equivalent, so I was prevented from defending my firearm rights in State court for six years – another deprivation of due process.

345.    SCOTUS frowned on local meddling with citizens' firearm rights in November 2021, when Chief Justice John Roberts "expressed skepticism about New York's licensing system, saying it was surprising that a constitutional right was subject to the discretion of local officials"[20] (see *New York State Rifle & Pistol Association v. Bruen,* No. 20-843).

346.    The Fourth Amendment right was expanded by *Katz v. United States*, 389 U.S. 347 (1967) to protections from the right of search and seizures of an individual's "persons, houses, papers, and effects", as specified in the U.S. Constitution, to include as a constitutionally protected area "what [a person] seeks to preserve as private, even in an area accessible to the public".  Justice Harlan introduced what has come to be known as the *Katz* test, "a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'"  (*Katz, 398 U.S. at 361 (Harlan, J., concurring)).*

347.    The Defendants' actions would not pass the Katz test.  They took possession of my PHI, detained and interrogated me under false pretenses, taking advantage of me by insisting that I – the victim of crime – submit to this abuse without counsel, asking me unnecessarily personal questions, and collecting my privileged information with the intention of using it to embarrass and defame me.  All of the Defendants withheld key documents, which gave the courts and me an incomplete picture of the situation.  It will be important to discover what training these people had received on privacy rights, searches, and seizures.  I include the Defendant attorneys here under §1983 even though they were ostensibly "private" attorneys, because I think their clients' hidden government agendas should create "State action" and make them subject to §1983.

348.    The hospital staff told me in depositions that they did not have warrants.  I have a right to know if anyone else involved had a warrant pertaining to me, and if they did not, what

---

[20] "Justices' Questions Suggest New York Gun-Control Law Unlikely to Survive", by Adam Liptak, *New York Times,* Nov. 3rd, 2021.

surveillance they think they are allowed to do on a warrantless basis.  The PAPD and EMS unlawfully took possession of my belongings which included *inter alia* my vehicle, my travel documents, official ID, computer and phone, which prevented me from traveling and from communicating with anyone for help.

349.    In *Taylor v. Saginaw*, No. 17-2126 (6th Cir. 2019), the Sixth Circuit held that the practice of "chalking" in which parking enforcement officers apply chalk to mark the tires of parked vehicles in order to track the duration of time for which those vehicles have been parked, constitutes a search under the Fourth Amendment.  The city failed to establish an exception to the warrant requirements, and the court found that this made their marking unreasonable.

350.    Similarly, the manner in which these Defendants have barged onto the scene without obtaining warrants, and without identifying themselves or explaining their presence, has had the effect of "chalking" me as a target.  The insinuation, for example, of Lopez mentioning the Agency and the VA in his deposition was that there was some legitimate reason for those organizations to want to punish me, when in fact there wasn't.

351.    In these ways, the Defendants marked me as a dupe for additional con artists like themselves, leading to (*inter alia*) the aforementioned identity theft.  Forcing me to handle this matter in a public courtroom instead of dealing with matters administratively and privately is also a form of chalking.

352.    The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." As stated in the foregoing, the Defendants did impose excessive fines and punishments.  Anything more than zero in this context should be considered excessive.  Further, the hospital and ambulance fees were to all intents and purposes bail.  The fees were effectively a personal recognizance (PR) bond, because hospital staff refused to discharge me unless I paid to go see another psychiatrist on the outside, whether I wanted to or not.  Or you could call this a surety bond, albeit a fraudulent

one, because my insurance company (UnitedHealthcare) fronted the hospital fees, and hospital staff forged an agreement behind my back to make me responsible for those fees.  The attorneys, police and regulators may not have been involved at that stage, but they have defended Northwell's use of these illegal practices for ten years.

353.    The Defendants also violated my Fourteenth Amendment rights not to be deprived of life, liberty, or property, without due process of law. The Supreme Court said this requires consideration of three distinct factors: (a) "the private interest that will be affected by the official action"; (b) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (c) the Government's involvement.  My adversaries' misuse of their political power to skew proceedings, obstruct justice, chill the information flow, and barricade me from retaining an attorney violates my procedural due process rights; so do the misrepresentations of the facts contained in the documents, and their withholding or spoliation of other key documents for up to a decade.  Their failure to reveal their true identities and motives also violates my due process rights, because I cannot punish their alternate selves in this §1983 action if they are federal employees; as I understand it, I must wait to obtain the information about their hidden identities, and then file a separate Bivens action.  That potentially doubles the cost and duration of my litigation.

354.    Defendants' flagrant misuse of City and State investigatory powers contravened my constitutional rights and deprived me of life, liberty, and/or property without due process of law.  Defendants' actions were motivated by an improper purpose, namely their malice, political animus, and a desire to harass, intimidate, threaten, oppress, coerce, injure me and/or retaliate against me.

355.    The Defendants also subjected me to peonage. The Thirteenth Amendment forbids slavery and involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted.  Involuntary servitude refers to a person being held by actual force, threats

of force, or threats of legal coercion in a condition of slavery – compulsory service or labor against his or her will. This includes the condition in which people are compelled to work by a "climate of fear" evoked by the use of force, the threat of force, or the threat of legal coercion (i.e., suffer legal consequences unless compliant with demands made upon them) which is sufficient to compel service.  Illegal for-profit hospitalization lends new meaning to the expression "lock the door and throw away the key".  The threat becomes "you must **buy** this key, then we'll lock the door with it, and throw it away"... thereby transforming healthcare into peonage.  The Defendants did that, then turned it into a new game, which was conspiring to harass me by doxing me and concealing key documents.  This was just as malicious a form of coercion as the actual incarceration had been.

356.    Lastly, Americans should be incensed to find that their voting rights are cancelled at a locked psych ward's door, because a patient cannot leave in order to vote, there is no ballot box, and the US postal service is not allowed to carry a mail-in ballot (or any other mail) into the wards.  Although there was no election at the time of my detention that could have triggered my Constitutional right to vote, the threat of violation can still count toward my discrimination, negligent supervision and IIED claims.

## Second Cause of Action:
## Trafficking Victims Protection Act of 2003 ("TVPA"),
## Forced Labor 18 USC §1589
## (against all Defendants)

357.    I hereby repeat and reallege paragraphs "1" through "356" herein, as if each has been fully set forth at length.

358.    This claim is timely filed pursuant to 18 USC §1595 of the TVPA.  The statute of limitations for a civil trafficking case under 18 U.S.C. § 1595(c)(1) is ten years. The underlying

trafficking by Northwell began in June 2011, but Defendants did not get involved until 2012, so my claim is within the SOL.  The court closures due to COVID would extend the time well beyond ten years anyway.

359.    18 USC §1589(a)(3) provides a means of punishment for "Whoever knowingly provides or obtains the labor or services of a person … by means of the abuse or threatened abuse of law or legal process".  18 USC §1589(b) extends to "Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means".

360.    The term "abuse or threatened abuse of law or legal process" is defined broadly in 22 U.S.C. § 7102 as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  This applies to all of the Defendants.

361.    The Defendants participated in a profitable forced labor scheme that began at JFK airport and has continued until the present day, to falsely arrest and abduct me, transport me to a locked facility, hold me without due process, and force me to perform work for them on an uncompensated basis, by *inter alia* undertaking my own investigation and legal representation unassisted, without the necessary tools and materials.  BA, PANYNJ, and NYC were effectively recruitment agencies, which collaborated to deliver me (the laborer) to Northwell for detention, in what was to all intents and purposes a sweatshop, sponsored by UHCPNY.  The forced labor continued after my discharge from the hospital, because I was compelled to waste thousands of hours of my time over ten years, fighting the Defendants through one rigged administrative or court proceeding after the next, to try to obtain documents to which I was legally entitled, but

121

which they have unlawfully withheld from me, and to try to obtain seals on my private documents. I also have had to do the City and State agencies' investigatory, prosecution and restitution work for them, uncompensated.  This work has been compulsory, because if I failed to continue this fight, I would have no hope of clearing my record.

362.    The SOL for TVPA is ten years, which would be extended by the COVID court closures, which allows plenty of time for this cause of action to be used.  Although unnecessary, it could likely also be tolled due to the many instances of information chilling and obstruction of justice to which I have been subjected.

363.    If the Court accepts this cause of action, it should also accept that the Defendants committed retaliation, intimidation, hostile work environment, and unequal pay, in violation of Title VII of the Civil Rights Act.   Since I was subjected to forced labor, I was to all intents and purposes an employee of the Defendant organizations – albeit an unpaid one.  However, I was subjected to degrading, inhumane, obstructive, harassing treatment, and segregated due to my disability, while Defendants' other employees were not.  It is typical for employers who practice forced labor to keep their employees hidden away from public view, and gagged by various means. That is exactly what these slave-masters have done to me.  They did not want me to talk to the media or anyone else about their misconduct.

364.    Dowling told the *NY Times* "If employees don't trust you, and you don't trust them, we aren't going to get anything done."[21]  This is only one example of the fundamental disconnects between the medieval reality of his psych ward sweatshops, and his rosy pronouncements in multitudes of media interviews.

365.    Please do not confuse my case with Prasanna Goonewardena's 2021 *pro se* complaint against Northwell (21-cv-4530, EDNY), except to the extent that he has a point about the TVPA and some other valid causes of action.  He is an *agent provocateur*, who has a tendency

---

[21] https://www.nytimes.com/2016/02/14/business/michael-j-dowling-if-it-cant-be-done-you-havent-tried.html

to make unsubstantiated statements which I find offensive about certain ethnic groups, particularly the Jewish people.  The fact that we have both been abused by the same Jewish company doesn't mean that I agree with his unsubstantiated, outlandish statements.

<u>**Third Cause of Action:**</u>
<u>**42 U.S. Code § 1985 - Conspiracy**</u>
<u>**(against all Defendants)**</u>

366.    I hereby repeat and reallege paragraphs "1" through "365" herein, as if each has been fully set forth at length.

367.    The essential elements of a 42 U.S.C. § 1985 claim are: (a) a conspiracy; (b) to deprive plaintiff of equal protection or equal privileges and immunities; (c) an act in furtherance of the conspiracy; and (d) an injury or deprivation resulting therefrom. In the foregoing, I have explained how the Defendants worked together either actively or through deliberate indifference to deprive me of my rights.  Evidence is in the deposition transcripts, and more will be revealed in discovery.

368.    The second clause of 42 U.S. Code §1985 pertains to "Obstructing justice; intimidating party, witness, or juror".  I have referred in the foregoing repeatedly to the manner in which the Defendants and their organizations have conspired to obstruct justice, thereby keeping me from seeing a verdict or a settlement for the past decade.  Additional links between them will be revealed in discovery.

369.    The third clause of 42 U.S. Code §1985 pertains to "Depriving persons of rights or privileges", starting out with the wording "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws…". The "disguise" element is quite relevant here, as

discussed *supra*.   The use of false identities and hidden employers fits the legal definition of "disguise", which means the act of misleading another through intentionally false statements or fraudulent actions.   This is the Defendants' *modus operandi*.

## Fourth Cause of Action:
## Civil RICO – 18 U.S.C. § 1962(a) - (d)
## (against all Defendants)

370.    I hereby repeat and reallege paragraphs "1" through "369" herein, as if each has been fully set forth at length.

371.    To establish a substantive RICO violation, a plaintiff must show a "pattern of racketeering activity," 18 U.S.C. § 1962(a)-(c), and to establish a RICO conspiracy, a plaintiff must show a conspiracy to commit a substantive RICO violation, *id.* § 1962(d). Thus, "[u]nder any prong of § 1962, a plaintiff in a civil RICO suit must establish a 'pattern of racketeering activity.'"

372.    RICO defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" committed in a 10-year period. (18 U.S.C. § 1961(5)). To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are "related, *and* that they amount to or pose a threat of continued criminal activity."  *See H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Defendant organizations and individuals constitute an "association-in-fact" for the purposes of RICO; to perceive it, one only needs to follow the chain of custody of my person and my PHI, from JFK to Zucker to the agencies and the dockets.  The continuity of the acts in this case is open-ended, since as I have shown above, they have every indication of continuing into the future in the absence of intervention by this Court.  The acts are ongoing, interrelated, and current because (*inter alia*) my Northwell, UHG/UHCPNY and NYC accounts remain open, information requests remain chilled, my PHI remains on the dockets, and the fact that the Defendants have made no

attempt to rectify the situation implies a threat of further violation.  Every time, for example, another individual accesses my PHI on the dockets, or I am denied access to my privileged documents, or another defense attorney lies in court or pays to file fraudulent documents, or OCA accepts medical records for filing without a seal, or the City Bar makes another conflicted denial of a lawyer referral, or I have to deal with yet another individual wearing a fake identity, then another racketeering act occurs.  My loss of employment opportunities – in addition to actual monetary losses – due to the Defendants' racketeering was an injury to "business or property" within the meaning of RICO.  Other Plaintiffs have been allowed to bring RICO actions for acts of public corruption that resulted in pecuniary injury to them.  I would like to explore in discovery how Northwell's tentacles have reached the public sector Defendants, just as they reached for example Touro.  It should be clear from the foregoing that the acts by various Defendants are related, and they have occurred within a ten-year period.

373.    Obstruction of justice has been rampant in the Cuomo-Northwell criminal enterprise; it has been committed by all of the participants, and repeatedly by some of them.  It is a multi-state, international syndicate, based in New York but with appendages in New Jersey (PANYNJ), Minnesota (UHG), and even the UK (BA).  It follows that the wire transfers made to move funds (which were the product of money laundering) were interstate, and that significant email and fax communication was also interstate. This can be confirmed in discovery.

374.    "Where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity."  *COFACREDIT, SA v. Windsor Plumbing Supply Co.*, 187 F. 3d 229 (1999).  It has been apparent from my discussion with the Defendants and their staff that they believed (or, more likely, purported to believe) this was a normal way to operate their business, even when I pointed out how their conduct deviated from their policies and from law (e.g. see the transcript of

the Alex call, and Northwell EBT transcripts).  For example, the possibility that BA and PAPD may have conspired to falsely arrest other people in the past in a blasé manner – resulting in towing and ambulance charges for the victims, and filing an "Aided Report" in other instances too – would not make such conduct any less a deviation from their policies or less an act of racketeering. Northwell staff purported to think it was perfectly OK to falsify financial agreements such as the ones in Exhibit A, but that does not eliminate these acts from the list of the company's instances of racketeering.   (NB: Discovery should reveal who was responsible for those fraudulent documents; I was unable to find out in dozens of hours of depositions.)

375.    It is a matter for discovery to ascertain to what extent these organizations have worked together to commit racketeering acts prior to their abusing me.  It was clear based on the PAPD and EMS employees conduct that these organizations had brought arrestees to Zucker in the past.  Even if BA had not previously participated in the abduction-and-psych-detention racket, the airline has cooperated continuously with the other Defendants to chill the flow of information and obstruct justice for the past decade.

376.    In a bait-and-switch trick, the PAPD officers asked if I wanted an escort to the hospital, which I assumed meant that I could drive my own car, but then they insisted that I go in a City ambulance.  I had my own vehicle, and nobody ever alleged that I was incapable of driving it, but PAPD or EMS took my car keys so that I could not do so.  They also prevented me from avoiding the towing charges which my family had to pay in order to obtain release of my minivan. This shell game the Defendants played with my car keys supports the RICO claims.  **It shows that the purported boundaries between the entities involved were an illusion, which is a recurring theme in this matter.**  The removal of my vehicle was nothing short of a carjacking.  In the absence of a properly-issued parking ticket, this was Grand Theft Auto.  NYC has previously been sued for such bait-and-switch abductions, involving vehicles towed and drivers abducted to a psych ward (see *Kamilah Brock v. NYC et. al*., 15-cv-01832, SDNY, 2015.)

377.   I recently received a phishing email from a fraudster posing as PayPal, saying that it had suspended my account due to suspicious activity, and asking me for copies of my identity documents. How is this different from the Defendants' conduct – using false fronts to deprive me of my freedom and confiscate my identity documents?

378.   The gang stripping assault and gang syringe assault resembled "hit" methods used by the Mafia and gangs such as MS-13.

379.   The Section 1961 predicate acts in this case include *inter alia* 18 U.S.C. § 1503 – obstruction of justice, 18 U.S.C. § 1341 and 1343 – mail and wire fraud, 18 U.S.C. § 1644 – credit card fraud, 18 U.S.C. § 880 – receiving proceeds of extortion, 18 U.S.C. § 1344 – bank fraud, 18 U.S.C. § 1589 – forced labor, 18 U.S.C. § 1956 – money laundering, 18 U.S.C. § 1512-1513 – witness/victim tampering and retaliation, 18 U.S.C. § 2422 – coercion and enticement, 18 U.S.C. § 1466 – engaging in the business of selling or transferring obscene matter, False Statements Act (18 U.S.C. §1001), false entries (18 U.S.C. § 1005 and § 1006), Federal Falsification of Business Records (18 U.S.C. § 1519), Aiding and Abetting (18 U.S.C. § 2), 42 U.S.C. § 1320d–6 – Wrongful disclosure of individually identifiable health information, and 42 U.S.C. 1320a–7a – penalties for disclosing Social Security numbers. In addition, there were 18 U.S. Code § 249 hate crime acts, and many NY penal code violations including *inter alia* public corruption, false arrest, kidnapping, false imprisonment, battery, grand larceny, and criminal possession of stolen property.

380.   The acts began in 2011 and have continued to the present day, so they are within the SOL for civil RICO.

381.   The fact that my allegations of human trafficking and extrajudicial punishment were disparaged by an exclusive club of Jewish-Democrat-dominated organizations was shockingly discriminatory, and hypocritical in the extreme.  The Court should consider this to fit the definition of hate crime, a RICO predicate act.  (NB: USDOJ points out on its website that the

term "hate" can be misleading. When used in a hate crime law, "hate" simply means **bias** against people or groups with specific characteristics that are defined by the law.)

### Fifth Cause of Action:
### Titles II and III of the ADA (42 U.S.C. § 12101, et seq.)
### (against all Defendants)

382.     I hereby repeat and reallege paragraphs "1" through "381" herein, as if each has been fully set forth at length.

383.     Title II of the Americans with Disabilities Act (ADA) states, in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity."

384.     Title III of the ADA states, pertaining to private sector entities: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

385.     This includes preventing individuals with disabilities from fully and equally enjoying services through policies, practices, and procedures.

386.     Defendants discriminated against me, in violation of Title II and III of the ADA not only as part of a general pattern of discrimination against people with mental health conditions and medical malpractice plaintiffs who are disabled, but also individually.

387.     To state a valid claim under Title II of the ADA, a plaintiff must prove three elements: (1) that he is a qualified individual with a disability, (2) that he was discriminated against

by being excluded from or denied the benefits of a public entity's services, and (3) that he was discriminated against because of his disability.

388.     To state a valid claim under Title III of the ADA, a plaintiff must allege (1) that she is disabled within the meaning of the ADA; (2) that Defendants own, lease, or operate a place of public accommodation; and (3) that Defendants discriminated against her by denying her a full and equal opportunity to enjoy the services the Defendants provide.

389.     The private sector Defendants – law firms and City Bar association – qualify as places of public accommodation for the purposes of Title III of the ADA. They are open to the public, they usually provide their services for financial remuneration, and they operate under rules and regulations issued by New York State and the federal government.  The individual private sector Defendants operate the firms, by virtue of their employment.

390.     A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).  The public sector Defendants fit the definition of public entities, for the purposes of Title II of the ADA.  They are open to the public, they provide services, and they operate under rules and regulations issued by New York City, State and federal government.  The individual Defendants "operate" the agencies and the court system, by virtue of their employment as officers of the court and public officials, or attorneys representing them.

391.     A person is considered a "qualified individual" with a disability under the ADA if that individual (1) has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) has "a record of such an impairment;" or (3) is a person "regarded as having such an impairment."  42 U.S.C. § 12102(2). Impairments that limit major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working... other examples of major life

activities include mental and emotional processes such as thinking, concentrating, and interacting with others... and major bodily functions (e.g., functions of the digestive system and bowel).

392.    I am considered disabled under the ADA and Rehabilitation Acts.  This was discussed extensively in my previous EDNY, Nassau and Queens cases.  My disabilities are not an allegation conveniently concocted for a lawsuit; they are facts, which have been well established over 25 years.  I have suffered from depression periodically since the late 1990s, had my entire colon removed in 2005, and had major spine surgery in 2009.  My status as disabled has been validated by multiple physicians and government agencies.

393.    Further, GINA (the Genetic Information Nondiscrimination Act of 2008) protects people with genetic illnesses from discriminatory treatment. There is increasing evidence that psychiatric illnesses such as the depressive illness from which I suffer are genetic in nature. This indicates that the tendency to blame a psychiatric patient for his own condition is based on faulty assumptions, and that the real culpability for his behavior may be in his own DNA. It is no different to discriminate against someone with a gene for a psychiatric illness than it is to discriminate against an individual with a gene that causes his dark skin, or his homosexuality, or a hereditary form of cancer.

394.    I have not alleged that the Defendants rendered me disabled, only that their conduct made me suffer due to my preexisting disabilities. Furthermore, psychiatric disabilities are just as valid under the ADA as physical ones.  It is no different for a business to discriminate under the ADA by e.g. failing to provide a wheelchair ramp than it is to discriminate by failing to prohibit broadcasting of private medical records on the court dockets.  It is a reasonable accommodation for any enterprise or individual in a publishing business – even if it is only in a highly specialized publishing venture such as court dockets or a hospital IT system – to avoid publishing a patient's private, confidential medical records without so much as giving the individual a chance to comment.  It is a reasonable accommodation for any company executive or government official

whose agency keeps records about a patient to release those records to the individual on request without a fuss, and without lying about it, especially when he knows that person suffers from PTSD due to the events described in the records and would obviously medically benefit from being able to put the incidents behind him and get on with his life.  It is a reasonable accommodation for any law enforcement agency to investigate crimes against disabled people on a par with crimes against non-disabled ones, and avoid lying to victims or treating them as if they were annoyances instead of victims.   It is a reasonable accommodation to avoid treating a victim of violence who has PTSD by further subjecting her to violence and traumatic experiences.   These are not merely reasonable accommodations, they are common sense.  They are things that anyone with a modicum of human decency would do.  By failing to provide reasonable accommodations, Defendants have failed to provide equal access to their services, in violation of Title III of the ADA and its implementing regulations.

395.    Because of my disabilities – borrowing the language of the statute – I am not likely to "fully and equally" share in the "enjoyment" of the Defendants' medical records publishing services, or the government agencies' and corporations' information-chilling services… not to the extent that – for example – a litigant with no medical problems, who is devoid of matters that he considers private, might benefit from these same services.

396.    In addition to the previously discussed lowly caste for unrepresented litigants in the courts, Northwell and its conspirators also operate on the basis of a caste system, where there is one set of rules for medical patients and everyone else, and another, harsher set, for psychiatric patients.  Within the psychiatry caste system is a caste subsystem, where there is an authoritarian set of rules for involuntary patients, and a relatively fair and lenient set for voluntary patients. Are medical patients or voluntary psychiatric patients ever kidnapped, handcuffed, assaulted, drugged, stripped, and robbed of their vehicles and other belongings?  The Defendants need to provide Documents that explain how they justify these contradictions in the 21st century world of quality

assurance systems. Not only is the involuntary patient trapped within his lowly assigned caste, but he is also caged within a cramped physical space, where a few errant microorganisms could cause a deadly nosocomial (hospital-acquired) infection, for which he would have no control over his treatment. This caste system is unsustainable, but it is enabled by Northwell's corporate imperialism and the deliberate indifference of regulators and law enforcement. Psychiatric patients – and particularly involuntary ones – are not granted the same rights as voluntary or medical patients, by hospitals, law enforcement or regulators. A few of my adversaries – including Mr. Dowling – departed countries based on caste systems for America, because our country is supposed to be devoid of such unequal treatment. It is ironic that they established the same discriminatory conduct when they got here. CNN reported on January 40th that several major US universities are adding caste protections to their discrimination policies.[22]

397.    Egregiously frivolous, mendacious conduct by my Defendants and their conspirators – such as Dr. Russ' amnesia about his security clearance, or Dr. Hanna's professed inability to remember even the basics of hospital policies, her work history, the oath she took on graduating medical school, or NYMHL §9.39 – add to the impression that Defendants and their conspirators as a ruling class think that patients are too *meshugeneh* or worthless to deserve the truth, or to merit being treated by genuine professionals. It is deeply discriminatory and offensive.


**Sixth Cause of Action:**
**Section 504 of the Rehabilitation Act of 1973**
**(against all Defendants)**


398.    I hereby repeat and reallege paragraphs "1" through "397" herein, as if each has been fully set forth at length.

---

[22] https://www.cnn.com/2022/01/30/us/csu-caste-protections-universities-cec/index.html?fbclid=IwAR2WJtyDEsBn7v1sbAIOMwhjTYXUC1JFZfqWWuhOK-Wn7Mr4L4daY5v8lF4

399.    The same arguments that apply to the ADA also apply to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794(a) and (b)(1)(B)).  To address these elements in order: (a) my qualifying disability has already been established, (b) I was qualified for benefits of service as a complainant and plaintiff, and (c) I was denied the benefits of service, because as a disabled litigant I could not benefit from whatever Defendants aimed to achieve through the "service" of publishing my medical records on the docket, lying in court, obstructing justice and chilling the information flow.

400.    Senators Kirsten Gillibrand and Chuck Schumer, Former US Congressman Pete King, and other New York politicians have helped Northwell to attract so much money – literally **billions** of dollars in TARP and other federal funding – that it might as well be a branch of the federal government. For example, in 2011, while Northwell was illegally surveilling me and splashing the product of its surveillance all over its IT system behind my back, distributing my medical records electronically to 1000+ people, US Senator Gillibrand gave it $500k to develop its IT system. While Northwell was lying about its policies and breaking every quality rule in the book, HHS/CMS was rewarding the company with $3.7m in federal funding for its quality system. While it was forcing me to take unapproved drug cocktails that had not undergone scientific research, Northwell was taking $40 million a year in National Institutes of Health (NIH) grants for research. These are all described in the 2012 annual report. However, Northwell's pattern of federal funding spans many years, including the intervening nine years while it was harassing me and lying about me in court. A particularly large example is $795 million in federal hotspot funding last year for COVID.  The law firms benefited from this federal largesse too.  It is a matter for discovery to find out how much of the defendant attorneys' fees were paid by federal funds.

401.    A Northwell doctor, Konstantino Zarkadas, age 48, pleaded guilty on Nov. 12th 2021 to fraud related to the receipt of more than $3.7 million in COVID-19 related disaster relief

loans[23].  His employer has received vastly more than that in federal funding, so why was he criminally charged while the company has repeatedly been spared?  USDOJ said, "This Office will vigorously prosecute those who steal from government programs that are designed to help struggling small businesses and families stay afloat during the pandemic."  In my experience, that statement is false.  USDOJ selectively makes politically-motived examples of relatively small criminal cases, exactly as the NYSAG does – but I invite it to prove that statement wrong by prosecuting these Defendants.  The Cuomo-Northwell enterprise bears similarities to the recently-announced case *United States v. Alexander Gulkarov*, et al., 22 Cr. 20 and *United States v. Bradley Pierre*, et al., 22 Cr. 19, except that it pertains to health insurance scams instead of automotive insurance.  (What is USDOJ waiting for?)

402.    The State court system itself also receives significant federal funding, according to its 2019-2020 budget – including from HHS.[24]  Judge Marks stated in the February 2021 joint legislative hearing on the judiciary budget that he anticipated further federal funding, but also talked about austerity measures.[25]  There could be no better application of federal funds to the NY court system than to bring it into compliance with HIPAA.

## Seventh Cause of Action: Discrimination
## Title II of the Civil Rights Act of 1964, Sections 201-204
## (against all Defendants)

403.    I hereby repeat and reallege paragraphs "1" through "402" herein, as if each has been fully set forth at length.

---

[23] https://www.justice.gov/usao-edny/pr/long-island-doctor-pleads-guilty-covid-19-loan-fraud
[24] http://ww2.nycourts.gov/sites/default/files/document/files/2018-11/2019-20-JUDICIARY-Budget.pdf
[25] https://www.nysenate.gov/sites/default/files/lawrence.k.marks-testimony-fisc_comm_hrg_-_2021.02.10.pdf

404.     Title II of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance.  Most of the Defendant organizations receive federal funding; it is a matter for discovery to quantify this.

405.     The Defendants are (or operate) places of public accommodation as defined in Title II section 201(a), as discussed under the ADA cause of action. In the same way that Defendants discriminated against me as a disabled person, they also discriminated against me selectively on the grounds of religion and gender.  As stated in the foregoing, in the discussion of the §1983 cause of action, as a Christian and a woman, I am entitled to have my special needs for protection of my PHI and other confidential information respected by the Defendants, all of which operate places of public accommodation.

406.     A plaintiff bringing a Title II claim must allege facts which show that she was deprived of equal use and enjoyment of the facility's services and facts which demonstrate discriminatory intent.  Either direct or circumstantial evidence is sufficient to show discriminatory intent.   It should be clear from the foregoing that Defendants' conduct was intentionally discriminatory; it was not merely disparate impact.  This was evident in their refusals to make reasonable accommodations – even when such accommodations would be easy for them to implement – or to discuss any forms of compromise.   Forced labor is by its very nature discriminatory.

407.     The patriarchy is thriving at the Defendants' organizations.  It is common for sweatshop operators like Northwell and its conspirators to exploit female, disabled and child laborers.   The lowly workers are traditionally kept locked away from public view, while the sweatshops place men at the front of the house.  BA's, Northwell's and UHG's senior management teams were predominantly white and male in 2011, and still are. (See *González v. Abercrombie & Fitch Stores, Inc.*, no. 3:03-cv-02817; the settlement required the company to institute policies to prevent discrimination based on race or gender).

408.    I was menaced, assaulted, and forcibly drugged at Northwell by a gang of about six employees who were entirely black, led by Mr. Lopez carrying a loaded syringe.  There were plenty of other employees around of various races from which to choose. Call me a Karen if you will, but it is obvious this group was specially chosen to intimidate me.  I was only 115 lbs. at the time, had recently had spine surgery, and had fled my home due to domestic abuse, so the use of a racially-motivated, violent bunch of thugs in this situation was not merely inappropriate – it was monstrous.  If this had happened outside the hospital, these bullies would have been arrested. Clearly this procedure had nothing to do with healthcare; it was some kind of warped simulation in which everyone around me was doing the most inappropriate thing possible.  It should have been investigated as a discriminatory act and a possible hate crime, but to this day, even after EBTs, I still have been unable to identify all of the members of the gang.  Not only does Northwell have racist practices, but it is notoriously white at the top of the organization chart and black at the bottom.  It is self-evident that such inequality in a company would lead to some negative feelings, which could affect quality of care.

409.    This episode signposted not only discrimination, but also negligent supervision, abuse of process and RICO.  How is it that New York, a state which boasts about its support for women's rights, would deny her protection as a victim of domestic and bias-motivated violence? This is the most insincere State in the country.

### Eighth Cause of Action:
### Negligence, under state tort law
### (against all Defendants)

410.    I hereby repeat and reallege paragraphs "1" through "409" herein, as if each has been fully set forth at length.

411.    A claimant must prove four elements to have a successful negligence claim in New York state. The elements to a negligence case are duty, breach of duty, causation, and damages.

412.    These Defendants ignored their responsibilities as public officials and officers of the court to abide by applicable laws, such as protecting PHI, mental health information, and privacy generally.  The State officials are bound by Public Officers Law (PBO) §74 Code of Ethics, notably the sections pertaining to confidential information and conflicts of interest.  The other entities (PANYNJ, city, and county) have similar rules.   It is a matter for discovery to find out the other organizations' relevant policies.

413.    *Inter alia*, Mr. Carucci breached his duty by failing to ensure that NYSCEF complies with the NYS Shield Act.  Ms. James breached her duty by employing an investigator as incompetent as Alex.  All Defendants breached their duty by failing to produce documents pertaining to me that were in their possession, if not also spoliating evidence.

414.    The Defendants almost uniformly failed to keep me informed of the status of my complaints.  By dodging my specific document requests for 10 years, they have chilled the flow of information and hampered my quest for justice.

**Ninth Cause of Action:**
**NYS Human Rights Law (Executive Law §296)**
**(against all Defendants)**

415.    I hereby repeat and reallege paragraphs "1" through "414" herein, as if each has been fully set forth at length.

416.    A court system that is "free from any and all forms of bias and discrimination" and the NYSAG, "the guardian of the legal rights of the citizens of New York" should not discriminate against litigants like me, according to the NYS Human Rights Law (Executive Law §296).  This

law says in section 2(a), "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof," NYMHL §33.13 is the State statute that gives me special privacy protection for mental health reasons.  I have discussed disability in the foregoing at length, so I will discuss the others here.

417.    As a Christian, a woman, and mother of a child who is a minor, I am entitled to have my needs for protection of my PHI and other confidential information considered by the courts, as discussed *supra*.  Decisions about when and how to share sensitive information with children usually falls to mothers rather than fathers, so this is a gender issue as well.  And the use of sexualized violence against me – a rape survivor and recent victim of domestic violence – in the hospital and the cover-up of that by these Defendants was a gender issue too.  Northwell has a history of gender discrimination (see importantly *Ekholm v. NSLIJ*, 06-cv-02080, EDNY).  It is a sad statement about New York that its leaders still seem to believe male perpetrators of violence and torment are more entitled to justice than are their female victims, even though these organizations have policies that prohibit all forms of discrimination including *inter alia* gender.

418.    I have the same right to Ms. James' investigative services as anyone else.  If the NYSAG had bothered to do an investigation, it could have stopped this persecution, but it was too busy with its politically-motivated crusades.

419.    Under the NYS Human Rights Law, places of public accommodation are prohibited from publishing any written materials that would indicate a denial of privileges based on the characteristics listed.  So, OCA's pronouncements making e-filing mandatory and closing the law libraries might be an example of such publishing, since they made it even more difficult than it

already is for disabled litigants to function.   HPMB's and KBR's publishing of my PHI on the dockets without censure by the courts is another example.

420.    The City and State treated me in a discriminatory manner by comparison with inmates in their prisons, although I was not convicted of or even charged with a crime.   I was denied Miranda rights, police and regulatory investigations – in fact, any and all forms of procedural due process.

421.    As a civilian who was victimized in a place of public accommodation by an assailant who claimed to be from the military, I am entitled to equal treatment also.   The use of military tribunals to try civilians in any jurisdiction where the civil courts were functioning has been unconstitutional since *Ex parte Milligan* (1866).   If the civil courts were so dysfunctional in 2011 that they needed to use a military one, nobody informed me of that.   Do I need an honorary military rank, like Henry Drummond in *Inherit the Wind*?   I'd really rather have a lawyer.   I was treated as if I were a deserter from the military, but without any of the paperwork.

## Tenth Cause of Action:
### Negligent hiring, retention & supervision under State tort law
### (against all Defendants in supervisory roles)

422.    I hereby repeat and reallege paragraphs "1" through "421" herein, as if each has been fully set forth at length.

423.    The elements of a negligent supervision claim include: (a) the defendant and the tortfeasor employee were in employer-employee relationship; (b) the defendant knew of the tortfeasor's propensity to commit the tortious act or should have known of such propensity had the defendant conducted an adequate hiring procedure; (c) the defendant supervised and retained the

employee despite his propensity to commit the tortious act; and (d) the plaintiff suffered damages proximately caused by the defendant's negligent hiring, training or supervision.

424.    The Defendants in supervisory positions created a work environment where deliberate indifference to serious misconduct could occur without fear of reprimand.   The Defendants should produce *inter alia* customer/complainant satisfaction surveys in discovery, and explain how the supervisors were involved.   They should explain the training that they and their employees underwent, what staff required authorization to do, and what reporting was necessary.

425.    The extensive use of gamesmanship by these Defendants and their staff should be considered negligence, due to the fact that mental healthcare is a regulated profession, not a playing field for a sport played by providers against their patients. The Defendants' out-of-control bullying behavior points to inadequate hiring, training, retention and supervision.

426.    The Second Circuit has listed five ways in which a plaintiff can establish a supervisor's personal involvement: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of others by failing to act on information indicating that unconstitutional acts were occurring. (*Colon v. Coughlin*, 58 F.3d 865,873 (2d Cir. 1995).

427.    It is clear that all of the defendant supervisors created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, and they showed me deliberate indifference when I complained about the violations.   BA, Northwell, UHG, PANYNJ, and NYC all have been dodging my requests for documents for nine years, and Mr. Lawrence and others have repeatedly failed to respond to my correspondence.   The

degree to which the supervisors participated directly in the violations is a matter to be determined in discovery, and it is also to be determined whether any of the defendants had a previous history of misconduct and what the supervisors knew about that.   Merely creating a toxic work environment in which such misconduct could occur is sufficient for a negligent supervision claim.

428.   For example, Alex is an employee of the NYSAG.  The NYSAG showed deliberate indifference to my complaints about his misconduct.  If the NYSAG had not created a toxic work environment, this might have been stopped before it was too late.  The indifference to complaints has been intensified by the chilling of the information flow.  I will talk about more misconduct by the NYSAG in the sequel.

429.   In another example, usually a psychiatrist will take a full medical history of a new patient, but Northwell never did so, and this evidenced negligent training and supervision by management such as Defendants Kane and Russ.  Its multitude of false statements in the records were based on its slipshod medical history, and on dishonesty by the Defendants.

430.   I am entitled to know whether the people who abused their power to detain and torture me were authorized to do that type of work legally in New York. Northwell refused to provide me with this information in prior discovery. Millions of Americans in my position would be horrified if they found that the foreign individuals who locked them in a psych ward did not have the proper immigration status or registration to do their jobs.  It is the supervisors' responsibility to ensure their employees had the proper working papers.

431.   Research studies such as the Milgram and Stanford Prison Experiments showed the importance of authority in creating cruel employees.  A fish rots from the head.

**Eleventh Cause of Action:**
**Deceptive business practices**
**(against all Defendants)**

432.     I hereby repeat and reallege paragraphs "1" through "431" herein, as if each has been fully set forth at length.

433.     New York General Business Statutes, Article 22-A, §349 prohibits deceptive trade practices, and §350 prohibits false advertising. To state a cause of action for a violation of that statute, a plaintiff must allege: (a) an act, practice, or omission that was consumer oriented, (b) that said act, practice, or omission was misleading in a material respect, and (c) that plaintiff sustained an injury as a result of the alleged act, practice, or omission.

434.     The abovementioned allegations demonstrate that the Defendants engaged in conduct that was consumer-oriented; engaged in deceptive or misleading acts, practices, or omissions, and directly and proximately caused me substantial damage, including emotional distress, as result of the Defendants' acts, practices, or omissions.  Notably, engaging in theatrical productions to dupe me, involving individuals using fake or partially concealed identities meets the definition of deceptive and misleading acts.

435.     The exact wording of §350-a contains the following: "In determining whether any advertising is misleading, there shall be taken into account not only representations made by statement, word, [etc], but also the extent to which the advertising **fails to reveal facts material in the light of such representations** with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual." In other words, it is not only the Defendants' acts that count, but also their omissions.

436.    The Defendants make public pronouncements on their websites about how straightforward it is supposed to be to obtain information from them, when the reality is a Kafkaesque nightmare.

437.    Defendants should produce a record of sales of my PHI – which Northwell admits in public documents that it practices – along with a description of what is actually sold, in what form, to whom, and for how much.  This is a deceptive business practice if informed consent has not been provided in advance.  They should also produce a description of all surveillance conducted on me during the period June 12, 2011, to present.

438.    Northwell continues to routinely send me marketing materials by USPS and email, although I am the last person on earth who would want these, and I want to be removed from its database.

439.    The Defendants' mission statements they could not have been further from reality in my case.  I request that the Court insist on Defendants behaving in a way that is consistent with their organizations' missions.

440.    The Defendant individuals with whom I have corresponded were not working to protect my rights; they were working to ensure the continuation of the Cuomo-Northwell racketeering enterprise.

441.    Staff learn from their superiors about whether an organization thinks it is acceptable to show empathy, and the behavior of the Defendants' employees whom I encountered demonstrated that empathy was not a part of these organizations' culture at all.  In fact, just the opposite – which conflicts with the welcoming, helpful public image they try to cultivate.

442.    The Northwell Health Nurse Choir recently performed at the White House.  Yes, employees of a Jewish company which practices human trafficking were singing "*We Need a Little Christmas*" for President and Mrs. Biden.  How much more farcical could it get than that, other

than perhaps a Christian company performing "*Tradition*" from *Fiddler on the Roof*?   (to paraphrase a recent Saturday Night Live joke).

**Twelfth Cause of Action:**
**NY Judiciary Law §487**
**(against Ms. James, the attorneys, and the law firms)**

443.    I hereby repeat and reallege paragraphs "1" through "442" herein, as if each been fully set forth at length.

444.    These attorneys and their firms violated NY Judiciary Law §487, which says: "An attorney or counselor who: (1) Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;  or, (2) Wilfully delays his client's suit with a view to his own gain;  or, wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for, is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

445.    As discussed in the foregoing, Mssrs. Bruno, May and their colleagues at KBR and HPMB deliberately and heedlessly published my PHI and other confidential information on the court dockets as if they were tabloid newspapers.  As stated above, when you pay for mental healthcare, you implicitly are also paying for the confidentiality that the psychiatric profession is supposed to guarantee. So, for the healthcare provider to deny you that privilege is a form of fraud, and the same goes for its attorneys because they are the provider's agents.

446.    The attorneys' false statements about me and other dirty tricks successfully convinced the judges to dismiss my cases.  Bruno accused me of lying in my federal case against Northwell (docket #181 page 3), which was false.  As stated in the foregoing, they repeated

unsubstantiated comments made by junior hospital staff in the records as if they were fact, and even fabricated statements completely to make me appear crazy (id., page 4).  Bruno stated that the staff "**had to**" restrain me, and I "**required** a sedative injection" as if these were necessary parts of their protocol rather than illegal acts of violence.

447.    When I pointed out their misconduct, these attorneys failed to correct their errors, and they lied to the courts about what they did, so their delinquency was malicious, and calculated to cause me emotional distress. Similarly, Alex refused to acknowledge that he had made serious errors of judgment.  Their errors were so fundamental, and their stonewalling reaction after I confronted them directly about their inaccuracy was so complete, that their statements could only have been made in bad faith.

448.    All of the attorneys covered up key documents, and most delayed proceedings, with the intent of running out SOL clocks and ensuring their success in the litigation.  Mr. Parker denied me a referral to protect the City Bar's cronies.  It is a matter for discovery to determine how much compensation the attorneys and the City Bar have taken from third parties to do what they did. The attorneys who concealed their third-party benefactors and those of their clients satisfied the "deceit or collusion" requirement of NY Judiciary Law §487(1).

### Thirteenth Cause of Action:
### Fraud
### (against all Defendants)

449.    I hereby repeat and reallege paragraphs "1" through "448" herein, as if each has been fully set forth at length.

450.    The elements of a fraud claim are 1) the making of a statement, 2) the falsity of the statement, 3) an intent to deceive, called "scienter", or reckless disregard as to its truth or falsity,

4) reasonable reliance on the statement by the injured party and 5) injury sustained as the result of the reliance.

451.    The attorneys lied about material facts in their pleadings, in courtrooms, and in depositions – to deprive me of my right to procedural due process after their clients had already deprived me of dozens of my other rights.  They defrauded me.  They knew their statements were false because I provided evidence to correct them.  But the judges believed my adversaries' lies instead of my truth, resulting in a waste of ten years of my life.  No amount of money could ever adequately compensate me for that.  They wasted a decade of my life, reduced my standard of living, and worsened my depression and PTSD.

452.    Like most people, I prefer my hospitalizations to be done for genuine healthcare reasons.  The fact that my detention at Northwell was transparently carried out for political reasons was evidence of fraud, and so was the subsequent cover-up by Defendants of the true motivations for the detention.

453.    The ongoing abuse of my confidential information by the company and its attorneys has been fraudulent. The fact that Northwell and its lawyers refused to correct my medical records after being faced with evidence that they made false statements refreshes my fraud claims.

454.    The attorneys needed to certify that they were (a) complying with NYSCEF's terms of use[26] in order to (b) post my private health information on the docket, and these two actions are mutually exclusive.  It was quite obvious that they did this knowingly and with intent to harm me, so their actions went beyond negligence.  They also needed to complete the NYSCEF user manual to be able to use the system.  They needed to certify their familiarity with the provisions of New York's Social Security Number Protection Law (GBL § 399-ddd), and 22 NYCRR § 202.5(e).  They must have done this, otherwise they would not have been able to file papers on NYSCEF.

---

[26] https://iappscontent.courts.state.ny.us/NYSCEF/live/termsOfUse.htm

455.    The fees that UHCPNY and Northwell charged were more than twice the market rate for a hospital bed in NY, so I should have received a quality of service on a par with the price, but Zucker was boot camp.  When insurance premiums are used to incarcerate the policyholder without a hearing, they are fraudulent, so all of the premiums that I paid UHCPNY under that policy should be considered fraudulent.  It is a matter for discovery to find out where the fees that my insurance policy paid to Northwell and its conspirators were actually deposited.  The fact that I asked for but never received final statements of account from the Defendants is further evidence of fraud; I have the right to know whether they think I owe them any money and to ask the Court to close the accounts.

456.    The biggest lies that these Defendants told were their oaths of office.  The lawyers' oath of office requires them to "solemnly swear (or affirm) that I will support the constitution of the United States, and the constitution of the State of New York", which they absolutely did not do, in my case.  The Constitution does not allow the Defendants to victimize litigants by publishing their PHI and defaming them on court dockets, nor does it allow them to cripple plaintiffs' due process rights.  Physicians must swear to do no harm, when they take the Hippocratic Oath, but it was clearly the intention of these doctors to harm me.  These so-called professionals need to be reminded of their oaths.

457.    The Defendants' fraudulent tactics look even sleazier when you consider how similar they are to classic scams such as the Fake Police Officer con, the Red Light Robbery, the phony Charity Solicitation, the gypsies' favorite Distraction Swindle, ATM skimmers and Credit Card ripoffs, the Accommodation Recommendations hustle, and the old Passport as Security for Debt trick.

**Fourteenth Cause of Action:**

**Defamation *per se***
**(against all Defendants)**

458.     I hereby repeat and reallege paragraphs "1" through "457" herein, as if each has been fully set forth at length.

459.     To establish defamation *per se*, four elements are generally required: (1) a false statement purporting to be fact concerning another person or entity; (2) publication or communication of that statement to a third person without privilege or authorization; (3) fault on the part of the person making the statement amounting to intent or at least negligence; and (4) some harm caused to the person or entity who is the subject of the statement.

460.     The HPMB and KBR attorneys filed the medical records and deposition transcript on the docket including the many false statements, without giving me the opportunity to make corrections, after I had pointed out that the statements were false.  The legal definition of "loathsome disease" for the purposes of defamation *per se* includes mental illness, such as the bogus Bipolar Disorder diagnosis that Northwell pinned on me.  In addition to actual Depression, I suffer from metaphorical ailments such as Major Oppressive Illness and Chronic Due Process Deficiency.  I am at risk of developing Psy Attica.  But I do not have Bipolar Disorder.

461.     Another criterion of defamation *per se* is a false inference that someone is unchaste, such as Dr. Hanna's accusation in the Northwell records that I had been having an affair with someone in the UK, which the attorneys placed on the docket with no corrections or comments. This information was disseminated to their conspirators.   But actual broadcasting of the information is not required; simply documenting it and leaving it in a place that is accessible to others meets the standard for defamation.

462.    The KBR attorneys relied on bombastic, patronizing psychobabble in their *ad hominem* attacks on me in their court briefs – using words such as "delusional", "manic", and "paranoid" – in an attempt to dupe others into believing that the hospital was justified in committing me.  In the absence of objective testing – of which Northwell and its cronies did none at all – these labels amounted to hate speech, and were no more scientific than slurs like "window-licker", "nutcase", or "lunatic".   A layperson might assume the worst on reading such pseudo-scientific, sensationalist adjectives applied to me, and mistakenly draw the conclusion that I was a dangerous individual.    These lawyers played fast and loose with unsubstantiated, emotionally charged words and exclamation points in lieu of evidence.  They weaponized every informational nugget that the hospital staff had gathered under false pretenses, and used them to discredit and embarrass my family and me.  As Dr. Anthony Fauci said in a congressional hearing on January 11th, this kind of disinformation "kindles the crazies out there" in society.  Like me, Dr. Fauci has had to deal with resulting harassment.

463.    Hypocritically, Mr. Dowling acknowledged in his 2018 book the deleterious effects of "the stigma surrounding mental health conditions"[27], at the same time that his lawyers were busily defaming me in court.

464.     These Defendants and their conspirators have destroyed my public image through their character assassination campaign, so I ask the Court to order them to conduct a character resurrection campaign.  With their collective PR power, this should be easy for them to achieve. Let the punishment fit the crime.

---

[27] *"Health Care Reboot"*, page 112.

**Fifteenth Cause of Action:**
**Abuse of Process**
**(against all Defendants)**

465.    I hereby repeat and reallege paragraphs "1" through "464" herein, as if each has been fully set forth at length.

466.    Abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective.

467.    Not only did the Defendants mislead me into believing that proceedings had been properly filed against me in Mental Hygiene Court as they were statutorily obligated to do under NYMHL §9.39 and §9.27, as discussed *supra*, but they also misused Mr. Ritchie's and my federal and state civil actions as an excuse to defame me and invade my privacy.  Northwell staff gave me some of the §9.39 and §9.27 paperwork in the hospital – although it was improperly served – and its attorneys gave me the rest in discovery for the Nassau case (see Exhibit A).  §9.39 and §9.27 say the paperwork **should** be filed with the Mental Hygiene Court.  This process is **not optional.**

468.    The Defendants didn't merely have their finger on the scales of justice – these Tyrannosaurs threw their entire collective weight onto the scales, to cheat me of compensation. The process began at JFK with PANYNJ's and NYC's false arrest and abduction, and continued through the Northwell ward and into the courts and the City Bar.  Giving me a FBI rap sheet without due process – or even so much as informing me – is scandalous abuse of process.

469.    Northwell and its attorneys wrongfully and maliciously – and with intent to injure me – extracted privileged information from me in discovery, while denying me legal counsel or any other form of human support, so that they could stab me in the back by publishing it on the

public dockets.   They did it again in the *Ritchie* case.   By covering up key documents and recordings, Northwell, BA, PANYNJ and NYC presented only a partial picture to the courts, thereby creating a biased view of the situation, and cheating me of justice.   By failing to redact my social security number, the Suffolk clerk exposed me to the risk of identity theft.   By obstructing the process of removing medical records from the docket with red tape, OCA has not only exposed me to risk of defamation, invasion of privacy and identity theft, but has also done the same to dozens of other doxed plaintiffs.   The lawyer referral process at the City Bar might also be considered "regularly issued process", which it obstructed.

470.     *Inter alia*, I am seeking reimbursement from the attorneys and their clients for all of the legal fees and costs that I will have incurred by the end of this action, plus damages, since they obtained judgments in their favor by bullying and deception.   I will quantify the costs at a later date.

**Sixteenth Cause of Action:**
**Breach of Fiduciary Duty**
**(against all Defendants)**

471.     I hereby repeat and reallege paragraphs "1" through "470" herein, as if each has been fully set forth at length.

472.     For the aforesaid reasons, I placed trust and confidence in Defendants to: (a) act to protect me from known dangers, (b) warn and advise me of known dangers, (c) advise me as to the knowledge of criminal activities by others that could affect me.   As such, fiduciary relationships existed between Defendants and me, either as a matter of law or as a matter of fact. When I made complaints to the Defendants, I provided them with privileged information, and ceded decision-making control to them.   They were therefore in a position of power over me, and owed me a duty to exercise the utmost good faith and honesty.   With the possible exception of the

defense attorneys, they also owed me loyalty.  However, even the defense attorneys owed me loyalty by association, because they owed loyalty to their clients, who owed loyalty to me due to their professional obligations as physicians and nurses.

473.    The Defendants had actual knowledge of facts and/or documents necessary to establish my causes of action against them, which was information to which I was entitled, but they intentionally concealed those facts and/or documents from me for the purposes of causing obstruction in my process of filing and litigating a legal complaint against their conspirators or themselves.

474.    Several Defendants accepted their duty to me while knowing that they had material conflicts of interest based on the contradictory motives of their cronies or their clients, which is a wanton breach of fiduciary duty.

475.    The acts and omissions of Defendants demonstrated a reckless and conscious disregard of my rights, health, and safety – and that of my loved ones, and other potential victims. These acts and omissions were so malicious, willful, and wanton as to give rise to punitive damages.

## Seventeenth Cause of Action:
## Unjust enrichment
## (against all Defendants)

476.    I hereby repeat and reallege paragraphs "1" through "475" herein, as if each has been fully set forth at length.

477.    The doctrine of unjust enrichment allows a plaintiff to recover from a defendant, without the benefit of an enforceable contractual obligation, where the defendant has unfairly benefited from the plaintiff's efforts without compensation. In New York, the elements of an unjust enrichment claim are "that (1) the other party was enriched, (2) at that party's expense, and (3)

that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011). The doctrine of unjust enrichment is available whether the defendant has obtained the money by wrongdoing, illegality, or even mere mistake. (See, e.g., *Parsa v. State of New York*, 474 N.E.2d 235, 237-38 (N.Y. 1984)). There is no enforceable contract between the Defendants and me.

478.   As discussed above, in the context of fraud and NY Judiciary Law §487, the attorneys and law firms cheated and lied to the courts, in order to exploit me illegally to generate income and benefits in kind. It is a matter for discovery to determine how much of this filthy lucre they collected. They caused me to waste thousands of hours fighting their lies in court. They kept drawing their paychecks for their "work" of abusing me over ten years, while I was suffering on low income. If they had told the truth about what they had done instead of covering it up, in any normal employment situation they would have been fired. The Court should throw the book at them.

479.   Northwell's fees of $3700 per day were both fraudulent and usurious; even if they were charged for legitimate services, which they were not, they were more than twice the average day rate for a hospital bed in NY at the time. UHCPNY/UHG was complicit in collecting them and preventing me from leaving the hospital. The City's fee of $600 for transport from JFK airport to the hospital was also fraudulent and usurious since I was coerced into using the service when I had my own vehicle.

## Eighteenth Cause of Action:
## Negligent or Intentional Infliction of Emotional Distress
## (against all Defendants)

480.   I hereby repeat and reallege paragraphs "1" through "479" herein, as if each has been fully set forth at length.

481.    The tort of intentional infliction of emotional distress (IIED) occurs when one acts abominably with intent to cause another to suffer severe emotional distress, such as issuing the threat of future harm.  In a *prima facie* IIED case, there are four elements: the defendant acts, his conduct is outrageous, he acts for the purpose of causing the victim emotional distress so severe that it could be expected to adversely affect mental health, and the defendant's conduct causes such distress.

482.    I discussed in the foregoing the shock, terror and humiliation of being falsely arrested, handcuffed, perp-walked and abducted at the airport – courtesy of BA, PAPD and EMS. I have had to revisit this feeling repeatedly over the past decade thanks to of the Defendants, e.g. when discovering my medical records twice on the dockets, when seeing the Defendants' fabrications about me in print or hearing their fiction in depositions, when experiencing flagrant discriminatory obstruction such as Alex's, and when reading judges' dismissal orders based on the Defendants' untruths.  I am exhausted from a decade of this emotional rollercoaster.

483.    The publishing of my medical records and confidential transcript on the court dockets by Northwell's attorneys and the City lawyers – aided by OCA and the Suffolk clerk – was unconscionable; it was designed to cause me distress because (a) they did not notify me in advance, (b) my repeated anguished complaints to and about these lawyers show that they did indeed cause me distress, and (c) they refused to take any corrective action.  The extent to which the Defendants carried out advance planning to cause me actual harm – as opposed to doing so spontaneously – is to be established in discovery.

484.    I have not received any assurances that my medical records have ever been removed from Northwell's or its conspirators' computer networks, although I have asked repeatedly for that to be done.  Zucker's executive director, Joseph Schulman, testified that over 1200 people have access to Northwell's Netsmart electronic clinical records system.  That is a large enough audience to be a small tabloid newspaper.  This number vastly exceeds the list of staff who actually needed

to work on my records, which demonstrates Northwell's lax security practices.  There were no firewalls to separate the need-to-know staff from those with no need to know.  I ask the Court to order the Defendants to remove my medical records from their IT systems permanently.

485.    By incarcerating me and confiscating my phone and computer, Northwell effectively handed over my money to my two ex-husbands without my consent, putting me at risk of total financial and career meltdown. My estranged second husband was a joint signatory on my bank accounts, and could have taken all of my funds while I was incarcerated – along with our house and my personal effects.  And, under UK law, because I was involuntarily detained in a psychiatric hospital, my first husband could have had me removed as Chairman of my company. He might also have been able to win custody of my younger son by using Northwell's allegations of my purported mental illness.  Northwell staff could have helped me to arrange paperwork to prevent this from happening, but they did not seem to care or even think about the emotional or other consequences of their behavior.

486.    The NYSAG's failure to discipline Alex showed that it not only condoned his abusive misconduct but actually intended to cause me suffering.

487.    I wanted to forget the ghastly experiences inflicted on me by my adversaries, but instead I have had to remember my suffering and write about it repeatedly for ten years, like a macabre version of *Groundhog Day*.  This effect was aided by the City Bar's refusal to find me an attorney. The deliberately delayed resolution of this matter – and the ballooning number of people I have had to get involved to seek resolution – is in and of itself evidence of IIED.

488.    The Supreme Court has held that mental and emotional distress caused by the denial of procedural due process itself is compensable under §1983, which as applies here, as discussed in the foregoing.

489.    As part of its fishing expedition, HPMB additionally inflicted emotional distress on my elderly, infirm parents and aunt – persecuting them for out-of-state depositions.  One of them

has dementia and is no longer competent to testify.  HPMB's sole explanation for wanting to depose my family members was that I had mentioned them in pleadings, and their buddy Judge Steinman complied, as he did for their every request.  This had the effect of further increasing my own emotional distress by causing my family's.  It is a statement on Northwell's utter moral bankruptcy that it failed to show a modicum of respect for my mother, a physician who referred dozens of patients to Northwell hospitals during her 40-year career in Internal Medicine, and was on staff at Glen Cove hospital (part of Northwell).  I ask the Court to put an end to Northwell's gratuitous, vulgar harassment of my family and me.

490.    Traumatic experiences in the mental health "care" system – including by extension the courts – can cause a "butterfly effect" that damages people's lives throughout a patient's family and social network, as it has done to mine. This is similar to the law of unintended consequences, which the intelligence community calls "blowback". Nobody should understand the potentially dangerous effect of this phenomenon on human brains better than psychiatrists. And yet shrinks still pretend that dragging patients back to their cave and hitting them on the head with the chemical equivalent of Neanderthal clubs is the treatment of choice in the 21st century.

491.    I am not seeking apologies from all of the Defendants, because apologies from most of them would be insincere.  However, I am pursuing confessions from them.  I think that formal apologies from the Defendants that I am not suing for damages would be appropriate.

492.    Absent judicial relief, Defendants will continue to violate my rights in an unconstitutional manner, and I will suffer imminent and irreparable harms.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, I, Plaintiff Lauren Andersen, demand judgment against the Defendants on all claims. I further request:

a)      Injunctive and declaratory relief, to avert the likelihood that illegal acts of the foregoing nature will continue to be committed by the Defendants, to create a permanent moratorium on the following practices that they have used against me:  unlawful detention, confiscation of property and funds, billing for "services" not requested, publishing of PHI and other confidential information, bad faith, gamesmanship, conflicts of interest, misrepresentations of the facts, rumormongering, deliberate indifference, harassment, deception, obstruction, retaliation, spoliation of evidence, hostile and/or covert surveillance, discrimination, red tape, delay tactics, confidence tricks, defamation and other character assassination techniques, against my loved ones and me;

b)      Rule 11 sanctions against the Defendants;

c)      Withdrawal of all documents pertaining to me that were shared with third parties, including *inter alia* the FBI under NYMHL §7.09(j)(1), which may have resulted in my disqualification under 18 USC §922(4)(d);

d)      Attorney's fees pursuant to 42 U.S.C. §1988 and other costs associated with the disbursement of this action, plus interest, and the previous litigation in which the Defendants also cheated, defrauded me, and lied to the courts;

e)      A seal on my clinical records and PHI on court dockets, and a seal on the *Ritchie* case in its entirety;

f)      Punitive damages, compensatory damages, and incidental damages in an amount to be determined at trial;

g)      Interest; and

h)      All other relief to which this Honorable Court may seem just, proper, or necessary.

No previous application for the relief herein prayed has been made, other than as described in the foregoing.

## IX.    **DEMAND FOR JURY TRIAL**

Plaintiffs hereby requests a trial by jury of any issue so triable as of right pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

_____

I hereby declare the foregoing to be true, to the best of my knowledge and belief, under penalty of perjury.

DATED:        February 11, 2022

Huntington, New York

Respectfully submitted,

_____
Lauren Andersen
Plaintiff, *pro se*

phone: 516-934-1985
Box 500, 126 Main Street
Cold Spring Harbor, New York 11724
myhumanrights2@gmail.com

## **LIST OF EXHIBITS**

Exhibit A:  Selected documents from Northwell Health records

Exhibit B:  Port Authority Police Arrest Report

Exhibit C:  City of New York Fire Department EMS "pre-hospital care report"

Exhibit D:  FOIL request follow-up email to the NYS Office of Court Administration

Exhibit E:  NYS Office of Court Administration FOIL response letter

Exhibit F:  NYS Unified Court System sample internal audit report

Exhibit G:  NYS Unified Court System CourtNet security policy

Exhibit H:  Partial transcript of call received from NYSAG healthcare bureau

Exhibit I:   Letter from Suffolk administrative judge's staff

Exhibit J:  Letter from Number 10 Downing Street

Exhibit K:  HIPAA release form

Exhibit L:  Deposition transcripts (reference material)